ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/14/2025 6:14 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00120-CV

# In the Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/14/2025 6:14:55 PM
CHRISTOPHER A. PRINE
Clerk

## STATE OF TEXAS,

*Appellant,*

*v.*

## HARRIS COUNTY, TEXAS, ET AL.,

*Appellees.*

On Appeal from the 165th District Court, Harris County, Texas
Cause No. 2024-63919, Hon. Ursula Hall, Presiding Judge

## BRIEF OF APPELLEES

Of Counsel:

Grant B. Martinez
Justin P. Tschoepe
Lily E. Hann
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
Phone: (713) 632-8000

**Christian D. Menefee**
Harris County Attorney

**Jonathan G. C. Fombonne**
Deputy County Attorney & First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov

**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5101

**ATTORNEYS FOR APPELLEES**

## IDENTITY OF PARTIES & COUNSEL

**Appellant**                                    State of Texas

**Trial and Appellate Counsel**        Ken Paxton
Brent Webster
Ralph Molina
James Lloyd
Kimberly Gdula
William D. Wassdorf
William H. Farrell (lead counsel)
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 059)
Austin, Texas 78711
Phone: (512) 936-1700
Fax: (512) 474-269
Biff.Farrell@oag.texas.gov

**Appellees ("Harris County")**
Harris County, Texas
Harris County Commissioners Court
Harris County Public Health
Lina Hidalgo, in her official capacity as Harris County Judge
Rodney Ellis, in his official capacity as Commissioner of Harris County Precinct 1
Adrian Garcia, in his official capacity as Commissioner of Harris County Precinct 2
Tom Ramsey, in his official capacity as Commissioner of Harris County Precinct 3
Lesley Briones, in her official Capacity as Commissioner of Harris County Precinct 4
Leah Barton, in her official capacity as Interim Executive Director of Harris County Public Health

| **Trial and Appellate Counsel** | Christian D. Menefee |
|---|---|
| | Jonathan G.C. Fombonne |
| | Tiffany S. Bingham |
| | Christopher Garza |
| | Eleanor Matheson |
| | Ryan Cooper |
| | Edward D. Swidriski III |
| | **OFFICE OF THE HARRIS COUNTY ATTORNEY** |
| | 1019 Congress Plaza, 15th Floor |
| | Houston, Texas 77002 |
| | Phone: (713) 274-5101 |
| | Fax: (713) 755-8924 |
| | |
| | Grant B. Martinez |
| | Justin P. Tschoepe |
| | Lily E. Hann |
| | **YETTER COLEMAN LLP** |
| | 811 Main Street, Suite 4100 |
| | Houston, Texas 77002 |
| | Phone: (713) 632-8000 |
| | Fax: (713) 632-8002 |

# TABLE OF CONTENTS

Identity of Parties & Counsel ...................................................................... ii

Index of Authorities ..................................................................................vii

Record References ......................................................................................xv

Statement of the Case ..............................................................................xvi

Issues Presented ...........................................................................................1

Introduction................................................................................................ 2

Statement of Facts .......................................................................................3

Statement of Procedural History................................................................ 8

Standard of Review ................................................................................... 11

Summary of the Argument........................................................................ 13

Argument................................................................................................... 15

I.      The Final Judgment Mooted the Temporary Injunction Order, which
        this Court Need Not and Should Not Review. ........................................... 15

II.     The Attorney General Lacked Authority to Represent the State in this
        Case in the Trial Court. .................................................................................16

        A.      Texas law did not authorize the Attorney General to represent
                the State in the district court in this case.......................................... 17

                1.      The text of the Constitution specifies and limits the
                        Attorney General's authority to represent the State in
                        district courts...........................................................................18

                2.      The Supreme Court confirmed the Attorney General's
                        lack of authority in the trial courts absent a clear statute. ........19

                3.      No statute authorizes the Attorney General to represent
                        the State in this case in the trial court.....................................21

        B.      The Attorney General has argued Harris County's position
                before, successfully. ....................................................................... 22

C. The Attorney General's arguments lack merit. ............................... 24

    1. The Attorney General has no inherent or common-law authority to represent the State in the trial courts. ................. 24

    2. The Attorney General's limited authority results from a deliberate reduction in his powers in 1876. .............................26

    3. The Attorney General's cases do not substitute for authority. ...................................................................... 28

    4. The Harris County Attorney's authority is not the issue before the Court.................................................................29

    5. This Court should reject the Attorney General's invitation to engage in judicial lawmaking. ..............................29

III. The State Did Not Affirmatively Establish the Trial Court's Jurisdiction. ................................................................................30

    A. *Ultra vires* claims did not overcome the governmental entities' immunity. ...................................................................... 31

    B. For the government officials, the State did not plead the essential standing element of traceability. .........................33

IV. The State Lacks a Viable *Ultra Vires* Claim Because the Program Is Constitutional. ..............................................................................36

    A. The Program is presumptively constitutional...................................37

    B. The Gift Clauses do not apply to relief for the poor. .........................39

    1. In 1876, care for the poor was understood to be the exercise of a local government duty to the community, not a gift to those helped. ...................................................... 40

    2. In 1876, Texans ratified the Gift Clauses to stop corporate welfare to railroads and similar commercial enterprises. ............................................................... 42

    3. Section 52(a)'s text does not support extending a ban on corporate welfare assistance to the needy............................. 44

    4. Contemporaneous interpretations refute the State's position.............................................................................47

C.     Even if the Gift Clauses apply, the Community Prosperity Program satisfies the Supreme Court's test. ....................................49

     1.     Harris County received return consideration. ..........................51

     2.     The Community Prosperity Program serves many public purposes. .............................................................................54

     3.     Harris County retains control over the funds. .........................60

     4.     The State's arguments about other constitutional provisions do not apply. ..........................................................66

D.     The Community Prosperity Program is authorized by § 52-a. ...........68

E.     The Community Prosperity Program does not violate the Equal Protection Clause.................................................................70

F.     The Court Must Affirm the Trial Court's Conclusion that the Community Prosperity Program Is Statutorily Authorized...............72

Conclusion and Prayer ......................................................................73

Certificate of Service.........................................................................75

Certificate of Compliance ..................................................................76

Appendix

# Index of Authorities

| Cases | Page(s) |
|---|---|

*Abbott v. Mex. Am. Legislative Caucus,*
647 S.W.3d 681 (Tex. 2022)........................................................................ 33, 34

*Agey v. Am. Lib. Pipe Line Co.,*
172 S.W.2d 972 (Tex. 1943) ...........................................................................25

*Alamo Heights Indep. Sch. Dist. v. Clark,*
544 S.W.3d 755 (Tex. 2018) ........................................................................... 11

*Atchison, Topeka & Santa Fe R.R. v. Jefferson Cnty. Comm'rs,*
21 Kan. 309 (1878) ..........................................................................................43

*Bell County v. Alexander,*
22 Tex. 350 (1858) ...........................................................................................42

*Bexar County v. Linden,*
220 S.W. 761 (Tex. 1920)........................................................................*passim*

*Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC,*
603 S.W.3d 385 (Tex. 2020) ......................................................................15, 16

*Borgelt v. Austin Firefighters Ass'n, IAFF Local 975,*
692 S.W.3d 288 (Tex. 2024) ....................................................................*passim*

*Brady v. Brooks,*
89 S.W. 1052 (Tex. 1905)............................................................................ 19, 20

*Brown v. De La Cruz,*
156 S.W.3d 560 (Tex. 2004)............................................................................29

*Campbell v. Bd. of Educ.,*
310 F. Supp. 94 (E.D.N.Y. 1970)..................................................................... 71

*Chambers-Liberty Cntys. Navigation Dist. v. State,*
575 S.W.3d 339 (Tex. 2019) ............................................................................32

*City of Aransas Pass v. Keeling,*
247 S.W. 818 (Tex. 1923)................................................................................57

*City of Dallas v. Albert*,
354 S.W.3d 368 (Tex. 2011) ................................................................. 35

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ................................................................. 31

*City of Elsa v. M.A.L.*,
226 S.W.3d 390 (Tex. 2007) .................................................................32

*City of Galveston v. State*,
217 S.W.3d 466 (Tex. 2007) .....................................................*passim*

*City of San Antonio v. Maspero*,
640 S.W.3d 523 (Tex. 2022) ....................................................................9

*Commissioners Ct. of Titus Cnty. v. Agan*,
940 S.W.2d 77 (Tex. 1997) .............................................................. 37, 38

*Cook County v. Wolf*,
962 F.3d 208 (7th Cir. 2020) (Barrett, J. dissenting) ...................................*passim*

*Davis v. City of Lubbock*,
326 S.W.2d 699 (Tex. 1959) .................................................................55

*Davis v. City of Taylor*,
67 S.W.2d 1033 (Tex. 1934) ..................................................................54

*Day Land & Cattle Co. v. State*,
4 S.W. 865 (Tex. 1887) .......................................................21, 24, 25

*Dohlen v. City of San Antonio*,
643 S.W.3d 387 (Tex. 2022) ................................................................. 35

*Downs v. United States*,
113 F. 144 (4th Cir. 1902), *aff'd*, 187 U.S. 496 (1903) ......................................44

*El Paso Elec. Co. v. Tex. Dep't of Ins.*,
937 S.W.2d 432 (Tex. 1996) ................................................................18, 21

*Ex Parte City of Irving*,
2024 WL 5172273 (Tex. App. [15th Dist.] 2024, no pet h.) ............................ 12

*Ex parte City of Irving*,
343 S.W.3d 850 (Tex. App.—Dallas 2011, judgment vacated
w.r.m.) ..................................................................................68, 69

*Florida ex rel. Shevin v. Exxon Corp.*,
526 F.2d 266 (5th Cir. 1976)..................................................26

*Friedman v. Am. Sur. Co. of N.Y.*,
151 S.W.2d 570 (Tex. 1941)...................................................67

*Garcia v. Laughlin*,
285 S.W.2d 191 (Tex. 1955)..............................................22, 24

*Gardner v. Children's Med. Ctr. of Dall.*,
402 S.W.3d 888 (Tex. App.—Dallas 2013, no pet.) ...................70, 72

*Hall v. McRaven*,
508 S.W.3d 232 (Tex. 2017)...................................................36

*Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*,
690 S.W.3d 32 (Tex. 2024) ....................................................15

*Hebert v. Hopkins*,
395 S.W.3d 884 (Tex. App.—Austin 2013, no pet.) ...................71

*Heckman v. Williamson County*,
369 S.W.3d 137 (Tex. 2012) ..............................................11, 36

*Heller v. Doe ex rel Doe*,
509 U.S. 312 (1993) ..............................................................70

*Hill v. Lower Colorado River Auth.*,
568 S.W.2d 473 (Tex. App.—Austin 1978, writ ref'd n.r.e.) ......24, 28

*Hogan v. S. Methodist Univ.*,
688 S.W.3d 852 (Tex. 2024) ..............................................39, 42

*Hous. Auth. of City of Dallas v. Higginbotham*,
143 S.W.2d 79 (Tex. 1940).....................................................56

*In re Abbott*,
628 S.W.3d 288 (Tex. 2021) (orig. proceeding) .........................66

*In re Abbott*,
   628 S.W.3d 288 (Tex. 2021) (orig. proceeding) .................................................67

*In re Abbott*,
   645 S.W.3d 276 (Tex. 2022) (orig. proceeding) .................................................34

*In re Gee*,
   941 F.3d 153 (5th Cir. 2019) .............................................................................34

*In re Lee*,
   411 S.W.3d 445 (Tex. 2013) ..............................................................................69

*In re State*,
   2024 WL 2983176 (Tex. 2024) (orig. proceeding) .....................................*passim*

*Isuani v. Manske-Sheffield Radiology Grp., P.A.*,
   802 S.W.2d 235 (Tex. 1991) ........................................................................16, 19

*Klumb v. Hous. Mun. Emps. Pension Sys.*,
   458 S.W.3d 1 (Tex. 2015) ...................................................................... 11, 36, 37

*Lewright v. Bell*,
   63 S.W. 623 (1901) ....................................................................................25, 28

*Longoria v. Paxton*,
   2022 WL 2208519 (5th Cir. 2022) ....................................................................23

*Matzen v. McLane*,
   659 S.W.3d 381 (Tex. 2021) ..............................................................................36

*Monghon v. Van Zandt County*,
   1886 WL 4550 (Tex. Ct. App. 1886, no writ) .............................................. 47, 49

*Mosaic Baybrook One, L.P. v. Simien*,
   674 S.W.3d 234 (Tex. 2023) .........................................................................33, 35

*Owens v. Alexander*,
   2019 WL 3334626 (Tex. App.—Dallas 2019, no pet.) .......................................72

*Patel v. Tex. Dep't of Licensing & Regulation*,
   469 S.W.3d 69 (Tex. 2015)..................................................................... 31, 32, 33

*Paxton v. Longoria*,
646 S.W.3d 532 (Tex. 2022) ........................................................23

*Paxton v. Simmons*,
640 S.W.3d 588 (Tex. App.—Dallas 2022, no pet.) ........................................34

*Perry v. Del Rio*,
67 S.W.3d 85 (Tex. 2001) ........................................................26

*Queen Ins. Co. v. State*, 22 S.W. 1048, 1052 (Tex. Civ. App. 1893)
*rev'd*, 24 S.W. 397 (1893) ........................................................28

*Roswell v. Cleaver-Brooks Sales & Serv., Inc.*,
2020 WL 897101 (Tex. App.—Houston [14th Dist.] 2020, no pet.)................. 15

*Smith v. State*,
328 S.W.2d 294 (Tex. 1959)........................................................20

*State ex rel. Downs v. Harney*,
164 S.W.2d 55 (Tex. App.—San Antonio 1942, writ ref'd w.o.m.) ............22, 24

*State ex rel. Durden v. Shahan*,
658 S.W.3d 300 (Tex. 2022) ........................................................20

*State v. Farmers' Loan & Tr. Co.*, 17 S.W. 60, 66 (Tex. 1891) ................................28

*State v. Hollins*,
620 S.W.3d 400 (Tex. 2020)........................................................ 29, 33

*State v. Moore*,
57 Tex. 307 (1882) ........................................................19, 24, 27

*State v. Stephens*,
664 S.W.3d 293 (Tex. Crim. App. 2022)........................................................ 27, 28

*Sullivan v. Univ. Interscholastic League*,
616 S.W.2d 170 (Tex. 1981)........................................................70

*Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp.*
*Comm'n*,
74 S.W.3d 377 (Tex. 2002) ........................................................ 4, 50, 60

*Univ. of Tex. v. Garner*,
   595 S.W.3d 645 (Tex. 2019) .....................................................69

*WCJ Assets, Ltd. v. US Trinity Bridgeport, LLC*,
   2023 WL 4115398 (Tex. App.—Fort Worth 2023, no pet.) ............................. 15

*Webster v. Comm'n for Lawyer Discipline*,
   2024 WL 5249494 (Tex. Dec. 31, 2024) ...................................... 16, 17, 18, 25, 26

*Yett v. Cook*,
   281 S.W. 837 (Tex. 1926) ......................................................28

CONSTITUTIONAL PROVISIONS, STATUTES, RULES & REGULATIONS

50 U.S.C. §3805 .................................................................... 71

Tex. Code Crim. Proc. Art. 35.11 ................................................... 71

Tex. Gov't Code § 402.021 ........................................................ 21

Tex. Loc. Gov't Code § 81.027 ....................................................72

Tex. Loc. Gov't Code § 381.003(a) ................................................69

Tex. Loc. Gov't Code § 381.004 ..................................................69

Tex. Const. art. III, § 50 ...........................................................39

Tex. Const. art. III, § 51 ...........................................................39

Tex. Const. art. III, § 52(a) ..............................................*passim*

Tex. Const. art. III, § 52-a...............................................57, 69, 70

Tex. Const. art. IV, § 22 ...............................................*passim*

Tex. Const. art. V, § 21...............................................18, 25, 1

Tex. Const. art. XI, § 2 .............................................................46

Tex. Const. art. XVI, § 6(a) ......................................................39

Tex. Const. art. XVI, § 8...........................................................46

Tex. Const. of 1869, art. IV, § 23 ...............................................................27

Tex. R. Civ. P. 12 ..............................................................................*passim*

31 C.F.R. § 35.6(b)(3)(ii)(A)(1) ................................................................3

19 Tex. Admin. Code § 5.5(g) ................................................................. 71

Act approved July 22, 1876, 15th Leg., R.S., ch. 55, § 4, 1876 Tex.
    Gen. Laws 51, *reprinted in* 8 H.P.N. Gammel, *The Laws of Texas
    1822-1897* (Austin, Gammel Book Co. 1898) .......................................... 47

Act approved Mar. 16, 1848, 2d Leg., R.S., ch. 98, § 3, 1848 Tex. Gen.
    Laws 113, reprinted in 3 H.P.N. Gammel, *The Laws of Texas 1822-
    1897* (Austin, Gammel Book Co. 1898) ...............................................42

Act of Dec. 20, 1836, § 25, *reprinted in* 1 H.P.N. Gammel, *The Laws of
    Texas 1822-1897* (Austin, Gammel Book Co. 1898) ..................................... 41, 42

**OTHER AUTHORITIES**

*Aid*, *Dr. Webster's Complete Dictionary of the English Language* (1864
    ed.) .....................................................................................45

*Aid*, *Oxford English Dictionary* ...........................................................45

Antonin Scalia & Bryan A. Garner, *Reading Law* 164 (2012) .......................... 47, 69

*ATTENTION, PAUPERS!*, The Dallas Daily Herald (June 15, 1877) ....................48

Barton H. Thompson, Jr., *The History of the Judicial Impairment
    'Doctrine' and Its Lessons for the Contract Clause*, 44 Stan. L. Rev.
    1373, 1405 (1992) .......................................................................43

Brenham Weekly Banner (July 12, 1878) ....................................................48

*Commissioners Court*, Brenham Weekly Banner (June 1, 1882) ...........................48

*Convention Proceedings*, Austin Weekly Statesman (Oct. 7, 1875)..................... 43, 44

George D. Braden et al., *The Constitution of the State of Texas: An
    Annotated and Comparative Analysis* 352 (1977) .............................*passim*

*Grant*, *Dr. Webster's Complete Dictionary of the English Language* (1864 ed.) .............................................................................................45

*Grant*, *Oxford English Dictionary* (2d ed. 1989) ........................................45

Jill S. Quadagno, *From Poor Laws to Pensions*, 62 Milbank Mem'l Fund Q. 417 (1984)....................................................................................40

*Local Intelligence*, Brenham Weekly Banner (Jan. 4, 1878) .....................48

Martha Doty Freeman, *Indigent Care in Texas*, 20 Index of Tex. Archeology 1 (2008) .....................................................................42

*Relief*, *Black's Law Dictionary* (1st ed. 1891) .........................................46

*TDHCA announces Housing Choice Voucher Program pre-application for wait-list to open May 2* (April 28, 2022), https://www.tdhca.texas.gov/news/tdhca-announces-housing-choice-voucher-program-pre-applications-wait-list-open-may-2 ......................70

*Texas—Facts and Fancies*, Austin American-Statesman (Aug. 16, 1878) ................48

Tex. Legis. Council, *Analyses of Proposed Constitutional Amendments and Referenda* 14 (Sept. 1987) ..................................................67

Texas Health and Human Services, *SNAP Food Benefits*, available at https://www.hhs.texas.gov/services/food/snap-food-benefits; 2.RR.21 ..............................................................................................5

Texas Health and Human Services, *TANF Cash Help*, available at https://www.hhs.texas.gov/services/financial/cash/tanf-cash-help;.............................................................................................5

U.S. Dep't of the Treasury, *Coronavirus State and Local Fiscal Recovery Funds*, 87 Fed. Reg. 4338 (Jan. 27, 2022) .......................................58

U.S. Dep't Treasury, *Coronavirus State and Local Fiscal Recovery Funds: Interim Final Rule*, 88 Fed. Reg. 64986 (Sep. 20, 2023).....................3, 58

# Record References

In this brief, citations to "App." refer to the tabs in the Appendix to this Petition. Citations to "CR.__" refer to pages of the clerk's record.

The reporter's record is cited as "[Volume].RR.[Page Number]." Because the exhibits in the reporter's record are not separately paginated, this brief cites to the specific page of the PDF in the relevant volume. For example, page 111 of the PDF for Volume 5 is cited as 5.RR.111.

Citations to "Br." refer to the appellant's brief.

# STATEMENT OF THE CASE

*Nature of the Case*    In *In re State*, 2024 WL 2983176 (Tex. 2024) (orig. proceeding), the Supreme Court expressed constitutional concerns about a Harris County pilot program to distribute federal funds to poor people. Following that decision, Harris County created a new program specifically designed to address those concerns. The State sued to stop this new program to provide relief to the poor. Its *ultra vires* suit seeks declaratory and injunctive relief.

*Trial Court*    165th Judicial District Court, Harris County, Texas

*Course of Proceedings*    The State applied for a temporary injunction. CR.7-26. Harris County filed a plea to the jurisdiction. CR.80-123. It also filed a Motion to Show Authority Under Rule 12, contending that the Attorney General lacks authority to represent the State in the district court in this case. CR.489-500.

*Disposition*    After hearings, the trial court denied the State's application for a temporary injunction, CR.471-72, and signed an Amended Final Judgment, granting the plea to the jurisdiction and the Rule 12 motion. App. 1. Because no person with authority to represent the State appeared, the Attorney General's trial-court pleadings have been struck. App. 1.

# Issues Presented

1. Whether the trial court erred in granting the plea to the jurisdiction and the Rule 12 motion. This issue includes the following sub-issues:

   a. ***Lack of Authority:*** Whether the Attorney General and attorneys from his office showed their authority to represent the State in the district court in this case.

   b. ***Ultra Vires Claims Against Entities:*** Whether the State affirmatively demonstrated that the Harris County governmental entities are not protected by governmental immunity in this *ultra vires* suit.

   c. ***Traceability to Specific Officials:*** Whether the State pleaded the traceability element of standing, when its petition lacks any allegations tying the challenged conduct to any specific government official.

   d. ***Constitutionality:*** Whether the State failed to affirmatively demonstrate a viable *ultra vires* claim because the Community Prosperity Program is constitutional.

2. Whether the trial court's order denying a temporary injunction was mooted by the final judgment.

## INTRODUCTION

Any honest reading of the 1876 Constitution requires dismissal of this lawsuit, the Attorney General's latest unsanctioned attempt to halt Harris County's poverty-alleviation work. *First*, the 1876 Constitution deliberately reduced and expressly limited the Attorney General's representation of the State in the trial courts and the Legislature has never enlarged that authority to include *ultra vires* suits against political subdivisions. In fact, the Attorney General has previously agreed that his authority to institute lawsuits in trial courts on behalf of the State is so limited. His brief cites no constitutional provision or statute authorizing him to represent the State in this case. So, the trial court properly struck his pleadings.

*Second*, and in any event, Harris County's Community Prosperity Program does not violate the Gift Clause—either under its original understanding when the 1876 Constitution was drafted, or under the Supreme Court's recently reaffirmed precedent. Following that court's constitutional concerns with a prior poverty-alleviation program based on a perceived lack of "public control over the funds," *In re State*, 2024 WL 2983176, at *3, the County's new program includes additional controls and public benefits throughout. The State's arguments against the new program rely primarily on bald assertions and fail to reckon with the record.

For these reasons and several others, the Court should affirm.

## STATEMENT OF FACTS

### State and Local Fiscal Recovery Funds

The federal government has provided Harris County with nearly $1 billion in pandemic-relief funds. Federal regulations expressly allow Harris County to use those funds for "cash assistance" to "households and individuals" at or below 300% of the poverty limit as part of "[r]esponding to the negative economic impacts" of the pandemic. 31 C.F.R. § 35.6(b)(3)(ii)(A)(1).

As recently as September 2023, the federal government reiterated that it "[r]ecogniz[es] that low-income households often experience deeper challenges recovering financially from a natural disaster."[1]

### Uplift Harris

In 2023, after considerable study, the Harris County Commissioners Court approved the Uplift Harris program "to address economic inequality and insecurity for low-income households most affected by the pandemic." 3.RR.6; *see* 3.RR.5-22, 24-25. Under Uplift Harris, selected Harris County residents would receive $500 monthly cash payments with few strings attached for 18 months. *In re State*, 2024 WL 2983176, at *1. Recipients would be chosen by lottery from among

---

[1] U.S. Dep't Treasury, *Coronavirus State and Local Fiscal Recovery Funds: Interim Final Rule*, 88 Fed. Reg. 64986, 64994 (Sep. 20, 2023).

applicants with income below 200% of the federal poverty line who either live in the top 10 poorest zip codes or participate in a particular Harris County public health program called ACCESS. *Id.*; 2.RR.10-11; 3.RR.6, 8, 24.

Throughout 2023, Harris County and its contractors worked to implement Uplift Harris. Participants expected the first round of assistance in April 2024.

### *The Supreme Court Weighs in on Uplift Harris*

In April 2024, the Attorney General sued. Having failed to obtain relief in the trial court or the Fourteenth Court, he petitioned the Supreme Court for relief. The Supreme Court, exercising its authority under Rule 52.10, granted the motion for temporary relief and prohibited all Uplift Harris payments until further order of that Court. *In re State*, 2024 WL 2983176, at *1.

The Supreme Court's order granting a stay offered a "preliminary" assessment of the merits but conspicuously focused on one issue. *Id.* at *3. The Court reasoned that the State "raised serious doubt that the Uplift Harris program can satisfy the 'public control' requirement of this Court's Gift Clause precedent." *Id.* at *4. That precedent requires that "a government in Texas that desires to dole out public funds must, among other things, 'retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment.'" *Id.* at *3 (relying on *Tex. Mun. League Intergovernmental Risk Pool v.*

*Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 384 (Tex. 2002)); *see id.* at *4 ("It appears there will be no public control over the funds after they are disbursed.").

### *Harris County Creates the Community Prosperity Program*

Harris County was eager to ensure its poor residents received relief, so, instead of awaiting a final resolution of the Uplift Harris litigation, it developed a new program with tighter controls to address the Supreme Court's concerns: the Community Prosperity Program (the "Program"). 2.RR.10, 5.RR.84, 88, 99. The Program is modeled on public benefits programs such as TANF and SNAP.[2] 2.RR.20-21, 43, 57. It uses federal funds to deliver $500 a month for 18 months to 1,850 participants; and, unlike Uplift Harris, it significantly restricts where and on what participants may spend the funds. 2.RR.11, 30, 41; 5.RR.84, 88, 99.

The Community Prosperity Program achieves the same goals as Uplift Harris, and the participants remain the same, but it functions differently. 5.RR.84, 99; 2.RR.9-10. It has three new, strict controls. These limit "what the funds can be spent on," restrict "the way that the funds are administered," and provide increased "insight" into how the funds are spent to guarantee more oversight. 2.RR.19. The

---

[2] "TANF provides cash payments to help families pay for food, clothing, housing and other essentials." Texas Health and Human Services, *TANF Cash Help*, available at https://www.hhs.texas.gov/services/financial/cash/tanf-cash-help; 2.RR.21. SNAP gives low-income households funds to buy food. Texas Health and Human Services, *SNAP Food Benefits*, available at https://www.hhs.texas.gov/services/food/snap-food-benefits; 2.RR.21.

controls differentiate the Program from Uplift Harris and address the Supreme Court's concerns.

*First*, participants agree that they will only use the funds for "basic needs" in a signed contract. 2.RR.20; 5.RR.111.

*Second*, to enforce that contractual restriction, participants must make purchases with a reloadable debit card that functions only at vendors serving basic needs. 2.RR.19-20, 30, 56-57; 5.RR.99, 106-07, 111. Harris County mandated these restrictions in its amended contract with its vendor GiveDirectly.[3] 2.RR. 24-26; 5.RR.88, 99.

*Third*, participants' account data is shared with GiveDirectly and the County, which have authority to audit by requesting additional documents from participants. 2.RR.20, 31, 35-37, 54; 5.RR.99, 111 ("Recipients will also consent to . . . [s]hare transaction-level spending data with GiveDirectly and Harris County Public Health."). These audit procedures are being designed "in response to the State of Texas' concerns over a lack of controls in the previous program." 2.RR.66.

In addition, the Community Prosperity Program retains three important controls from Uplift Harris. It exercises control on the front end by setting and

---

[3] GiveDirectly is the day-to-day administrator of the program operating under the County's supervision. 2.RR.16; 3.RR.65.

enforcing eligibility criteria. 2.RR.10-11, 35, 37-40; 5.RR.99,105, 111; *see also* 4.RR.85-86.[4] Additionally, Harris County releases funds to GiveDirectly in $5 million increments to "ensure that the program is being implemented with fidelity." 2.RR.17-18, 28; 5.RR.93. Finally, a participant who does not comply with the Program's terms will be removed. 2.RR.36, 81; 5.RR.99, 108.

Payments under the Program were originally expected to begin in January 2025. 2.RR.34, 36. Due to this litigation—and the injunction issued by this Court—the start date will be delayed. 2.RR.42-43.

---

[4] The County will invite those enrolled in Uplift Harris plus some individuals on the waitlist to apply for the Community Development Program. 2.RR.38-39, 41-42.

## STATEMENT OF PROCEDURAL HISTORY

Although Harris County specifically designed the Community Prosperity Program to ameliorate this Court's constitutional concerns, the Attorney General continues to object to Harris County helping the poor. He sued to enjoin the Program.

In September 2024, the State filed a petition alleging that the Program runs afoul of article III, § 52(a) (the "Gift Clause") and the Equal Protection Clause of the Texas Constitution. CR.7-26. It requested injunctive and declaratory relief. CR.24.

Harris County responded to the petition, opposing the request for injunctive relief and filing a plea to the jurisdiction. CR.80-469. Harris County showed that the trial court lacked jurisdiction: (1) because the program is constitutional and the State has no viable *ultra vires* claim; (2) because the State failed to connect any prospective, allegedly illegal acts to any particular defendant; and (3) because the Attorney General is not lawfully authorized to represent the State in the district court in this case. CR.95-122.

The trial court denied the motion for a temporary injunction and granted the plea to the jurisdiction. CR.471-74.

While the trial court maintained plenary jurisdiction, Harris County filed a motion to show authority under Rule 12.[5] The motion argued that the Attorney General lacked constitutional or statutory authority to prosecute this case in the district court and requested that the trial court strike the Attorney General's pleadings. CR.489-500; *see* Tex. R. Civ. P. 12.

After another hearing, the trial court granted the Rule 12 motion and signed an Amended Final Judgment, which replaced its prior order on the plea to the jurisdiction. App. 1 (CR.539-40). In the Amended Final Judgment, the Court ordered: "Unless a person who is authorized to prosecute this case on behalf of the State appears by November 25, 2024, . . . all pleadings filed in this action by the Attorney General purportedly on behalf of the State are stricken." App. 1. It also granted the plea to the jurisdiction and dismissed all claims and all parties for lack of jurisdiction. App. 1.

No person authorized to prosecute this case on behalf of the State appeared, so the Attorney General's pleadings have been struck.

The Amended Final Judgment is the judgment on appeal. Br. 13.

---

[5] Harris County filed a Rule 12 motion in addition to its plea to the jurisdiction because a successful motion and successful plea have different remedies. Rule 12 obligates the trial court to "strike the pleadings if no person who is authorized to prosecute . . . appears." Tex. R. Civ. P. 12. The proper remedy for a plea to the jurisdiction is dismissal of the case. *See, e.g.*, *City of San Antonio v. Maspero*, 640 S.W.3d 523, 533 (Tex. 2022) (dismissing claims for lack of jurisdiction).

On December 6, this Court entered an order enjoining Harris County "from distributing funds under the Program during the pendency of this appeal or until further order." Harris County's motion to vacate the injunction remains pending.

## STANDARD OF REVIEW

The "burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012). "A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018).

"When a jurisdictional plea challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction." *Id.* The "analysis begins with the live pleadings." *Heckman*, 369 S.W.3d at 150.

"If, however, the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates . . . the merits of a claim." *Alamo*, 544 S.W.3d at 770-71. For such pleas, "the standard of review mirrors that of a traditional summary judgment: '[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction.'" *Id.* at 771 (footnote omitted). The "trial court must rule on the plea as a matter of law if the evidence is undisputed or fails to raise a fact question." *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015).

"Whether a court has jurisdiction is a question of law, and we review a trial court's ruling on a plea to the jurisdiction de novo." *Ex Parte City of Irving*, 2024 WL 5172273, at *3 (Tex. App. [15th Dist.] 2024, no pet. h.) (citations omitted).

## SUMMARY OF THE ARGUMENT

As a threshold issue, the State is focused on the wrong order: the final judgment mooted the temporary injunction order, so it is not before the Court.

For all—or even one—of the reasons outlined below, the Court should affirm the final judgment.

*First*, the Attorney General lacked the authority to represent the State in the district court. The 1876 Constitution expressly limited the Attorney General's authority in the district courts to specific cases not relevant here. Although the Legislature can create new causes of action in favor of the State and authorize the Attorney General to prosecute such cases in the trial courts, it has not done so for *ultra vires* claims. The Attorney General cannot point to any constitutional or statutory authority to bring this suit for the State in the district court, so that court properly struck the pleadings and dismissed the suit.

*Second*, the State failed to carry its burden to establish the trial court's jurisdiction over any appellee. The Harris County governmental entities retain their governmental immunity against *ultra vires* claims. For the remaining appellees, government officials, the State did not plead the essential standing element of traceability. The trial court's lack of jurisdiction over any appellee independently required it to dismiss the suit.

*Third*, the trial court lacked jurisdiction because the State has no viable *ultra vires* claim that the Community Prosperity Program is unconstitutional. The Program complies with the Gift Clauses for three reasons: (1) the Gift Clauses do not apply to relief to the poor; (2) even if they did, the Program satisfies the Gift Clauses under the controlling test set out by the Supreme Court last year; and (3) the Program is independently authorized by another constitutional provision (art. III, § 52-a). The Program additionally complies with the Equal Protection Clause because Harris County acted rationally in distributing funds to achieve multiple rational public purposes. Finally, on appeal, the State has abandoned its allegation in the trial court that the Program lacked statutory authorization, so the issue is not before the Court. The State's lack of a viable *ultra vires* claim independently required the trial court to dismiss all claims.

For all these reasons, the Court should affirm.

**ARGUMENT**

## I. The Final Judgment Mooted the Temporary Injunction Order, which this Court Need Not and Should Not Review.

The State presents two issues for appellate review, but only one is properly before the Court. The trial court's order denying the temporary injunction was mooted by the entry of final judgment, so it is not reviewable on appeal. Thus, the only issue appropriate for this Court's consideration is whether the trial court correctly granted Harris County's plea to the jurisdiction and sworn motion to show authority under Rule 12.

A temporary injunction provides interim relief prior to a final judgment. *See Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024) (a temporary injunction is "intended to preserve the status quo until final judgment"). Once a final judgment is entered, no live controversy remains about the decision to grant or refuse such interim relief. *See Roswell v. Cleaver-Brooks Sales & Serv., Inc.*, 2020 WL 897101, at *1 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

So, when "a trial court renders a final judgment . . . the temporary[-]injunction order becomes moot." *WCJ Assets, Ltd. v. US Trinity Bridgeport, LLC*, 2023 WL 4115398, at *11 (Tex. App.—Fort Worth 2023, no pet.); *see also Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385 (Tex. 2020). In

*Bonsmara*, the Supreme Court observed that, at the end of the case, "appeals of some interlocutory orders—such as temporary injunctions—become moot because the orders have been rendered moot by subsequent orders," i.e., the final judgment. *Id.* at 395 (cleaned up). As a result, "temporary injunctions . . . can be the subject of interlocutory appeals but not of appeals from final judgments." *Id.*; *see also Isuani v. Manske-Sheffield Radiology Grp., P.A.*, 802 S.W.2d 235, 236 (Tex. 1991) (discussing temporary injunctions and mootness).

Because the order on the temporary injunction is moot and cannot be the subject of this appeal from a final judgment, Harris County's brief focuses on why the trial court correctly struck the Attorney General's petition and granted the plea to the jurisdiction.

## II. The Attorney General Lacked Authority to Represent the State in this Case in the Trial Court.

The Attorney General "exercises only those powers authorized by the Constitution or statute." *City of Galveston v. State*, 217 S.W.3d 466, 470 & n.25 (Tex. 2007) (Brister, J.); *accord Webster v. Comm'n for Lawyer Discipline*, 2024 WL 5249494, at *10 (Tex. Dec. 31, 2024) (recognizing attorney general's "authority comes from the Constitution and from statutes"). No statute or constitutional provision authorized the Attorney General to represent the State in this case in the district court. The appellant's brief does not cite any. That is dispositive.

Texas Rule of Civil Procedure 12 provides a mechanism (a sworn motion) for challenging attorneys' authority to represent a party in court. The burden is on the challenged attorney: "At the hearing on the motion, the burden of proof shall be upon the challenged attorney to show sufficient authority to prosecute or defend the suit on behalf of the other party." Tex. R. Civ. P. 12. When the attorney fails to meet that burden, the trial court must strike the pleadings: "Upon his failure to show such authority, the court shall refuse to permit the attorney to appear in the cause, and shall strike the pleadings if no person who is authorized to prosecute or defend appears." *Id.* That is what happened here. CR.489-501, 507-09, 537-40.[6]

This Court should affirm the final judgment's striking the petition and dismissing the claims brought by the Attorney General.

### A. Texas law did not authorize the Attorney General to represent the State in the district court in this case.

The Attorney General's lack of authority is evident from the plain text and history of the Constitution, Supreme Court decisions, and statutes.

---

[6] The appellant's brief does not contend that lawyers working for the Attorney General could somehow appear when the Attorney General himself cannot. *See Webster*, 2024 WL 5249494, at *11 (noting that such attorneys' "exercise of power is intertwined with and can never exceed the attorney general's" and that they "have no constitutional or statutory authority that is not derived directly from the Attorney General himself" (citation omitted)).

### 1. The text of the Constitution specifies and limits the Attorney General's authority to represent the State in district courts.

When it comes to representing the State in court, the 1876 Constitution limits the Attorney General's powers. The Attorney General is charged with "represent[ing] the State in all suits and pleas in the Supreme Court[.]" Tex. Const. art. IV, § 22. The Constitution gives him no authority to represent the State in the district courts, save for one narrow exception (inapplicable here) involving corporations and charters. *Id.* By contrast, the Constitution assigns county attorneys the duty to "represent the State in all cases in the District and inferior courts in their respective counties." Tex. Const. art. V, § 21. Thus, the express text of the Constitution divides the authority to represent the State and does not provide the Attorney General such authority in the district courts in cases like this one.

Commentators and courts have confirmed this basic division and limitation of authority. "Presumably, the draftsmen intended the local state's attorneys to handle trials and the attorney general to handle appellate work." George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 352 (1977) (App. 6); *see also El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996) (recognizing this constitutional division of authority); *City of Galveston*, 217 S.W.3d at 470 n.25 (same).

### 2. The Supreme Court confirmed the Attorney General's lack of authority in the trial courts absent a clear statute.

The Supreme Court contemporaneously confirmed the Attorney General's limited authority in the trial courts.[7] "Shortly after adoption of the constitution, Justice Stayton, who had been a delegate to the 1875 Convention, stated for the supreme court that indeed the constitution divided responsibility for representing the state with the attorney general to appear before the supreme court and county and district attorneys to appear in trial courts." *Id.* at 353. "This constitutional division of authority was mandatory, and a statute could not authorize the attorney general to file suit in behalf of the state without express constitutional authorization." *Id.* (citing *State v. Moore*, 57 Tex. 307 (1882)).

The Supreme Court later partially overruled *Moore* regarding the Legislature's ability to expand the Attorney General's authority via statute. The Court held that the Constitution permitted the Legislature "to create causes of action in favor of the state, and to make it the exclusive duty [of the attorney general] to prosecute such suits" in trial and appellate courts. *Brady v. Brooks*, 89 S.W. 1052,

---

[7]     The Attorney General misleadingly says he "has been representing the State of Texas in its district courts in civil matters" "[f]or well over a century." Br. 25 (citing Braden, *supra*, at 354). The Braden source cited makes it clear that this was not undisputed, but rather led to "a century of jurisdictional clashes with local state's attorneys." Braden, *supra*, at 355.

1054-57 (Tex. 1905).[8] Since *Brady*, "when the Legislature creates a new or additional cause of action in favor of the State it may also constitutionally authorize the Attorney General to prosecute such cause of action in both the trial and appellate courts of the State." *Smith v. State*, 328 S.W.2d 294, 295 (Tex. 1959).

The Supreme Court's recent decision in *State ex rel. Durden v. Shahan*, 658 S.W.3d 300 (Tex. 2022), further confirms the necessity of a statute authorizing the Attorney General to institute a suit in the trial court. The "authority to *represent* the state, however, does not necessarily include the authority to independently decide whether to *institute* a suit on the state's behalf. The Legislature must provide that authority by statute." *Id.* at 303 (citation omitted).

In both *Brady* and *Smith*, the statute providing the Attorney General authority to file suit in the name of the State in the trial courts was express and clear. *See Brady*, 89 S.W. at 1053 ("The Attorney General is authorized and required . . . to bring suit in the name of the state, in Travis county"); *Smith*, 328 S.W.2d at 294-95 ("The statute created a new cause of action in favor of the State and expressly authorized the Attorney General . . . to institute and prosecute the statutory suit thus created.").

---

[8]     *Brady* emphasized that the Legislature is not empowered "to authorize him . . . to represent the state in any case in any court." *Id.* at 1055-56.

Conversely, absent clear legislative authority, the Supreme Court has rejected the authority of the Attorney General to bring suit for the State in the district court. *See, e.g.*, *Day Land & Cattle Co. v. State*, 4 S.W. 865, 867-88 (Tex. 1887).

### 3. No statute authorizes the Attorney General to represent the State in this case in the trial court.

Given these precedents, the question is: has the Legislature created a "new or additional cause of action in favor of the State" for *ultra vires* claims and authorized the Attorney General to institute and prosecute such a cause of action in the trial courts? Not here. The appellant's brief cites nothing of the sort.

The Attorney General mistakenly relies on a statute permitting him to "prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals." Tex. Gov't Code § 402.021; Br. 26. But that statute conspicuously does not mention the district courts at all.

Further, the Supreme Court has expressly rejected the Attorney General's claim to "general authority to pursue civil claims on behalf of the State" (at 25) when it recognized that "there is no general statute authorizing the Attorney General to represent the State and its agencies in district court." *El Paso Elec.*, 937 S.W.2d at 438. Rather, "the Legislature has provided for such representation in particular types of cases" by enacting appropriate statutes. *Id.* But the Legislature has *never* passed a law giving the Attorney General the power to bring, or represent the State

in, *ultra vires* suits against counties and county officials. *Cf. City of Galveston*, 217 S.W.3d at 470 ("Nor does any statute specifically authorize such suits by the Attorney General," in the context of the State's suing political subdivisions.).

Because the Attorney General had no constitutional or statutory authority to represent the State in this case, or even to institute the suit in the first place, the district court correctly granted Harris County's Rule 12 motion, refused to permit the Attorney General and attorneys working in his office from appearing in the case, and struck the pleadings. CR.539-40; Tex. R. Civ. P. 12.

It also properly granted the plea to the jurisdiction. *See Garcia v. Laughlin*, 285 S.W.2d 191, 194–95 (Tex. 1955) (indicating that Attorney General's lack of authority would deprive trial court of jurisdiction); *State ex rel. Downs v. Harney*, 164 S.W.2d 55, 56-59 (Tex. App.—San Antonio 1942, writ ref'd w.o.m.) (dismissing cause due to Attorney General's lack of authority to institute suit).

### B. The Attorney General has argued Harris County's position before, successfully.

The Attorney General has successfully argued Harris County's exact points before. In the Fifth Circuit and the Texas Supreme Court, he argued: "Under the Texas Constitution, the Attorney General requires legislative authorization to represent the State in a trial court." Br. for Atty. Gen. of Tex. 37-42, *Paxton v. Longoria*, No. 22-0224 (Tex. Apr. 7, 2022) (excerpt in App. 7). He was right.

The Attorney General presented a thoroughly developed argument relying on many of the same authorities, reaching the same conclusion:

> Under this precedent, when the Legislature wants the Attorney General to be able bring a cause of action on behalf of the State, it typically must explicitly authorize the Attorney General to do so. . . . [The Supreme] Court has generally required a clear statement that expressly authorize the Attorney General . . . to institute and prosecute [a suit]. . . .

> Absent such clear evidence of legislative authorization, [the Supreme] Court has typically found that such authorization was lacking. . . .

> This silence is telling as the Legislature has demonstrated that it is well aware of how to assign a duty to the Attorney General.

*Id.* (quotation marks omitted).

The parties eventually agreed on this point, the Texas Supreme Court relied on their agreement to answer a certified question, and the Fifth Circuit ultimately held that the plaintiff's claims were barred by sovereign immunity because of it. *Paxton v. Longoria*, 646 S.W.3d 532, 541-42 (Tex. 2022); *Longoria v. Paxton*, 2022 WL 2208519, at *1 (5th Cir. 2022). The Court should embrace the Attorney General's clear, successful position: "Under the Texas Constitution, the Attorney General requires legislative authorization to represent the State in a trial court." App. 7 at 37.

## C. The Attorney General's arguments lack merit.

### 1. The Attorney General has no inherent or common-law authority to represent the State in the trial courts.

The Attorney General mistakenly maintains that he had the authority to represent the State in the district court based on some vaguely defined, inherent, extra-constitutional power derived from the common-law attorney general of England's power to represent the king in the courts of that country. Br. 25.

For nearly a century and a half, Texas courts have rejected the notion that the Attorney General has the power to bring suit on behalf of the State without an express constitutional or statutory basis for doing so. *See Moore*, 57 Tex. at 315–16.

Justice Stayton, the delegate to the 1875 Convention, wrote for the Supreme Court: "Finding no express law which authorized [the attorney general] to institute and maintain the suit, it would be difficult to hold that [he] had the implied power resulting from the general grants of power or imposition of duties. . . . [I]n a government in which the duties of all officers, as well as their powers, are defined by written law, no power ought to be exercised for which warrant is not there found." *Day Land & Cattle*, 4 S.W. at 867; *see also Garcia*, 285 S.W.2d at 194–95; *Harney*, 164 S.W.2d at 56–59; *Hill v. Lower Colorado River Auth.*, 568 S.W.2d 473, 479-80 (Tex. App.—Austin 1978, writ ref'd n.r.e.) (discussing the Attorney General's concession that his older authorities have been "interrupted" by *Garcia* and *Harney*).

- 24 -

Citing *Day Land & Cattle* and the constitutional provisions dividing power to represent the State in court, now-Chief Justice Brister wrote for the Supreme Court that the "Attorney General . . . exercises only those powers authorized by the Constitution or statute." *City of Galveston*, 217 S.W.3d at 470 & n.25 (quoting Tex. Const. art. IV, § 22; *id.* art. V, § 21).

At the end of 2024, the Supreme Court reiterated that the Attorney General's "authority comes from the Constitution and from statutes." *Webster*, 2024 WL 5249494, at *10. This decision helps cut through most of the Attorney General's out-of-context, uninformative quotations and musings here. In *Webster*, the Court considered many of the same cases, discussed the ancient English origins of the "common-law attorney general," and noted that the Attorney General is the "chief law officer of the State." *Id.* at *11-12 (discussing *Charles Scribner's Sons v. Marrs*, 262 S.W. 722 (Tex. 1924); *Agey v. Am. Lib. Pipe Line Co.*, 172 S.W.2d 972 (Tex. 1943); *Lewright v. Bell*, 63 S.W. 623 (1901)); *see* Br. 26.

Notwithstanding all the general rumination about discretion and chiefs and England, *Webster* concluded its discussion of the Attorney General's authority with a reaffirmation that it is limited and defined by the Constitution and statutes:

At the same time, of course, the "powers of the office of Attorney General are limited." Though he has "broad discretionary power in carrying out his responsibility to represent the State," "the Attorney General can only act within the limits of the Texas Constitution and statutes."

*Id.* at *12 (quoting, in second sentence, *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001)) (citation omitted). "[W]hile a state attorney general is the chief law officer of the realm, he does not exercise his authority as an unlimited monarch, governed only by his own judgment." *Id.* (quoting *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 276 (5th Cir. 1976) (Coleman, J., dissenting) (majority cited at Br. 25)). Courts cannot and should not, through resort to the common law, "enlarge" "the coordinate departments." *Id.*

Texas does not have a "common-law attorney general" like England, but rather a position whose powers are specified in detail by a written constitution. This Court should affirm the trial court's application of those limits.

### 2. The Attorney General's limited authority results from a deliberate reduction in his powers in 1876.

The Court should also reject the Attorney General's claim to inherent or common-law authority because the Attorney General's limited authority in trial courts is not accidental, but the result of deliberate, express reduction of his powers. "The 1869 Constitution directed the attorney general to represent the state before the appellate court, but it also gave him supervisory power over local state's

attorneys in most civil cases." Braden, *supra*, at 355; *see* Tex. Const. of 1869, art. IV, § 23 (requiring him to "superintend, instruct and direct the official action of the District Attorneys").

The 1876 Constitution stripped this supervisory power away. *See* Tex. Const. art. IV, § 22 (omitting any such power). The committee responsible for this change "probably was displeased with the theoretical subordination of local state's attorneys to the attorney general," and they retained "the 1869 Constitution's division of authority without any central supervision over the local trial attorneys." Braden, *supra*, at 355.

This express reduction in central, executive authority was consistent with the convention's approach to the 1876 Constitution. "The experience of Reconstruction prompted provisions to decentralize the state government. . . . To assure that the government would be responsive to public will, the constitutional convention precisely defined the rights, powers, and prerogatives of the various governmental departments and agencies." *State v. Stephens*, 664 S.W.3d 293, 294 (Tex. Crim. App. 2022) (Walker, J., concurring in denial of rehearing) (cleaned up).

Thus, those reformers decentralizing the government expressly reduced the Attorney General's power to control litigation for the State in the trial courts. In Texas, the People are sovereign, and their deliberate choice to limit the Attorney

General's authority in the trial courts should not be discarded by resorting to vague notions of inherent or common-law power.

### 3. The Attorney General's cases do not substitute for authority.

The Attorney General's out-of-context discussion of cases does not provide the requisite authority.

Many are unilluminating because they involved the Attorney General's express constitutional power (art. IV, § 22) to bring suit in trial courts against the unlawful actions of "private corporations," a power not at issue in this case. *See Lewright*, 63 S.W. at 623; *State v. Farmers' Loan & Tr. Co.*, 17 S.W. 60, 66 (Tex. 1891); *Queen Ins. Co. v. State*, 22 S.W. 1048, 1052 (Tex. Civ. App. 1893), *rev'd*, 24 S.W. 397 (1893).

Multiple authorities have recognized that early cases' broad pronouncements about the Attorney General's hypothetical inherent powers are "gratuitous statements and dicta." *Hill*, 568 S.W.2d at 479 (discussing *Queen*, *Yett v. Cook*, 281 S.W. 837 (Tex. 1926), and *Agey*); *see also* Braden, *supra*, at 354 (discussing "gratuitous statements in a few early cases" and citing *Queen*).

Several of the cites were immediately undermined by the Supreme Court. *Queen* was reversed, and the cited discussion in *Marrs* was deliberately omitted from the modified opinion on rehearing. *Marrs*, 262 S.W. at 729.

Finally, *In re State* and *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) do not support the Attorney General's authority because in neither case was the issue of the Attorney General's lack of authority raised, discussed, or adjudicated. Indeed, the Attorney General argues that his authority was not challenged in *Hollins*. Br. 29. Obviously, that prior litigation strategy cannot substitute for the constitutional and statutory authority the Attorney General lacks.

### 4. The Harris County Attorney's authority is not the issue before the Court.

Similarly, the Attorney General confuses the real issue here—his *own* lack of authority to represent the State in the district court—by arguing that the Harris County Attorney did not have the authority to independently "institute" this suit. Br. 25-26. But the Harris County Attorney did not file this suit, and his authority is not at issue here; the Attorney General's lack of authority is the issue on appeal.

### 5. This Court should reject the Attorney General's invitation to engage in judicial lawmaking.

Indeed, it is "possible" that the present suit could not have been brought "by any public official, attorney, or agency" because the Legislature has not unmistakably specified who could "institute" such a suit. *See Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004). Such an omission by the Legislature "does not give [this Court] the power . . . to legislate . . . to fill any hiatus [the Legislature] has left." *Id.* (citation omitted).

The Attorney General's assertion that this "simply cannot be right" is not a legal argument. Br. 30. His plea that he alone "should" be given the authority to "seek redress" on behalf of the State in this case, Br. 27, 30, is a policy argument properly addressed to the Legislature or to the voters of the State. It is not this Court's role to create an authority that the Legislature has never seen fit to grant him and that would contravene the 1876 Constitution's decentralizing power and expressly reducing the authority of the Attorney General in the trial courts.

<div align="center">*　　*　　*</div>

Because the Attorney General was not authorized to represent the State in the trial court by the Constitution or by statute, the trial court properly granted the Rule 12 motion and the plea to the jurisdiction.

## III.　The State Did Not Affirmatively Establish the Trial Court's Jurisdiction.

Another reason exists to affirm dismissal of the State's claims. The State's shotgun pleading names Harris County, its Commissioners Court, its health department, and various officials. CR.8-9. The entities have immunity, and the State has failed to show any connection between the officials it sued and the forthcoming payments the State seeks to enjoin. Together, the State has not shown jurisdiction over claims against any defendant.

## A. *Ultra vires* claims did not overcome the governmental entities' immunity.

Governmental immunity protects governmental entities even in suits by the State against political subdivisions. *See City of Galveston*, 217 S.W.3d at 468-69, 474; *City of El Paso v. Heinrich*, 284 S.W.3d 366, 369–70 (Tex. 2009). The State does not identify any legislative waiver of governmental immunity.

When claims are properly characterized as *ultra vires* claims, governmental entities retain their immunity. *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 76 (Tex. 2015). As the State recognizes, the "Supreme Court has distinguished between claims that an officer has exceeded his authority under a constitutional statute"—*ultra vires* claims—"and a claim that a statute is unconstitutional." Br. 18 (citing *Patel*, 469 S.W.3d at 76-77). In *Patel*, the Supreme Court held that "suits complaining of ultra vires actions may not be brought against a governmental unit, but must be brought against the allegedly responsible government actor in his official capacity." 469 S.W.3d at 76. So, "the State's *ultra vires* claim cannot proceed against the [County] itself. An *ultra vires* claim may name a government official in his official capacity, but the underlying governmental entity

remains immune from suit." *Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 348 (Tex. 2019).[9]

The State's petition and appellate brief show that its suit is properly characterized as an *ultra vires* suit. In its petition, the State explicitly uses the term "*ultra vires*" or otherwise describes its claims as being for actions taken without legal authority. *See* CR. 16 (Count 1 alleging Program "is an unlawful *ultra vires* act and should be enjoined"); CR.17 (Count 2 alleging "Harris County is without authority to carry out the program"); CR.17 (Count 3 alleging appellees "lack any legal authority" to create and implement the Program). The State's appellate brief, in turn, accurately characterizes these claims as *ultra vires*. Br. xiii ("The State of Texas brought an *ultra vires* suit against Harris County and certain county officials and entities[.]"); Br. 18 ("the State has a cause of action because County officials have acted *ultra vires*"). The State summarizes: "[T]he State has a cause of action against the County and its officials because they have exceeded their authority under state law." Br. 19.

---

[9] In *Patel*, the Supreme Court addressed *City of Elsa v. M.A.L.*, 226 S.W.3d 390 (Tex. 2007), on which the State relies (at 24), before reaffirming that *ultra vires* claims may not be brought against governmental entities. *Patel*, 469 S.W.3d at 76. The later-decided *Patel* and *Chambers-Liberty Counties* control, not *City of Elsa*.

The State's pleadings and appellate brief give away the game: the State brings *ultra vires* claims. The governmental entities retain immunity from such claims. *Patel*, 469 S.W.3d at 76.

## B. For the government officials, the State did not plead the essential standing element of traceability.

With respect to the remaining appellees—all county officials—the State has not met its burden to establish the traceability element of standing by tying the challenged action to any particular government official. [10]

"[T]o establish standing, a plaintiff must *plead* facts demonstrating that the plaintiff suffered an injury, this injury is fairly traceable to the defendant's conduct, and this injury is likely to be redressed by the requested relief." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 250–51 (Tex. 2023) (emphasis added). "[T]he party who invokes the courts' jurisdiction bears the burden of establishing these elements of standing; it is not the duty of the other side, or of the courts, to negate them." *Abbott v. Mex. Am. Legislative Caucus*, 647 S.W.3d 681, 693 (Tex. 2022) (quotation marks omitted).

---

[10]     *In re State* did not address traceability; it briefly touched on the injury-in-fact component of standing: "the State has a justiciable interest in assuring that its political subdivisions comply with Texas law." 2024 WL 2983176, at *4 & n.4; *see Hollins*, 620 S.W.3d at 409-10 (equating "justiciable interest" with injury). The Supreme Court alone can and should correct its erroneous conclusion that the State satisfies the injury element when it sues to enforce its own laws.

"[P]laintiffs who want the courts to pass judgment on the legality of government action must seek relief against the particular government official or agency responsible for the challenged action." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022) (orig. proceeding); *see also Mex. Am. Legislative Caucus*, 647 S.W.3d at 697-98 (citing *Paxton v. Simmons*, 640 S.W.3d 588, 602-03 (Tex. App.—Dallas 2022, no pet.)).

The Attorney General is adamant that courts must enforce this traceability requirement—including in litigation involving Harris County. *See, e.g.*, State's Resp. to Motion for Temporary Relief at 8-16, *State of Texas v. Harris County*, No. 23-0656 (Tex. Aug. 18, 2023). He argues: "standing is not dispensed 'in gross' and must be established for each defendant for each claim." *Id.* at 9 (quoting *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019)).

*Paxton* is in accord; it rejected an indiscriminate, dragnet approach to pleading. There, the plaintiff "joined all three possible government defendants and [took] no categorical position on which must remain but only that at least one must." 640 S.W.3d at 603-04 (quotation marks omitted). The plaintiff had not demonstrated the required connection between the challenged law and the defendants, so she had not "alleged sufficient facts to show the necessary standing element of traceability." *Id.*

Here, the State's petition lacks any allegations that any particular official is responsible for implementing the Program or making payments under it. It does not differentiate among officials. This failure means the State has not satisfied the traceability requirement of standing. It disposes of the State's claims against the various county officials.

The State's arguments on traceability fail many times over. *First*, the appellant's brief only addresses traceability for *two* of the *six* officials it sued. *See* Br. 22-23. It offers no justification for suing the remaining four officials. *Second*, on County Judge Hidalgo and Ms. Barton, the State only discusses evidence—some not even in the record here—of past actions; it does not tie them to any challenged future actions. Complaints about past actions do not suffice because "only prospective, not retrospective, relief is available in an ultra vires claim." *City of Dallas v. Albert*, 354 S.W.3d 368, 379 (Tex. 2011).

*Finally*, and most importantly, the State says nothing about the focus of this analysis—its live pleading. *See Mosaic Baybrook*, 674 S.W.3d at 250-51 ("a plaintiff must plead facts demonstrating that . . . injury is fairly traceable to the defendant's conduct"). "[A]nalysis of whether a party has standing begins with the plaintiff's live pleadings." *Dohlen v. City of San Antonio*, 643 S.W.3d 387, 398 (Tex. 2022)

(citation omitted). The appellant's brief does not discuss or cite the live pleading. Br. 21-23. Thus, the State has not showed that it met its burden to plead traceability.

<p style="text-align:center">*    *    *</p>

Because the State has not met its burden to plead traceability, the trial court lacked subject-matter jurisdiction over the claims against the government officials. Together with the governmental entities' immunity, the State has not met its burden to affirmatively demonstrate that the trial court had jurisdiction for its claims against any defendant, and the trial court had to dismiss the whole suit for want of jurisdiction. *See Heckman*, 369 S.W.3d at 150-51. The judgment should be affirmed.

## IV. The State Lacks a Viable *Ultra Vires* Claim Because the Program Is Constitutional.

"*Ultra vires* claims depend on the scope of a state official's authority." *Hall v. McRaven*, 508 S.W.3d 232, 234 (Tex. 2017). They do not turn on "the quality of the official's decisions" within that authority. *Id.* at 234, 242. If "the actions alleged to be ultra vires were not truly outside the officer's authority or in conflict with the law, the plaintiff has not stated a valid ultra vires claim and therefore has not bypassed sovereign immunity." *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021).

In determining whether official acted *ultra vires*, such that immunity is waived, courts "consider the pleadings and factual assertions, as well as any evidence in the record that is relevant to the jurisdictional issue." *Klumb v. Hous. Mun. Employees*

*Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015). If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law. *Id.*

Here, because Harris County has authority to pursue the Community Prosperity Program "[n]o waiver of immunity is alleged or supported on the record." *Id.* at 12 (affirming dismissal of *ultra vires* claims). Even though the Attorney General dislikes Harris County's policy decisions, the County acted consistently with the Constitution—and within its authority—for multiple reasons: (1) the Gift Clauses do not apply to relief for the poor; (2) even if they do apply, the Community Prosperity Program passes muster under *Borgelt v. Austin Firefighters Ass'n, IAFF Local 975*, 692 S.W.3d 288, 299 (Tex. 2024); and (3) Article III, § 52-a independently authorizes the Program. Additionally, the Program does not violate the Equal Protection Clause.

## A. The Program is presumptively constitutional.

Courts' review of decisions by a county's Commissioners Court is deferential. "A party can invoke the district court's constitutional supervisory control over a Commissioners Court judgment only when the Commissioners Court acts beyond its jurisdiction or clearly abuses the discretion conferred upon the Commissioners Court by law." *Commissioners Ct. of Titus Cnty. v. Agan*, 940 S.W.2d 77, 80 (Tex.

1997); *see also* Br. 31 (relying on same case). "If the Commissioners Court acts illegally, unreasonably, or arbitrarily, a district court may so adjudge." *Commissioners Ct.*, 940 S.W.2d at 80. But in "reviewing a Commissioners Court judgment for abuse of discretion, the district court has no right to substitute its judgment and discretion for that of the Commissioners Court." *Id.*

This deference helps courts fulfill their duty, emphasized last year by the Supreme Court in the leading case on the Gift Clauses, to "rigorously distinguish between policy conflicts and legal questions." *Borgelt*, 692 S.W.3d at 301. "Under our Constitution, policy choices belong to the other branches, and the judiciary may not second-guess them." *Id.* "Consistent resolution of cases in light of those precedents" interpreting the Gift Clauses "ensures that the courts' decisions flow from settled rules rather than ad hoc reactions to various governmental actions." *Id.*

A crucial part of *Borgelt*, on which the Supreme Court relied heavily, is the presumption that local governments' actions are constitutional and that local governments intend to comply with the constitution. *Id.* at 301, 302, 303 & n.17 , 304, 308. This presumption has special force in this case: Harris County's express goal in designing the Program was to ensure its compliance with the Constitution by following the Supreme Court's guidance. 2.RR.9-10, 19-20, 66; 5.RR.84, 106. Under the presumption, the "burden is on the party attacking the expenditure to show that

it is unconstitutional." *Id.* at 301 (brackets omitted). To meet that burden, the State "must show, and not ask the judiciary to assume, that the policy-making branches have" not followed the law and served the public. *Id.*

So, when Harris County Commissioners Court makes a reasonable legislative determination—based on months of analysis and study—about the benefits of a program, the purposes it serves, or the controls necessary to achieve those purposes, that legislative determination is entitled to deference from this Court. "The Gift Clause is important, but it was not intended as a tool for the judiciary to elevate itself above the other branches." *Id.* at 308.

## B.    The Gift Clauses do not apply to relief for the poor.

Relief to the needy is not "grant[ing] public money or thing of value in aid of, or to" as those terms were used by the Constitution's framers and understood by the Texans who ratified it. The Gift Clauses do not apply to, and do not bar, relief to the poor.[11]

In constitutional interpretation, courts' "bottom-line task is to identify what the constitutional provision would have meant to those who ratified [and framed] it." *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 857-59 (Tex. 2024). Courts

---

[11] The Gift Clauses include multiple constitutional provisions (Tex. Const. art. III, §§ 50, 51, 52(a); *id.* art. XVI, § 6(a)) but the State only alleged a violation of § 52(a), so that is the only provision at issue in this case. CR.15-16; *see Borgelt*, 692 S.W.3d at 298.

therefore "read the constitutional text not in a vacuum but also through the lenses of history and precedent." *Borgelt*, 692 S.W.3d at 299.

In *Borgelt*, the Supreme Court recited some of that history and precedent but noted that "further analysis of the Gift Clauses' original public meaning . . . could assist the courts and the public in understanding their contours." *Id.* at 300. So, Harris County starts with historical context, and then turns to text. Both reinforce the conclusion that the Community Prosperity Program is constitutional.

> **1. In 1876, care for the poor was understood to be the exercise of a local government duty to the community, not a gift to those helped.**

Since the Elizabethan Poor Law of 1601, the Anglo-American legal tradition has included government responsibility for the indigent.[12] Br. 4. And that government responsibility was traditionally carried out through local institutions: "The hallmark of the poor law was local autonomy." Jill S. Quadagno, *From Poor Laws to Pensions*, 62 Milbank Mem'l Fund Q. 417, 419-23 (1984) (App. 9).

In an opinion tracing the original meaning of "public charge," now-Justice Amy Coney Barrett showed that "state 'poor laws' . . . were in turn modeled on their English counterparts." *Cook County v. Wolf*, 962 F.3d 208, 239 (7th Cir. 2020)

---

[12] 43 Eliz. 1. c. 2 (App. 8).

(Barrett, J., dissenting).[13] Reflecting the inherited virtue of local autonomy, "towns and counties . . . made their own choices about how to" assist the needy. *Cook County*, 962 F.3d at 241.

Providing relief was universally acknowledged to be a government function serving a public purpose, and not a private gift. "Thus, when someone sought assistance from a city or county overseer of the poor, the cost of the relief provided was entered on the overseer's books as a public charge—that is, *an expense properly chargeable to, and therefore funded by, the public.*" *Id.* at 239 (emphasis added).

As in the rest of the country, care for the Texas needy has been a local government function no different from any other. *See* Br. 5-6. In its first year, the Congress of the Republic of Texas enacted a law providing for:

> [A] board of commissioners for their respective counties;
> which board shall have the entire superintendence and
> control of roads, highways, ferries, and bridges, *and of the
> poor* within said counties

Act of Dec. 20, 1836, § 25, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822-1897* at 1201, 1205-06 (Austin, Gammel Book Co. 1898) (emphasis added) (App. 10). That same law imposed "the duty of said board of commissioners to provide, at the

---

[13] All *Cook County* cites are to then-Judge Barrett's dissent.

expense of the county, for the support of indigent, lame, and blind persons, who are unable to support themselves." *Id.* at 1206, § 28.

Texas counties' duty to care for the poor was reaffirmed by the Legislature and Supreme Court prior to 1876. *See* Act approved Mar. 16, 1848, 2d Leg., R.S., ch. 98, § 3, 1848 Tex. Gen. Laws 113, reprinted in 3 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 113 (Austin, Gammel Book Co. 1898) (App. 11); *Bell County v. Alexander*, 22 Tex. 350, 364 (1858) ("The counties are entrusted with the duty, to provide for the support of indigent persons, resident in the county.").

As the State agrees, local autonomy and experimentation reigned. *See* Br. 5-6. In broad strokes, localities employed differing combinations of "'indoor' relief in the form of poorhouses" and "'outdoor relief'—in-kind and cash support without institutionalization." *Cook County*, 962 F.3d at 241. Traditionally, "Texas laws regarding the care of indigents were permissive"; and, "The population served by outdoor relief may have exceeded that served by institutions at all times." Martha Doty Freeman, *Indigent Care in Texas*, 20 Index of Tex. Archeology 1, 53 (2008) (cited at Br. 4).

### 2. In 1876, Texans ratified the Gift Clauses to stop corporate welfare to railroads and similar commercial enterprises.

The purpose of the Gift Clauses reinforces that they allow aid to the poor. As the Supreme Court observed, the Gift Clauses "were not merely abstract

enactments to pursue a concept of good government, but also responded to concrete issues." *Borgelt*, 692 S.W.3d at 299. The State agrees that § 52(a) was aimed at monied interests, not the needy, correctly noting that the provision was ratified in "response to the political patronage and corruption that ran rampant in the period following the Civil War." Br. 7.

"The basic reason" for the Gift Clauses in the 1876 Constitution was "to prevent the government from aiding private parties in their grandiose schemes to build railroads and other internal improvements." Braden, *supra*, at 226. This assistance to commercial enterprises was known as "aid bonds." *E.g.*, *Atchison, Topeka & Santa Fe R.R. v. Jefferson Cnty. Comm'rs*, 21 Kan. 309, 314 (1878). "Most often governments issued 'railroad aid' bonds and then used the money to buy stock in the proposed railroad." Barton H. Thompson, Jr., *The History of the Judicial Impairment 'Doctrine' and Its Lessons for the Contract Clause*, 44 Stan. L. Rev. 1373, 1405 (1992). "These giveaways had usually been obtained by gross corruption of legislatures." *Id.* at 232; *see generally Borgelt*, 692 S.W.3d at 299-300 (citing Braden and discussing "financial and political troubles" that motivated the gift clauses).

Indeed, the debate over the Gift Clauses focused entirely on the (un)desirability of corporate welfare for railroads. *See Convention Proceedings*, Austin Weekly Statesman, Oct. 7, 1875, at 2 (discussing amendment and railroads) (App.

12). Nowhere did the framers of the provision remotely raise the issue of poor relief or suggest that the provision was designed to prevent it. *Id.*

### 3. Section 52(a)'s text does not support extending a ban on corporate welfare assistance to the needy.

The language the 1876 framers chose, and ratifying Texans endorsed, for § 52(a) tracks the widespread concern about corporate welfare; it does not reject centuries' worth of precedent that care for the poor was a standard local government function. *See Borgelt*, 692 S.W.3d at 299. Section 52(a)'s text aims at commercial undertakings, not care for the poor.

That commercial aim is made clear in §52(a)'s last clause: prohibiting local governments from "becom[ing] a stockholder in such corporation, association or company" reveals a focus on commercial and monied interests, not the poor. *See* Thompson, *supra*, at 1405 (discussing the common practice of aid bonds and stock purchases).

The framers' use of "grant" and "aid" supports the County's position. In 1875-1876, neither the Constitution's framers nor its ratifiers would likely have understood the verb "grant" to include providing assistance to the poor. At the time, the verb *grant* was commonly employed to describe the act of a government bestowing benefits in response to a formal request, usually from an enterprise or individual engaged in commerce. *See, e.g.*, *Downs v. United States*, 113 F. 144, 147

(4th Cir. 1902) ("The word 'grant' . . . implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character, upon a corporation, person, or class of persons."), *aff'd*, 187 U.S. 496 (1903); *Grant*, *Oxford English Dictionary* (2d ed. 1989) (noting long use of "grant" as "To bestow or confer (a possession, right, etc.) by a formal act") (App. 13); *Grant*, *Dr. Webster's Complete Dictionary of the English Language* 585 (1864 ed.) ("Webster's 1864") (". . . usually in answer to petition") (App. 14).

Providing assistance to the poor would not have been understood to be *granting* anything because that assistance was a government *duty*, not some privilege bestowed on the poor. *See* Section IV.B.1. Thus, "grant" fits more naturally with an interpretation that does not reach assistance for the needy.

Similarly, when it comes to money, "aid" has long been associated with subsidies to those who are already well off. *See Aid*, *Webster's 1864* at 32 ("(*Eng. Law.*) An extraordinary grant of a subsidy or tax to the king by Parliament.") (App. 14); *Aid*, *Oxford English Dictionary* (noting historical use a subsidy to the crown and monetary contribution from feudal vassal to lord) (App. 15). And "aid" in that sense tracks perfectly the scourge of "aid bonds" Texans sought to stamp out with § 52(a).

For nineteenth century Texans, on the other hand, government assistance to the poor was not generally referred as "aid," but as "*relief*," a term of art in use since

at least 1601,[14] meaning, "The assistance or support, pecuniary or otherwise, granted to indigent persons by the proper administrators of the poor-laws." *Relief*, *Black's Law Dictionary* (1st ed. 1891) (App. 16); *see Cook County*, 962 F.3d at 241.

The Gift Clauses were adopted in 1876 as part of a constitution that recognized care for the needy as a traditional local government function for the public—not some private gratuity. The same Constitution that prohibited the Legislature from "authoriz[ing] any county . . . to lend its credit or to grant public money or thing of value in aid of, or to any individual," Tex. Const. art. III, § 52(a), also provided that "[t]he construction of jails, court-houses and bridges, *and the establishment of county poor houses and farms*, and the laying out, construction and repairing of county roads *shall be provided for by general laws*," *id.* art. XI, § 2 (emphases added); *id.* art. XVI, § 8. This list in art. XI reinforces that the framers and ratifiers of the constitution recognized care for the poor as a general government service like building courthouses, roads, and bridges—not a private gratuity.

Interpreting § 52(a) as the 1876 framers and ratifiers would have understood it—as not reaching poor relief—has the additional benefit of reconciling otherwise contradictory provisions framed and ratified at the same time. If § 52(a) prohibited

---

[14] 43 Eliz. 1. c. 2 (App. 8).

counties from using public resources to help *any individual* without limitation, including the poor, it would contradict the original article XI, § 2 and article XVI, § 8. The provisions can (and so must) be harmonized by reading § 52(a) not to apply to the traditional local government functions enumerated in the other amendments. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 164 (2012).

### 4. Contemporaneous interpretations refute the State's position.

Just a few months after ratification of the 1876 Constitution, the Legislature reinforced that relief to the poor was not covered by the Gift Clauses. It provided that county commissioners "shall have power, and it shall be their duty . . . To provide for the support of paupers." Act approved July 22, 1876, 15th Leg., R.S., ch. 55, § 4, 1876 Tex. Gen. Laws 51, 52, *reprinted in* 8 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 887, 888 (Austin, Gammel Book Co. 1898) (App. 17).

Courts understood that counties' "support" for the poor included many forms of direct relief: "Counties are required to provide for the 'support' of their paupers. 'Support,' as here used, means more than supplying them with food and clothing and a house to stay in. It means all that is necessary to bodily health and comfort." *Monghon v. Van Zandt County*, 1886 WL 4550, at *1 (Tex. Ct. App. 1886, no writ).

And in the years immediately following ratification of § 52(a), counties openly provided direct financial relief to paupers. Newspapers from the era consistently report on these efforts. *See, e.g.*, *Local Intelligence*, Brenham Weekly Banner, Jan. 4, 1878, at 3 (App. 18) ("Meanwhile the thirty-five or forty paupers will continue to draw their regular allowance from the county."); *ATTENTION, PAUPERS!*, The Dallas Daily Herald, June 15, 1877, at 2 (App. 19) ("all allowances to the poor outside of the poor farm will cease from this date"); *Texas—Facts and Fancies*, Austin American-Statesman, Aug. 16, 1878, at 3 (App. 20) ("Waller county pays out $2100 a year for supporting paupers" because the county lacked "a poor farm"); *Commissioners Court*, Brenham Weekly Banner, June 1, 1882, at 3 (App. 21) ("G.B. Cassels placed on pauper roll and allowed $7 per month from May 1st.") ("Charles McClellan . . . was declared a pauper and allowed $7 per month from May 1st."); Brenham Weekly Banner, July 12, 1878, at 2 (App. 22) ("Washington county needs a poor farm very much . . . We are now paying about $3600 a year for the support of the fifty paupers on the rolls.").

Thus, the framers and ratifiers did not understand the Gift Clauses to apply to poor relief. Mere months after ratification of those clauses, the Legislature required counties to provide "food and clothing" and "all that is necessary to bodily

health and comfort" to their poor residents. *See Monghon*, 1886 WL 4550, at \*1. And counties paid the poor cash allowances.

<p style="text-align:center">*    \*    \*</p>

Although it resists the outcome, the State concedes or does not dispute every step of the analysis leading to the inexorable conclusion that the Gift Clauses do not apply to relief to the poor.

At step one, it agrees that local governments have long helped the poor. Br. 4-6. At step two, the State agrees that Texas ratified § 52(a) to address "political patronage and corruption"—not to prohibit relief to the poor. Br. 7.

Finally, at step three, the State has no response to the well-established fact that, in line with an originalist reading of the text, counties continued to aid the poor—and indeed were obligated to—after the Gift Clauses were ratified. *See* CR.95-99 (making similar arguments in the trial court); *see* Sections IV.B.3-4.

In sum, the State is right that there is no "specific constitutional exception" to the Gift Clauses for assistance to the poor. Br. 32-33. For the reasons stated above, the Gift Clauses have never applied to poor relief at all.

### C. Even if the Gift Clauses apply, the Community Prosperity Program satisfies the Supreme Court's test.

Even if § 52(a) applies to relief to the poor, the Community Prosperity Program complies with the provision.

In *Borgelt*, the Supreme Court reiterated a three-part test to determine whether an expenditure satisfies § 52(a). 692 S.W.3d at 301 (relying on *Tex. Mun. League*, 74 S.W.3d at 383-84). The Program clears that test: (1) the assistance under the Community Prosperity Program "is not gratuitous but instead brings a public benefit"; (2) the Program's "predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party"; and (3) "the government retains control over the funds to ensure that the public purpose is in fact accomplished." *Borgelt*, 692 S.W.3d at 301; *see Tex. Mun. League*, 74 S.W.3d at 383-84.

As the dissent in *Borgelt* recognized, the State's "strict" approach to the Gift Clauses has been superseded by "multi-factor tests," first in *Texas Municipal League* and then in *Borgelt*. *Borgelt*, 692 S.W.3d at 316 (Busby, J., dissenting) (discussing *Bexar County v. Linden*, 220 S.W. 761 (Tex. 1920)).[15] Thus, the State's repeated exhortations that aid to individuals is strictly prohibited, and most of its citations to *Linden*, are distractions that should be ignored.

---

[15] In *Borgelt*, the State initially argued that *Linden* required the Supreme Court to hold that the expenditure of public funds must be limited to "strictly governmental purposes." Br. 9, 20-29, *Borgelt*, No. 22-1149 (Tex. Sept. 7, 2023). It abandoned that contention at oral argument. *Borgelt*, 692 S.W.3d at 300 n.12. The Court therefore reaffirmed the *Texas Municipal League* test. *Id.* at 301.

Instead, the Court should begin with the presumption that the Program is constitutional and conduct its analysis through that lens. *See* Section IV.A. Applying that presumption and considering all of the evidence before the trial court—not just the cherry-picked fragments the State has selected for its brief—it is clear that the trial court correctly granted the plea to the jurisdiction because the officials acted within their authority.

### 1. Harris County received return consideration.

A "political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Borgelt*, 692 S.W.3d at 301. "There need be only sufficient—not equal—return consideration to render a political subdivision's paying public funds constitutional." *Id.* (quotation marks and citation omitted). As the State observes, "consideration can take many forms." Br. 24.

Here, the program provides two primary return benefits to the County. Together, this consideration is "presumably proper and provide[s] sufficient return consideration" for Harris County. *Borgelt*, 692 S.W.3d at 302.

Most notably, Brandon Maddox, the Director of Planning and Innovation for Harris County Public Health, testified that the program "of course" benefits the County by "reducing poverty." 2.RR.9, 11. Harris County Commissioners Court

understood that there was "a significant risk that the working poor population will increase, . . . contributing to income inequality in the region." 4.RR.114. Economic inequity, in turn, "negatively impacts families and undermines our region's overall well-being and financial health." 5.RR.105. By reducing poverty, the Community Prosperity Program would forestall that communal downward trajectory, benefiting the County.

Additionally, Community Prosperity Program payments are not gratuitous because participants give the County illuminating data in return. Participants are contractually *required* to share their account data directly with GiveDirectly and with the County. 2.RR.31, 35, 37, 54; 5.RR.99, 111. They are also encouraged to participate in a survey of their financial status and spending habits. 4.RR.81. This corpus of detailed information is valuable. It allows Harris County to further refine the best way for the County to spend money on economic development and poverty alleviation in the future. Indeed, because the information is valuable, the County has hired a contractor to assess the impact of the program on participants and develop a model for scaling it if additional funding becomes available. 3.RR.6, 28, 38, 99-100; 5.RR.5, 12, 15.

The State downplays the consideration Harris County receives by making bald assertions unsupported by the record. Without citation, it says "Harris County gets

nothing for paying Program funds." The explicit, unrebutted evidence before the trial court shows that Harris County *does* receive return consideration: poverty reduction benefits the County; and the County uses the data participants *must* share it for its own ends. RR.31, 35, 37, 54; 5.RR.99, 111; 3.RR.28, 38, 99-100; 5.RR.5, 12, 15.

The State also incorrectly says the "Program's own website" shows the program has minimal requirements, but it cites the website for Uplift Harris—not the Community Prosperity Program. Br. 35. Wrong program.

The State fairs no better when it attempts to tackle one-by-one the benefits Harris County established. It contends that it is "no answer to simply say the program reduces poverty" (no citation). Br. 25. But the State's policy beliefs and *ipse dixit* cannot overcome evidence presented to the trial court. The County studied the issue and determined that poverty reduction returned a meaningful benefit. *See* 2.RR.11; 3.RR.5-16; 5.RR.105. That is a classic legislative determination warranting deference.

The State's contention that the study and the data sharing do not count because they are "mere participation in a giveaway" is also unsupported. Br. 36. The County showed that such information is helpful to it and demanded that participants

provide it. 2.RR.31, 35, 37, 54; 5.RR.99, 111; 3.RR.28, 38, 99-100; 5.RR.5, 12, 15. That evidence is uncontradicted.

The first element of the *Borgelt* test is satisfied.

### 2. The Community Prosperity Program serves many public purposes.

The Community Prosperity Program's "predominant objective" is to accomplish multiple "legitimate public purpose[s]." *Borgelt*, 692 S.W.3d at 301. Mr. Maddox testified that the Community Prosperity Program will: "reduce unemployment, reduce poverty, boost self-sufficiency and improve general health and educational outcomes for those participating in the program." 2.RR.10; *see* 2.RR.10, 12, 15, 17; 3.RR.24-25 (discussing return benefits); 4.RR.114. This testimony was not contradicted. *See* Br. 39-40 (citing no conflicting evidence).[16] The Program therefore satisfies the second element of the *Borgelt* test.

The Court must "presume that" the Community Prosperity Program's "predominant purpose is to accomplish a legitimate public purpose unless" the State shows "that it clearly is not." *Borgelt*, 692 S.W.3d at 304. Accordingly, "if an object is beneficial to the inhabitants and directly connected with the local government it will be considered a public purpose." *Id.* (quoting *Davis v. City of*

---

[16] Harris County has not abandoned any of the public purposes supported by the record. *Contra* Br. 37-38.

*Taylor*, 67 S.W.2d 1033, 1034 (Tex. 1934)). So "unless a court can say that the purposes for which public funds are expended are *clearly not* public purposes, it would not be justified in holding invalid a legislative act providing funds for such purposes." *Id.* (alteration omitted) (quoting *Davis v. City of Lubbock,* 326 S.W.2d 699, 709 (Tex. 1959)). "These standards protect the separation of powers and advance the principle of self-government." *Id.*

Ignoring that presumption, the State erroneously contends that the eligibility requirements are not tied to the public purposes. Br. 39. But the County determined that poverty and location-based eligibility criteria were the best way to achieve its purposes. Those criteria specifically targeted residents "adversely impacted by the COVID-19 pandemic and corresponding economic crisis." 3.RR.6. And the evidence shows that, "when you congregate those resources in the areas that need them the most," there are "community-level benefits." 2.RR.46, 89. The Program is grounded in research showing that financial assistance can increase employment and lead to "better physical health outcomes." 3.RR.7. The State offered no reasoned basis to second guess the County's policy decisions, and there is no single way to address complex issues.

The State wishes that Harris County had invested the funds in a different program and quibbles over the *primacy* of the public purposes, Br. 37-40, but it does

not meaningfully dispute that the purposes identified by Mr. Maddox are valid public purposes.

Reducing poverty has been an established public purpose for centuries. *See* Section V.B. And although the Attorney General thinks assistance to the needy confers *primarily* a private benefit, Br. 37, the Supreme Court has long recognized that assisting the poor provides a clear benefit to "the entire community." *See Hous. Auth. of City of Dallas v. Higginbotham*, 143 S.W.2d 79, 85 (Tex. 1940) (low-income housing); *see also Linden*, 220 S.W. at 763. ("[T]he care of the poor . . . intimately affect[s] all the people.").

Even the State "recognize[s] the importance of providing for the less fortunate." Br. 37; *id.* ("The State does not dispute that poverty relief is a laudable goal[.]"). Still, it contends that the Program's predominant purpose "seems to be to give away 'use-it-or-lose-it' money the County has lying around." Br. 39. It offers no citation to support that conjecture, which contradicts the record evidence. The State also objects that "the Gift Clauses do not contain an implicit carveout for assisting the poor," Br. 38, but that quip does not grapple with (a) whether the Gift Clauses' original public meaning applies to relief for the poor at all; or (b) whether poverty reduction is an important public purpose under the *Borgelt* test.

Encouraging economic development by boosting self-sufficiency and reducing unemployment, is another indisputably public purpose. *See* Tex. Const. art III, § 52-a. Undisputed testimony explained that the program was "expected" to achieve a number of goals associated with economic development, including reducing poverty and unemployment, and offering incentives to work. 2.RR.15; 3.RR.6-7 ("[A] monthly transfer of $500 will provide essential economic opportunities for households in poverty."). The State says the economic benefits are "too attenuated," Br. 38, but the informed judgment of the County receives deference, not the State's unsupported assertion.

Offering relief to recover from a public calamity (here, the COVID pandemic) is yet another well-established public purpose. Article III, § 51 (the Gift Clause applying to the Legislature) carves out disaster-relief spending from the prohibition on gifts: "[T]he provisions of this Section shall not be construed so as to prevent the grant of aid in cases of *public calamity*." Likewise, "[t]he use of . . . counties as agents of the state in the discharge of the state's duty is in no wise inhibited by the Constitution." *City of Aransas Pass v. Keeling*, 247 S.W. 818, 820 (Tex. 1923). A county program granting aid in response to a public calamity serves a proper public purpose.

The State does not dispute that COVID is a public calamity or that recovering from a calamity is a proper public purpose. Br. 38. It likewise does not dispute that "the poor were disproportionately impacted by COVID's consequences." 2.RR.123. Its only argument is that the Program is not "link[ed]" to COVID relief. Br. 38. That is easily rebutted by the record. Mr. Maddox testified that the payments were "to address disparities caused by COVID-19." 2.RR.11. Harris County noted in the trial court the rules implementing ARPA recognized that "the people that were most likely to be impacted by the COVID pandemic were poor people." 2.RR.102. [17] And the exhibits presented during the hearing echoed the "link" between the Program and COVID recovery. 3.RR.5-6; 4.RR.29-30, 113-14, 116; 5.RR.92, 105. In response, the State says only that "COVID is over." Br. 38. But that is no response at all.

<p style="text-align:center">*     *     *</p>

The fact that the recipients receive some private benefit does not defeat the overwhelming public purposes of the Community Prosperity Program. "*Some private benefit will almost inevitably arise from government payments to non-government entities or individuals; the Gift Clause does not treat such an inevitability as a poison pill that dooms a much larger public objective.*" *Borgelt*, 692

---

[17] *See* U.S. Dep't of Treasury, *Coronavirus State and Local Fiscal Recovery Funds*, 87 Fed. Reg. 4338, 4388, 430-41 (Jan. 27, 2022); U.S. Dep't Treasury, *Coronavirus State and Local Fiscal Recovery Funds: Interim Final Rule*, 88 Fed. Reg. 64986, 64994 (Sep. 20, 2023); *see also* 5.RR.105.

S.W.3d at 304. Thus, because the Community Prosperity Program advances "important public purposes," it is no matter that "accomplishing those purposes also leads to some collateral private benefit." *Id.* at 304.

To the extent the State's argument turns on potential misuse of the funds, its concerns are unfounded and not constitutionally significant. Participants are contractually bound to spend the money in ways that facilitate the program's public purposes. 5.RR.111. Misuses "would constitute potential violations, not manifestations" of the contract and the Program. *Id.* at 308. "Not all contractual violations (indeed, very few) are of *constitutional* significance. If it were otherwise, all aspects of government functioning would become constitutionalized under the Gift Clause, effectively turning Texas courts into full-time hall monitors who oversee the minute operations of the rest of the government. The Gift Clause is important, but it was not intended as a tool for the judiciary to elevate itself above the other branches." *Id.*

The Community Prosperity Program ensures that the program's clear public benefits predominate by exercising the controls described in the next section. *See id.* at 304-05, 309 (examining same provision in public purpose and controls analyses).

### 3. Harris County retains control over the funds.

The Community Prosperity Program employs controls "to ensure that the public purpose" of providing relief to the poor is "accomplished." *Borgelt*, 692 S.W.3d at 301, 308-10; *Tex. Mun. League*, 74 S.W.3d at 384. Indeed, among the most significant differences between Uplift Harris and the Community Prosperity Program is the County's heightened level of control over the funds.[18] *See* 5.RR.106 (noting that CPP "has introduced more controls with stricter guidelines and spending restrictions").

The County tightly controls where, how, and on what participants may spend their funds. *See* 5.RR.99, 106, 111. These controls "ensure that funds are used responsibly and align with the program's focus on supporting basic needs." 5.RR.106.

### *Overview of the Controls*

There are six principal controls. The first three are new and significantly differentiate this program from Uplift Harris.

***First***, participants agree to restrict their purchases to "basic needs" in a signed contract. 5.RR.106. Each participant must sign an attestation accepting the

---

[18] The State suggests that the controls must be "'specifically tailored' to link the expenditures to the predominately public purpose they purport to serve." Br. 40. Neither *Borgelt* nor *Texas Municipal League* uses such language.

"terms and restrictions" of the Program, including that the "financial assistance provided *must* be used for basic needs, including housing-related expenses, utilities, transportation, groceries, medical care, education, clothing, and other goods and services." 5.RR.111 (emphasis added).

Courts must assume that recipients will "comply with these requirements." *Borgelt*, 692 S.W.3d at 310; *id.* at 293 ("We assume . . . the parties will adhere to their agreement."). And as Mr. Maddox testified, in programs like SNAP and TANF "the vast majority of participants" *do* "follow whatever rules or guidelines are in place." 2.RR.92.

***Second***, to enforce that contractual restriction, participants must make purchases with a reloadable debit card. 5.RR.99, 111. They cannot make cash withdrawals. 5.RR.99, 106; 2.RR.31. The debit card functions only at vendors with a qualifying Merchant Category Code (MCC).[19] 2.RR.19-21, 30, 56-57, 64; 5.RR.99, 106-07. Harris County carefully generated the list of acceptable MCCs—those supporting basic needs—by referring to constitutionally sound programs such as TANF and SNAP. 2.RR.20-21, 56-57, 60-62; 5.RR.107; 6.RR.5-53. The State does not dispute that the debit card functions only at qualifying vendors. Br. 41.

---

[19] An MCC is a number assigned by the payment processor based on the goods or services the business provides. 2.RR.20-21; 5.RR.99, 107.

*Third*, the County monitors participants spending in two ways. Participants' account data is shared automatically with GiveDirectly and the County. 2.RR.20, 31, 36-37, 54; 5.RR.99, 111. And Program participants consent to having their transactions "audited for compliance purposes" to "ensure that the funds are being used in alignment with the program's goals and requirements[.]" 5.RR.111; 2.RR.35-37. They contractually agree to "provid[e] necessary documentation if requested." 5.RR.111. These procedures were designed "in response to the State of Texas concerns over a lack of controls in the previous program." 2.RR.66.

*Fourth*, in addition to these new controls, the Community Prosperity Program, like Uplift Harris, exercises control on the front end: it restricts who may participate to ensure it is effective at achieving its stated goals. Each participant must have a household income below 200% of the federal poverty line and either be a member of the ACCESS Harris County Initiative or, alternatively, live in one of the top-10 poorest zip codes in Harris County. 5.RR.105, 108, 111; *see* 2.RR.10-11, 40; *see also* 4.RR.85-86. When enrolling in the Community Prosperity Program, participants must sign an attestation confirming that they still meet the eligibility requirements. 2.RR.35; 5.RR.107, 108, 111.

*Fifth*, Harris County releases funds to GiveDirectly in $5 million increments. 2.RR.17-18, 28; 5.RR.93. By dispensing only a limited amount of money at a time,

Harris County "ensure[s] that the program is being implemented with fidelity." 2.RR.18. The State ignores this aspect of why Harris County dispenses payments incrementally. *See* Br. 44.

***Finally***, if a participant somehow evades these controls and does not qualify or misspends funds, he or she will be removed from the program for non-compliance. 2.RR.36, 81; 5.RR.99, 108. Harris County has an effective auditors' office that would inform the process for the Community Prosperity Program. 2.RR.93-94; *see* 3.RR.86 (requiring GiveDirectly to report fraud, waste, and abuse). As part of its contract with the County, GiveDirectly is required to "take appropriate actions" if it becomes aware of "any violations of the program's restrictions." 5.RR.99.

Together, these controls ensure that the public purposes are accomplished. By restricting the items that participants may purchase, the County ensures that participants "basic needs" are met—lifting communities out of poverty, resolving the inequities exacerbated by the pandemic, and providing a secure floor from which participants can support the economy by seeking work and spending money. The Community Prosperity Program's controls satisfy the deferential review applicable here.

### The State's Arguments Are Wrong

The State's arguments that the Program lacks sufficient controls are wrong. Br. 40-45.

The State's overarching critique is that the County will not automatically receive information showing item-by-item purchases. It conflates that with the County remaining "completely unaware of what may be purchased with the funds as long as the purchases are made at a vendor with an approved merchant category code." Br. 41-43. There are several problems with this argument.

From the outset, the State inherently downplays the significance of requiring participants to make purchases at only a sliver of all existing vendors, which necessarily restricts how funds are spent and limits them to vendors primarily satisfying basic needs. This is an about face from its position in the trial court, where the State agreed that, if an approved vendor sells a product, the purchase is "presumably acceptable." 2.RR.60.

Moreover, the County *does* have insight into what participants do with the funds. Participants are contractually bound to limit their purchases to discrete "basic needs," *and* they must provide additional information about their specific purchases if requested. This latter control is a "mechanism for ascertaining whether participants adhere to that promise." Br. 42. Independently and together, these

controls contradict the State's unfounded assertion that the County has no mechanism to "verify[] how the money is spent." Br. 12.[20]

Exercising item-level control via the reloadable debit card, as the State would prefer, "just isn't feasible for this type of program," nor is it necessary for the Program to be constitutional. 2.RR.55. "If the legislature concludes that greater restraints are necessary to ensure obedience to the Gift Clause, it can create new mechanisms to hold local governments accountable." *Borgelt*, 692 S.W.3d at 310. But making that policy decision is beyond the scope of this Court's authority.

The State also mischaracterizes the controls by arguing that the County is merely "asking recipients to comply with the Program requirements." Br. 42-43. The County is not asking recipients to comply; it requires that they do. Participants must sign a contract pledging to adhere to the spending limitations. 5.RR.111. They can be audited, and they will be removed for non-compliance. 5.RR.99, 108, 111.

In *Borgelt*, the Supreme Court confronted a similar critique—that recipients of funds might spend them improperly and outside the contractual bounds. Rejecting it, the Supreme Court opined that the challenged conduct was "not authorized by or the necessary fruit of the agreement; it would breach that agreement. Under ordinary

---

[20] The State mischaracterizes the controls, stating that "the County relies on chance and word of mouth to ensure that the funds are not used in a way the Community Prosperity program disallows." Br. 12. As described above, it relies on contractual controls and audit rights.

contract-interpretation principles, . . . we must read the agreement to authorize only lawful conduct." *Borgelt*, 692 S.W.3d at 294 (holding contractual provision did not violate the Gift Clauses). Violations of the Gift Clauses "require far more than occasional breaches of [an] agreement." *Id.* Until the State presents evidence that these controls do not work, they are sufficient to pass constitutional muster.

The State finally notes that Harris County has not finalized its audit procedures, but it is not a knock on the Program that its constitutionally sufficient controls might be subsequently enhanced. *See* Br. 44.

\*      \*      \*

This case is similar to *Borgelt*. There, the Supreme Court concluded: "We do not and are not asked to *endorse* [the program]; we simply conclude that, whether [it] is wise or foolish, the agreement's text constrains [payments] to uses that satisfy our 'public purpose' jurisprudence." *Id.* at 307. So too here.

### 4. The State's arguments about other constitutional provisions do not apply.

The State makes the confusing argument that "no other constitutional provision authorizes the Program." Br. 46. Aside from § 52-a (addressed below), Harris County does not rely on any of the provisions the State discusses to authorize the Program. To the extent the State intends its survey of later-enacted

constitutional provisions to be used to interpret § 52(a), its reliance is misplaced. Br. 7-9; 46-49. Subsequent enactments do not inform the original meaning of § 52(a).

Later additions cannot change the meaning of unamended text "as it was understood by those who ratified it," which is the meaning that matters. *See In re Abbott*, 628 S.W.3d 288, 296 (Tex. 2021) (orig. proceeding).

Additionally, the Supreme Court has recognized, in rejecting a Gift-Clause challenge, that those amendments are just as likely to be matters of political expediency rather than necessity: "[T]he history of the submission of constitutional amendments in this State will prove that not all of them have been submitted in order to create a legislative power. Some few have undoubtedly been submitted to ascertain the will of the people, and to enable them to express such will regarding a governmental policy." *Friedman v. Am. Sur. Co. of N.Y.*, 151 S.W.2d 570, 580 (Tex. 1941); *accord* Braden, *supra*, at 235-36 ("One can only conclude that [art. III, §51-a] was a device to get public approval of the program. Once the unnecessary provision got into the constitution, every change would naturally follow the same route.").

The State relies on *Linden*, to argue that these addendums can in fact change the meaning of unamended text. Br. 8, 47. But *Linden* "has only the remotest rational connection" to the Gift Clauses. Braden, *supra*, at 233. The dispositive legal question in *Linden* had nothing to do with what a county could spend public money on, only

whether counties are "corporations" as used in article III, § 51. 220 S.W. at 761, 763-64. *Linden*'s broader discussion of the Gift Clauses is obiter dictum. In any event, *Linden* makes clear the Court's view that "the care of the poor" is a "strictly government purpose" on which county funds may be spent. 220 S.W. at 763-64.

### D. The Community Prosperity Program is authorized by § 52-a.

Regardless of whether the Program clears the *Borgelt* test, the Constitution expressly authorizes the Program in article III, § 52-a. *Contra* Br. 49-52. Article III, § 52-a states:

> Notwithstanding any other provision of this constitution, the legislature may provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the economy of the state" and "the elimination of unemployment or underemployment in the state.

By its plain text, § 52-a thus authorizes economic-development programs like this one that focus on the elimination of unemployment or underemployment.

Section 52-a is an express exception to other constitutional restrictions on spending public funds. *See Ex Parte City of Irving*, 343 S.W.3d 850, 855 (Tex. App.—Dallas 2011, judgment vacated w.r.m.); *see also* Tex. Legis. Council, *Analyses of Proposed Constitutional Amendments and Referenda* 14 (Sept. 1987) (naming article III, §§ 51-52 as constitutional impediments that § 52–a was intended to overcome) (App. 23). Sections 51 and 52 (and the *Borgelt* test) do not apply to economic development

programs authorized by § 52-a: the authority under § 52-a exists "[n]otwithstanding any other provision of this constitution." Tex. Const. art. III, § 52-a.

In turn, Local Government Code § 381.003(a) grants counties the authority to administer community and economic development projects authorized by federal law. And Local Government Code § 381.004 authorizes counties' "making . . . grants of public money" in similar programs, without connection to federal law.

The Community Prosperity Program is a federally authorized program aimed at improving the economy and reducing unemployment and underemployment. 2.RR.10, 15. It was created in part to ameliorate the County's historically high unemployment rate during the pandemic. 3.RR.15.

A program under § 52-a need not satisfy the Gift Clauses. "Notwithstanding any other provision of this constitution" has a clear meaning. "*Notwithstanding* . . . indicates that the main clause that it introduces or follows derogates from the provision to which it refers." Scalia & Garner, *supra*, at 119; *accord Univ. of Tex. v. Garner*, 595 S.W.3d 645, 650 (Tex. 2019) (per curiam); *In re Lee*, 411 S.W.3d 445, 454 (Tex. 2013). Section 52-a thus plainly derogates from the other provisions in the Constitution. *See City of Irving*, 343 S.W.3d at 855-57. And § 52-a's permissive language—"the legislature may provide for the . . . making of loans and grants of public money"—parallels §§ 51 & 52(a)'s prohibitions. Applying

those prohibitions would reverse the superordinating function of "notwithstanding" § 52-a. On the State's tortured reading, it is the Gift Clauses, not § 52-a, that apply "notwithstanding any other provision of this constitution." The State may not rewrite the Constitution in this manner.

In the Uplift Harris case, the Supreme Court said nothing about the underemployment and unemployment aspects of § 52-a. *See In re State*, 2024 WL 2983176, at *3-4; *see* Br. 49-50. Moreover, a new program is before this Court, and Harris County has significantly developed the argument since that emergency litigation last April. Therefore, the Supreme Court's preliminary assessment of § 52-a (ignoring wholly underemployment and unemployment) does not control here. Section 52-a authorizes the Community Prosperity Program.

## E. The Community Prosperity Program does not violate the Equal Protection Clause.

The trial court did not err in dismissing the State's equal protection claim, which borders on frivolous. The "equal protection analysis requires that the classification be rationally related to a legitimate state interest." *Sullivan v. Univ. Interscholastic League*, 616 S.W.2d 170, 172 (Tex. 1981). "The party challenging the rationality of the legislative classification has the burden of negating every conceivable basis that might support it." *Gardner v. Children's Med. Ctr. of Dall.*, 402 S.W.3d 888, 892 (Tex. App.—Dallas 2013, no pet.) (citing *Heller v. Doe ex rel*

*Doe*, 509 U.S. 312, 320 (1993)). "It is not [the court's] place to question the [government's] policy decisions when conducting a rational basis review" of a program challenged on equal protection grounds. *Hebert v. Hopkins*, 395 S.W.3d 884, 900 (Tex. App.—Austin 2013, no pet.).

The State's claim fails out of the gate because eligible participants *are treated equally*—each had an *equal* chance of being selected. *See Campbell v. Bd. of Educ.*, 310 F. Supp. 94, 103 (E.D.N.Y. 1970). At any rate, a lottery is a rational tool of government in use for millennia.[21] If selection by lot is good enough for military drafts and jury pools (50 U.S.C. §3805; Tex. Code Crim. Proc. Art. 35.11) it is good enough for public benefit pilot programs. Indeed, the State itself makes certain housing benefits dependent on the outcome of lotteries.[22] And college admissions.[23] Government use of lotteries for benefits abounds.

The State's argument is frivolous in any event. Harris County acted rationally in using a limited pool of federal funds in line with federal regulations to achieve

---

[21] "The Archons of ancient Athens would undoubtedly have been surprised to learn that their selection by lot from among the citizenry was the result of an invidious discrimination." *Campbell*, 310 F. Supp. at 103.

[22] *TDHCA announces Housing Choice Voucher Program pre-application for wait-list to open May 2* (April 28, 2022), https://www.tdhca.texas.gov/news/tdhca-announces-housing-choice-voucher-program-pre-applications-wait-list-open-may-2.

[23] 19 Tex. Admin. Code §5.5(g) (Tex. Higher Educ. Coordinating Bd., Uniform Admission Policy).

multiple rational public purposes. The State challenges what it says are Harris County's justifications for the program's parameters. Br. 53-56. But the rational basis test puts no burden on Harris County: "*The party challenging* the rationality of the legislative classification *has the burden of negating every conceivable basis that might support it.*" *Gardner*, 402 S.W.3d at 892 (emphases added). The State does not even purport to try—the State merely complains (Br. 54) that Harris County could have done better. The State's argument has no connection to the rational-basis test that governs its claim.

**F.    The Court Must Affirm the Trial Court's Conclusion that the Community Prosperity Program Is Statutorily Authorized.**

The appellant's brief says nothing about the trial court's dismissal of Count 3, which alleges that the Program is not authorized by two statutes. CR.17-19, 540. "[I]f an appellant fails to challenge all grounds upon which the trial court could have granted a motion to dismiss and plea to the jurisdiction, we have no discretion to do anything other than to accept the validity of the unchallenged ground." *Owens v. Alexander*, 2019 WL 3334626, at *4 (Tex. App.—Dallas 2019, no pet.) (citations omitted) (cleaned up). The State's failure to press this claim on appeal is unsurprising: the County is statutorily authorized to provide support for the poor. *See* Tex. Loc. Gov't Code § 81.027. The Court must affirm on this Count.

<div align="center">*    *    *</div>

Because the State lacks any viable *ultra vires* claim, it has not carried its burden, and the trial court properly granted the plea to the jurisdiction.

## Conclusion and Prayer

The Court should affirm the final judgment. Appellees further request all other legal and equitable relief to which they are entitled.

Dated: January 14, 2025                    Respectfully submitted,

                                           **CHRISTIAN D. MENEFEE**
Of Counsel:                                Harris County Attorney

                                           */s/ Jonathan G.C. Fombonne*
Grant B. Martinez                          **JONATHAN G.C. FOMBONNE**
State Bar No. 24104118                      Deputy County Attorney and First Assistant
gmartinez@yettercoleman.com                State Bar No. 24102702
Justin P. Tschoepe                         Jonathan.Fombonne@harriscountytx.gov
State Bar 24079480                          **TIFFANY S. BINGHAM**
jtschoepe@yettercoleman.com                Managing Counsel
Lily E. Hann                               Affirmative & Special Litigation Division
State Bar No. 24133836                     State Bar No. 24012287
lhann@yettercoleman.com                    Tiffany.Bingham@harriscountytx.gov
**Yetter Coleman LLP**                     **CHRISTOPHER GARZA**
811 Main Street, Suite 4100                Senior Assistant Harris County Attorney
Houston, Texas 77002                       State Bar No. 24078543
Phone: (713) 632-8000                      Christopher.Garza@harriscountytx.gov
                                           **ELEANOR MATHESON**
                                           Assistant Harris County Attorney
                                           State Bar No. 24131490
                                           Eleanor.Matheson@harriscountytx.gov
                                           **RYAN COOPER**
                                           Assistant Harris County Attorney
                                           State Bar No. 24123649
                                           Ryan.Cooper@harriscountytx.gov
                                           **EDWARD D. SWIDRISKI III**
                                           Assistant Harris County Attorney
                                           State Bar No. 24083929
                                           Edward.Swidriski@harriscountytx.gov
                                           **Office of The Harris County Attorney**
                                           1019 Congress Plaza, 15th Floor
                                           Houston, Texas 77002
                                           Phone: (713) 274-5101

                    *Attorneys for Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served on all counsel of record in this case, identified below, on January 14, 2025, electronically through the electronic filing manager in compliance with the Texas Rules of Appellate Procedure:

Ken Paxton
Brent Webster
Ralph Molina
James Lloyd
Kimberly Gdula
William D. Wassdorf
William H. Farrell (lead counsel)
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 059)
Austin, Texas 78711
Phone: (512) 936-1700
Fax: (512) 474-269
Biff.Farrell@oag.texas.gov

*Counsel for Appellant*

/s/ *Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Texas Rule of Appellate Procedure 9.4. It contains 14,996 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

This brief complies with the typeface requirements because it has been prepared in a proportionally spaced typeface using Microsoft 365 E5 in 14-point Equity font for text and 12-point Equity font for footnotes.

*/s/ Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

No. 15-24-00120-CV

# In the Fifteenth Court of Appeals
# Austin, Texas

**STATE OF TEXAS,**

*Appellant,*

*v.*

**HARRIS COUNTY, TEXAS, ET AL.,**

*Appellees.*

On Appeal from the 165th District Court, Harris County, Texas
Cause No. 2024-63919, Hon. Ursula Hall, Presiding Judge

## APPENDIX

1. Amended Final Judgment

2. Tex. Const. art. III, §52(a)

3. Tex. Const. art. III, §52-a

4. Tex. Const. art. IV, § 22

5. Tex. Const. art. V, § 21

6. George D. Braden, et al., *The Constitution of the State of Texas:  An Annotated and Comparative Analysis* (1977) (excerpts).

7. Brief for Attorney General, *Paxton v. Longoria*, No. 22-0224 (Tex. Apr. 7, 2022) (excerpt)

8. Elizabethan Poor Law

9. Jill S. Quadagno, *From Poor Laws to Pensions*, 62 Milbank Mem'l Fund Q. 417, 419 (1984)

10. Act of Dec. 20, 1836

11. Act of Mar. 16, 1848

12. *Convention Proceedings*, Austin Weekly Statesman (Oct. 7, 1875)

13. *Grant*, Oxford English Dictionary (1989)

14. Webster's Complete Dictionary (1864)

15. *Aid*, Oxford English Dictionary Aid (1989)

16. *Relief*, Black's Law Dictionary (1881)

17. Act of July 22, 1876

18. *Local Intelligence*, Brenham Weekly Banner (Jan. 4, 1878)

19. *ATTENTION, PAUPERS!*, The Dallas Daily Herald (June 15, 1877)

20. *Texas—Facts and Fancies*, Austin American-Statesman (Aug. 16, 1878)

21. *Commissioners' Court*, Brenham Weekly Banner (June 1, 1882)

22. Brenham Weekly Banner (July 12, 1878)

23. Tex. Legis. Council, *Analyses of Proposed Constitutional Amendments and Referenda* 14 (Sept. 1987)

24. Tex. Const. art. I, § 3

# TAB 1

**FILED**
Marilyn Burgess
District Clerk

NOV 25 2024
Time:_____

Harris County, Texas
By_____
Deputy

**CAUSE NO. 2024-63919**

| | | |
|---|---|---|
| STATE OF TEXAS, *Plaintiff,* | § § § | IN THE DISTRICT COURT |
| v. | § § | |
| HARRIS COUNTY, TEXAS, HARRIS COUNTY COMMISSIONER COURT, LINA HIDALGO, in her official capacity as Harris County Judge, RODNEY ELLIS, in his official capacity as Commissioner of Harris County Precinct 1, ADRIAN GARCIA, in his official capacity as Commissioner of Harris County Precinct 2, TOM RAMSEY, in his official capacity as Commissioner of Harris County Precinct 3, and LESLEY BRIONES, in her official Capacity as Commissioner of Harris County Precinct 4, HARRIS COUNTY PUBLIC HEALTH, BARBIE ROBINSON, in her official capacity as Executive Director of Harris County Public Health, *Defendants.* | § § § § § § § § § § § § § § § § § § § § § | 165th JUDICIAL DISTRICT  HARRIS COUNTY, TEXAS |

**AMENDED FINAL JUDGMENT**

The Court replaces its Order granting the Harris County Defendants' plea to the jurisdiction, signed on October 24, 2024, with this Amended Final Judgment.

On October 24, 2024, the Court considered Harris County Defendants' Plea to the Jurisdiction filed in the above-styled and numbered cause. After having considered the pleadings, all documents on file with the Court, testimony of witnesses, exhibits, and arguments of counsel, the Court **GRANTS** the Harris County Defendants' Plea to the Jurisdiction.

On November 22, 2024, the Court considered the Harris County Defendants' Sworn Motion to Show Authority Under Rule 12 (the "Motion"). After having considered the motion, response, any replies, and arguments of counsel, the Court **GRANTS** the Motion.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that the Court refuses to permit the Attorney General and attorneys working for his office from appearing on behalf of the State of Texas in this Court in this case. Unless a person who is authorized to prosecute this case on behalf of the State appears by November 25, 2024, it is further ORDERED that all pleadings filed in this action by the Attorney General purportedly on behalf of the State are stricken.

IT IS THEREFORE FURTHER ORDERED, ADJUGED, and DECREED that Harris County Defendants' Plea to the Jurisdiction is GRANTED and all parties and all claims are dismissed for lack of jurisdiction. All costs shall be borne by the party incurring them.

This Order is Final and Appealable.

SIGNED this ___23rd___ day of November, 2024 at 8:06 p.m.

_____
JUDGE PRESIDING

- 2 -

540

# TAB 2

THE TEXAS CONSTITUTION

ARTICLE 3. LEGISLATIVE DEPARTMENT

REQUIREMENTS AND LIMITATIONS

Sec. 52.  RESTRICTIONS ON LENDING CREDIT OR MAKING GRANTS BY POLITICAL CORPORATIONS OR POLITICAL SUBDIVISIONS; AUTHORIZED BONDS; INVESTMENT OF FUNDS.  (a)  Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company.  However, this section does not prohibit the use of public funds or credit for the payment of premiums on nonassessable property and casualty, life, health, or accident insurance policies and annuity contracts issued by a mutual insurance company authorized to do business in this State.

(b)  Under Legislative provision, any county, political subdivision of a county, number of adjoining counties, political subdivision of the State, or defined district now or hereafter to be described and defined within the State of Texas, and which may or may not include, towns, villages or municipal corporations, upon a vote of two-thirds majority of the voting qualified voters of such district or territory to be affected thereby, may issue bonds or otherwise lend its credit in any amount not to exceed one-fourth of the assessed valuation of the real property of such district or territory, except that the total bonded indebtedness of any city or town shall never exceed the limits imposed by other provisions of this Constitution, and levy and collect taxes to pay the interest thereon and provide a sinking fund for the redemption thereof, as the Legislature may authorize, and in such manner as it may authorize the same, for the following purposes to wit:

(1)  The improvement of rivers, creeks, and streams to prevent overflows, and to permit of navigation thereof, or irrigation thereof, or in aid of such purposes.

(2)  The construction and maintenance of pools, lakes, reservoirs, dams, canals and waterways for the purposes of irrigation, drainage or navigation, or in aid thereof.

(3)  The construction, maintenance and operation of macadamized, graveled or paved roads and turnpikes, or in aid thereof.

(c)   Notwithstanding the provisions of Subsection (b) of this Section, bonds may be issued by any county in an amount not to exceed one-fourth of the assessed valuation of the real property in the county, for the construction, maintenance, and operation of macadamized, graveled, or paved roads and turnpikes, or in aid thereof, upon a vote of a majority of the voting qualified voters of the county, and without the necessity of further or amendatory legislation.  The county may levy and collect taxes to pay the interest on the bonds as it becomes due and to provide a sinking fund for redemption of the bonds.

(d)   Any defined district created under this section that is authorized to issue bonds or otherwise lend its credit for the purposes stated in Subdivisions (1) and (2) of Subsection (b) of this section may engage in fire-fighting activities and may issue bonds or otherwise lend its credit for fire-fighting purposes as provided by law and this constitution.

(e)   A county, city, town, or other political corporation or subdivision of the state may invest its funds as authorized by law.

(Feb. 15, 1876.  Amended Nov. 8, 1904; Subsecs. (a) and (b) amended and (c) added Nov. 3, 1970; Subsec. (d) added Nov. 7, 1978; Subsec. (a) amended Nov. 4, 1986; Subsec. (e) added Nov. 7, 1989; Subsecs. (a), (b), and (c) amended Nov. 2, 1999.)  (TEMPORARY TRANSITION PROVISIONS for Sec. 52: See Appendix, Note 1.)

# TAB 3

THE TEXAS CONSTITUTION

ARTICLE 3. LEGISLATIVE DEPARTMENT

REQUIREMENTS AND LIMITATIONS

Sec. 52-a. PROGRAMS AND LOANS OR GRANTS OF PUBLIC MONEY FOR ECONOMIC DEVELOPMENT. Notwithstanding any other provision of this constitution, the legislature may provide for the creation of programs and the making of loans and grants of public money, other than money otherwise dedicated by this constitution to use for a different purpose, for the public purposes of development and diversification of the economy of the state, the elimination of unemployment or underemployment in the state, the stimulation of agricultural innovation, the fostering of the growth of enterprises based on agriculture, or the development or expansion of transportation or commerce in the state. Any bonds or other obligations of a county, municipality, or other political subdivision of the state that are issued for the purpose of making loans or grants in connection with a program authorized by the legislature under this section and that are payable from ad valorem taxes must be approved by a vote of the majority of the registered voters of the county, municipality, or political subdivision voting on the issue. A program created or a loan or grant made as provided by this section that is not secured by a pledge of ad valorem taxes or financed by the issuance of any bonds or other obligations payable from ad valorem taxes of the political subdivision does not constitute or create a debt for the purpose of any provision of this constitution. An enabling law enacted by the legislature in anticipation of the adoption of this amendment is not void because of its anticipatory character.

(Added Nov. 3, 1987; amended Nov. 8, 2005.)

# TAB 4

THE TEXAS CONSTITUTION

ARTICLE 4. EXECUTIVE DEPARTMENT

Sec. 22.  ATTORNEY GENERAL.  The Attorney General shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law.  He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and perform such other duties as may be required by law.

(Feb. 15, 1876. Amended Nov. 3, 1936, Nov. 2, 1954, Nov. 7, 1972, and Nov. 2, 1999.)  (TEMPORARY TRANSITION PROVISIONS for Sec. 22: See Appendix, Note 1.)

# TAB 5

THE TEXAS CONSTITUTION

ARTICLE 5. JUDICIAL DEPARTMENT

Sec. 21.  COUNTY ATTORNEYS; DISTRICT ATTORNEYS.  A County Attorney, for counties in which there is not a resident Criminal District Attorney, shall be elected by the qualified voters of each county, who shall be commissioned by the Governor, and hold his office for the term of four years.  In case of vacancy the Commissioners Court of the county shall have the power to appoint a County Attorney until the next general election. The County Attorneys shall represent the State in all cases in the District and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a District Attorney, the respective duties of District Attorneys and County Attorneys shall in such counties be regulated by the Legislature.  The Legislature may provide for the election of District Attorneys in such districts, as may be deemed necessary, and make provision for the compensation of District Attorneys and County Attorneys.  District Attorneys shall hold office for a term of four years, and until their successors have qualified.

(Feb. 15, 1876. Amended Nov. 2, 1954.)

# TAB 6

# THE CONSTITUTION OF
# THE STATE OF TEXAS:

## An Annotated and
## Comparative Analysis

# THE CONSTITUTION OF THE STATE OF TEXAS:
# AN ANNOTATED AND COMPARATIVE ANALYSIS

By

**George D. Braden**
Legal Consultant
(Editor and Author)

And By

**David A. Anderson**
Professor of Law
The University of Texas at Austin

**R. Stephen Bickerstaff**
Chief, State and County
Affairs Division, Office of the
Attorney General of Texas

**Darrell Blakeway**
Attorney-at-Law

**Ron Patterson**
Assistant Director
Legal Division
Texas Legislative Council

**Seth S. Searcy III**
Attorney-at-Law

**Thornton C. Sinclair**
Professor Emeritus
University of Houston

**Richard A. Yahr**
Legal Counsel
Texas Legislative Council

## Participating Agencies:

### Texas Constitutional Revision Commission of 1973

### Constitutional Convention of 1974

### University of Houston, Institute for Urban Studies

### Texas Advisory Commission on Intergovernmental Relations

### Texas Legislative Council

### Comparative Analysis

Most states have a prohibition on extending state credit to private groups. The prohibitions normally include corporations but usually do not include "municipal" or "public" as part of the characterization of corporation. (The *Index Digest* is not always clear on this point and it may be that there are more states that include municipal corporations than the *Index* shows. Moreover, there may be states where the courts have construed "corporation" to include municipal and other public corporations.) Many states have made exceptions to the prohibition in order to meet a public problem—housing, agricultural development, education, and welfare, for example. Neither the United States Constitution nor the *Model State Constitution* has a comparable provision.

### Author's Comment

As noted in the *History,* Section 50 is unchanged from the wording first presented to the 1875 Convention. This indicates that no one noticed the misplaced comma that makes the sentence ungrammatical. The second comma belongs after, not before "of." (The third comma should be omitted or another comma inserted after "or to.") There is no apparent reason for distinguishing between the power of the legislature to act directly or to authorize action. If somebody feared that a denial of power to lend would permit the legislature to authorize the treasurer to lend, the section could have been redrafted to start out: "the credit of the State shall not be given, lent, or pledged. . . ." This would have simplified the sentence and also avoided the omission of a prohibition against authorizing the pledging of credit. The structure of the sentence as it stands limits the denial of power to authorize to "giving or lending," but not to pledging.

One final puzzle in the drafting of Section 50 is why the forbidden recipients are called in the first half "any person, association or corporation, whether municipal or other," but in the second half are called "any individual, association of individuals, municipal or other corporation whatsoever."

Apart from all this close analysis of poor draftsmanship, one may raise the broad question as to why municipal corporations were included in the lending prohibition. The basic reason for Section 50 was to prevent the government from aiding private parties in their grandiose schemes to build railroads and other internal improvements. Section 52 stops municipal corporations from doing this. Thus, there was no occasion to forbid the state to bail out profligate municipalities that might underwrite internal improvements. But, someone might argue, municipal corporations might go wildly into debt if they did not know that the state could not bail them out. This will not wash, however, for the original limitations on municipal taxing power under Sections 4 and 5 of Article XI, combined with the practical limitation on going into debt contained in Section 7 of that article, made wild borrowing well-nigh impossible. One can only conclude that some draftsman in the 1875 Convention was so intent on ending government profligacy that he blindly included everything he could think of. The pity of the blindness is that it gave rise to the ridiculous social security flap that necessitated Section 51g of this article.

For a discussion of the advisability of a provision like Section 50, see the *Author's Comment* on Section 51.

Sec. 50a. STATE MEDICAL EDUCATION BOARD; STATE MEDICAL EDUCATION FUND; PURPOSE. The Legislature shall create a State Medical Education Board to be composed of not more than six (6) members whose

merely authorizing the bonds and stating their purpose. (See the *Author's Comment* on Secs. 49-b and 49-c.)

Sec. 50b-1. ADDITIONAL STUDENT LOANS. (a) The Legislature may provide that the Coordinating Board, Texas College and University System, or its successor or successors, shall have authority to provide for, issue and sell general obligation bonds of the State of Texas in amount not to exceed Two Hundred Million Dollars ($200,000,000) in addition to those heretofore authorized to be issued pursuant to Section 50b of the Constitution. The bonds authorized herein shall be executed in such form, upon such terms and be in such denomination as may be prescribed by law and shall bear interest, and be issued in such installments as shall be prescribed by the Board provided that the maximum net effective interest rate to be borne by such bonds may be fixed by law.

(b) The moneys received from the sale of such bonds shall be deposited to the credit of the Texas Opportunity Plan Fund created by Section 50b of the Constitution and shall otherwise be handled as provided in Section 50b of the Constitution and the laws enacted pursuant thereto.

(c) The said bonds shall be general obligations of the state and shall be payable in the same manner and from the same sources as bonds heretofore authorized pursuant to Section 50b.

(d) All bonds issued hereunder shall, after approval by the Attorney General, registration by the Comptroller of Public Accounts of the State of Texas, and delivery to the purchasers, be incontestable and shall constitute general obligations of the State of Texas under this Constitution.

(e) Should the Legislature enact enabling laws in anticipation of the adoption of this Amendment such acts shall not be void because of their anticipatory nature.

### History

At the time Section 50b-1 was added in 1969, there remained available for issuance some $46 million of the original $85 million authorized by Section 50b, and projections indicated that the $46 million would be sufficient to carry the student loan program only through 1971.

### Explanation

An additional $200 million in bonds was authorized, but, unlike Section 50b, which limited the interest rate to 4 percent, this section is more realistic in that it permits the coordinating board and legislature to set interest rates for the new bonds. (See also the *Explanation* of Art. III, Sec. 65.)

### Comparative Analysis

No other state constitution contains a provision resembling this section.

### Author's Comment

See the *Author's Comment* on Section 50b.

Sec. 51. GRANTS OF PUBLIC MONEY PROHIBITED; EXCEPTIONS. The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever; provided, however, the Legislature may grant aid to indigent and disabled Confederate soldiers and sailors under such regulations and limitations as may be deemed by the Legislature as expedient, and to their widows in indigent circumstances under such regulations and limitations as may be deemed by the

Legislature as expedient; provided that the provisions of this Section shall not be construed so as to prevent the grant of aid in cases of public calamity.

## History

This grants prohibition dates from the 1875 Convention. (But see the *History* of Sec. 6 of Art. XVI for a related prohibition in earlier constitutions.) The section as originally adopted consisted of the words up to the first semicolon plus the proviso at the end concerning public calamities.

The original 1876 Constitution contained an exception to the grants prohibition in the form of a section authorizing the legislature to provide small pensions to indigent soldiers who fought for independence from Mexico, to indigent signers of the Declaration of Independence of Texas, and to their widows remaining unmarried. (This was Sec. 55 of Art. XVI which was repealed for obvious reasons in 1969.) In 1894, the first of many welfare amendments was adopted. It provided that the legislature could "grant aid to the establishment and maintenance of a home for indigent and disabled Confederate soldiers or sailors who are or may be bona fide residents. . . ." No more than $100,000 a year could be granted for this purpose. (See the following *Author's Comment* for a discussion of this curious provision.)

Four years later a second Confederate amendment was adopted. Without a great deal of historical research it is not possible to be sure what was happening, but one can speculate that the Confederate home was inadequate and that Confederate veterans were moving to Texas to get into the home. The amendment limited aid to indigent and disabled Confederate soldiers and sailors "who came to Texas prior to January 1st, 1880." The amendment also authorized direct "aid" to individuals in addition to "aid" for establishment of a home, but, naturally, "no inmate of said home" could receive any other aid from the state. Various other restrictions showed up. Direct grants were not to exceed $8 a month. Covered under these grants were veterans "who are either over sixty years of age, or whose disability is the proximate result of actual service in the Confederate army for a period of at least three months." Widows also were covered for direct aid but only if (a) "in indigent circumstances," (b) "never re-married," (c) bona fide residents prior to March 1, 1880, and (d) married to such soldiers or sailors "anterior" (!) to March 1, 1866. The amendment put an annual ceiling of $250,000 for the "purpose hereinbefore specified," but went on to include a ceiling of $100,000 for the veterans' home. It is not clear whether the $100,000 was included in the $250,000 or was in addition to it.

This new grant program lasted for six years. In 1904 another amendment was adopted. This one increased the maximum from $250,000 to $500,000 but preserved the $100,000 for the veterans' home in the same ambiguous wording. A new group of widows was allowed in. The magic marriage date was changed from March 1, 1866 to March 1, 1880, the same date as the residency cut-off.

Three years later an effort was made to get wives, widows, and "women who aided in the Confederacy" into the veterans' home. Although the words "under such regulations and limitations as may be provided by law" were retained, somebody thought it necessary or appropriate specifically to authorize the legislature to "provide for husband and wife to remain together in the home." The amendment increased the annual maximum from $100,000 to $150,000. (This change leads one to believe that the ceiling amount was in addition to the ceiling for the "purpose hereinbefore specified" since no change was made in that ceiling.) The amendment lost by the close vote of 41,079 to 43,732. This was a special election at which four other amendments were voted upon, all defeated by

margins of three to one or greater. This was obviously a "coat-tail" phenomenon, for three years later the same amendment was adopted by a vote of 113,549 to 28,534. This was at a general election at which no other amendments were considered. (See Marburger, p. 16.)

This new deal lasted only two years. In 1912 a new amendment was adopted. This one removed the ceilings and the $8 a month maximum and substituted the power to levy a property tax, "in addition to all other taxes heretofore permitted by the Constitution of Texas," not exceeding 5¢ on the $100 valuation for the purpose of creating a "special fund for the payment of pensions." (This would seem to mean that the special fund was not to be used to maintain the veterans' home and that there was no limit on how much could be spent on the home. But at this late date, who knows what the amendment meant?) The amendment changed the date of arrival in Texas from January 1, 1880 for men and March 1, 1880 for widows to January 1, 1900 for both sexes. The magic marriage date was also moved to "anterior" to January 1, 1900, but young widows were excluded—no one born "since 1861" could qualify as a widow. (Any widow under age 50, therefore, was considered "young.") The amendment also expanded the definition of soldier to include those who for at least six months during the War between the States either served in the Texas militia or in "organizations" for the protection of the frontier against Indian raids or Mexican marauders. The minimum pension age of 60 and the definition of "disabled" were dropped. Finally, for no apparent reason, the public calamity proviso was dropped.

Things remained unchanged until 1924, but only because amendments went down to defeat in 1919 and again in 1921. The two defeated amendments and the successful one in 1924 were identical except for one date—the 1917 proposal would not have let a widow be born after 1866 whereas the other two retained the original "after 1861." (There were idiosyncratic variations among the three versions in the usual bad punctuation of Texas amendments.) There were four substantive changes: (1) the residency and marriage date was moved from 1900 to 1910; (2) the minimum six months' service requirement in the militia and frontier organizations was dropped; (3) the levy was made 7¢ instead of 5¢ and changed from an authorization to a direct levy with legislative power to decrease the tax; and (4) the public calamity proviso was reinstated.

The next amendment was adopted in 1928. It simply dropped the residency and marriage dates and deleted the prohibition against pensions for "young" widows. A 20-year-old woman could now marry an 80-year-old veteran and feel secure that she could qualify for a pension—if she were in indigent circumstances, of course. Things remained the same in Section 51 until 1968, but only in the sense that the words of the section remained unchanged. Evidently, the special Confederate fund grew too large. For five years beginning in 1943, the levy was reduced from 7¢ to 2¢. (See Anderson and McMillan, *Financing State Government in Texas,* at p. 54.) In 1947, Section 17 of Article VII was adopted. The first paragraph thereof "amended" Section 51 by levying a 2¢ tax but with legislative authority to reduce the tax.

Evidently, the Confederate fund still continued to generate too much money, for in 1954 Section 51-b of this article was added. It "amended" Section 51 by killing off the special fund, in effect, but directed that the pensions continue to be paid. (See *Explanation* of Sec. 51-b.)

In 1958, Section 66 of Article XVI was added. It "amended" Section 17 of Article VII by directing payment of Texas Ranger pensions from the special Confederate fund. (This appears inconsistent with killing off the fund in the preceding paragraph. Presumably the drafter forgot that the "fund" as such had been abolished.)

In 1968, the current version of Section 51 was adopted. Simultaneously, Section 1-e of Article VIII was adopted. It "amended" both Section 51 and Section 17 of Article VII. Among other things, Section 1-e kills the 2¢ tax as of December 31, 1976, and directs that, if in the meantime the legislature establishes a new trust fund for Confederate veterans, Texas Rangers, and their widows, the 2¢ tax is to be dropped forthwith.

### Explanation

Section 51 is three things and at one time was four things. First, and principally, it is a limitation on the power of the state, acting through the legislature, to dispense money. Second and third, the section contains two exceptions to that limitation—Confederate pensions and aid in case of a public calamity. Fourth, from 1912 to 1947, the section contained an operative exception to a different limitation—the power of the state to raise money by levying a tax on property. (This is all very confusing. Section 51 contained the words of the exception until the 1968 amendment, but Section 17 of Article VII took over the tax in 1947.)

Prohibitions on grants and loans for private purposes came into state constitutions in the 19th century as a reaction principally against giving away the public domain to builders of railroads, canals, and other "internal improvements." These giveaways had usually been obtained by gross corruption of legislatures. The reaction to this was so strong that the resulting prohibitions were frequently cast in extremely restrictive language. This was the case in 1875; the convention not only used harsh language, it kept saying the same thing over and over again. (In addition to Sec. 51, there are Secs. 50 and 52 of this article, Sec. 3 of Art. VIII, Sec. 3 of Art. XI, and Sec. 6 of Art. XVI. Moreover, Secs. 44, 53, 54, and 55 of this article are analogous prohibitions flowing from this same reaction.) The problem with these extreme formulations is that they soon get in the way of all sorts of governmental action that is arguably for a public purpose but looks like a "grant." The Texas story of these sections over the last hundred years has been one of extreme rigidity in some areas, considerable inconsistency in others, and general confusion across the board. Fortunately, over the past 20 years the courts have been pointing the way toward clearing up the confusion by a simple rule: if the grant is for a public purpose the grant is constitutional. Although this is now the principal controlling rule, it is appropriate to discuss another rule that has been used to avoid the prohibition and can continue to be used.

The thrust of the new rule is to say that there are "good" grants, those for a public purpose, and "bad" grants, those for a private purpose. Another approach is to distinguish between a grant and what appears to be but really is not a grant. The formal rule is that a grant is not a grant if the state receives a "quid pro quo." This can be easily illustrated if, as in some state constitutions, the word "gift" is substituted for "grant." If one says "You're a nice person, I'll give you ten dollars," one has made a gift. But if one says "You're a nice person, I'll give you ten dollars if you'll whitewash the fence," one has made a promise that is enforceable if the person whitewashes the fence. Although the verb "give" is used in both cases, the verb has distinct meanings. Likewise, there is a difference between a statute that "grants" a pension to veterans because they served in the armed forces and a statute that promises to "grant" a pension to employees who work for the state for a specified minimum number of years. If the "grant" is announced in advance and requires something in return, there is a quid pro quo and the "grant" has become something else.

The only clear instance of judicial reliance on this "quid pro quo" rule is the landmark pension case of *Byrd v. City of Dallas* discussed in the *Explanation* of

Section 48a of this article. There the commission of appeals made it clear that a pension plan announced in advance is part of the employee's compensation. There are other cases that can be brought under either the "quid pro quo" or the "public purpose" rule, but only because of the fuzzy way in which the court discussed the issue. Consider, for example, *Weaver v. Scurry* (28 S.W. 836 Tex. Civ. App. 1894, *no writ*). A state law authorized counties to pay cash bounties for the killing of predatory animals. The court upheld the statute against an attack based on Sections 51 and 52, stating that the bounty was a proper means "by which the public calamity wrought by these animals is to be averted." This is to say that there is no "grant" because the government got something in return. (It should be noted that this one-page opinion succeeded in confusing everything. Note the words "public calamity" in the quotation, presumably a reference to the public calamity exception in Sec. 51. Moreover, the court cited Sec. 23 of Art. XVI as bringing "the enactment within the scope of legislative powers." This might imply that Sec. 23 created an exception to Secs. 51 and 52.)

An even more obscure case is *Housing Authority v. Higginbotham* (135 Tex. 158, 143 S.W.2d 79 (1940)). This case involved an attack, on multiple constitutional grounds, on a state statute authorizing subsidized housing for the poor. The court set out at length the legislative declaration of necessity and relied upon the declaration's assertion that slum clearance would cut down disease and crime and in other ways benefit the entire state. This declaration was used to support the "public use" necessary to justify exercising the power of eminent domain. Later in the opinion the court disposed of the grants-and-loans argument thus: "It necessarily follows from the above holding that the law is not violative of Sections 52 and 53. . . ." (135 Tex. at 168, 143 S.W.2d at 86. Presumably the court meant Secs. 51 and 52.) There is no way of telling whether the court meant that the benefits to the state were a quid pro quo or that a grant is not a grant if it is for a public purpose.

At first blush this appears to be logic chopping of the worst sort. What difference does it make whether a general benefit to the state is called a "quid pro quo" that takes a grant out of the "giveaway" class or is called a "public purpose" and thereby makes the grant constitutional because it is not for a private purpose? In a practical sense there is no difference. As a matter of logical constitutional interpretation there is a profound difference. Sections 3 of Article VII and 6 of Article XVI prohibit spending for a private purpose. If one follows the standard rule that drafters of legal documents mean what they say, Sections 51 and 52 prohibit grants to private individuals whether for a private or a public purpose. Otherwise, the sections are redundant. The "quid pro quo" rule permits one to use the public purpose as if it were consideration for the grant, thus making the action analogous to a contract and taking it out of the giveaway category.

Be all this as it may, Sections 50, 51, and 52 are now to be applied as if they read: "No grant or loan may be made to any person, etc., for a private purpose." There is a line of cases that permits one to reach this conclusion. The first is *Bexar County v. Linden*, a case which has only the remotest rational connection with Section 51. (The case is discussed in the *Explanation* of Sec. 1 of Art. XI.) In the course of the opinion the supreme court said: "The giving away of public money, its application to other than strictly governmental purposes, is what the provision is intended to guard against" (110 Tex. 339, 344, 220 S.W. 761, 762 (1920)).

The next significant case was, paradoxically, the clear-cut "quid pro quo" pension case of *Byrd v. City of Dallas*. In the course of developing the argument that a pension plan is part of compensation, the court said: ". . . , if it is a part of the compensation of such employee for services rendered to the city, *or if it be for a public purpose,* then clearly it is a valid exercise of the legislative power." (118

Tex. 28, 36, 6 S.W.2d 738, 740 (1928) (emphasis added).) Subsequent cases that seem to support this new "public purpose" rule include *Davis v. City of Lubbock* (160 Tex. 38, 326 S.W.2d 699 (1959)); *State v. City of Austin* (160 Tex. 348, 331 S.W.2d 737 (1960)); and *Harris County v. Dowlearn* (489 S.W.2d 140 (Tex. Civ. App.—Houston [14th Dist.] 1972, *writ ref'd n.r.e.*)).

Actually, the attorney general is principally responsible for taking the cited cases and drawing the new rule from them. In one recent letter advisory, he said: "Expenditures for a true public purpose do not violate Article III, Section 51 of the Constitution. . . , even when a private agency is used to achieve the purpose" (Tex. Att'y Gen. Letter Advisory No. 6 (1973)). And again: ". . . Section 52 does not prohibit the grant of funds or property or credit for a public purpose" (Tex. Att'y Gen. Letter Advisory No. 9 (1973)). (See also Tex. Att'y Gen. Op. Nos. H-120 (1973); M-391 (1969); C-584 (1966); C-530 (1965).)

Under the new rule, the question is, of course, whether the grant or loan is for a public purpose. In a sense this is no more than asking whether the public benefit is too remote, indirect, or general to serve as a "quid pro quo." In 1973 the attorney general refused to approve an issue of revenue bonds by the City of McAllen for the purchase of land to be used for industrial development. (In 1968 an amendment permitting this had been defeated. See the *History* of Sec. 52.) The city sought leave to file a mandamus action to compel approval of the bonds, but the supreme court overruled the city's motion (*City of McAllen v. Hill*, No. B-4315, 17 Tex. Sup. Ct. J. 128). In a 1974 opinion on an analogous proposal, the attorney general discussed his earlier refusal to approve the McAllen revenue bonds and concluded: ". . . it is not considered a public purpose within this legal context, when municipal credit is used to obtain for the community and its citizens the general benefits resulting from the operation of a private industry." (See Tex. Att'y Gen. Op. No. H-357 (1974).) The question raised in Opinion No. H-357 was whether a city could give a promissory note to the United States for surplus land under terms that precluded the city from ever being liable on the note. The note was to be paid off out of rents received for the use of, or proceeds from sales of, the land. As in the case of McAllen, the land would be used for industrial purposes. The attorney general's conclusion was: "It is not constitutionally permissible for a city to purchase land for future industrial development by means of a promissory note to be paid out of revenues generated by the land without recourse to the city when the benefit to the public from such a purchase is such benefit as may be derived from the attraction of new industry."

It is fair to speculate whether opinions such as this would be forthcoming if the constitution contained no "grants and loans" prohibition. Would it be so clear that a lending of municipal credit in order to further the general well-being of the community and to increase the city's tax base was not for a public purpose if the constitution were silent about whom the credit was extended to? Obviously, what is a public purpose is a matter of judgment. Even under the new rule that any grant or lending of credit is constitutional if the grant or loan is for a public purpose, it seems likely that Sections 50, 51, and 52 will have some influence on the person trying to make a judgment about whether a public purpose is involved.

To put it another way, old habits are hard to break; people frequently look at problems the same way that they always did. Consider, for example, the attorney general's advice concerning a bill that would indemnify members, officers, and employees of the legislature against financial loss arising out of a claim based on negligence or other acts resulting from the maintenance of order in the legislature. The attorney general said: " Our Constitution prohibits grants of public moneys to an individual in Sec. 51 of Article III. If the state itself is liable for the loss, indemnification would be valid but if there is no liability upon the part of the State

as where a claim is barred by governmental immunity, the use of public money to pay a claim owed by an individual is a gift or donation in violation of the Constitution." (Tex. Att'y Gen. Letter Advisory No. 33 (1973). See also Tex. Att'y Gen. Op. No. H-70 (1973).) This sounds like the workmen's compensation problem all over again. (See the *History* of Sec. 59 of this article.) Indemnification becomes a grant because the state may assert the common law rule of sovereign immunity. (See the following *Author's Comment.*)

But the real problem is that the attorney general apparently forgot his earlier statement: "Expenditures for a true public purpose do not violate Article III, Sec. 51 of the Constitution." It can certainly be argued convincingly that a public purpose is served if the state tells its employees that they may carry out their duties without fear of financial loss. The public interest is not served if employees are afraid to do their job for fear that they will be sued and that their employer will not pick up the tab. (See also Tex. Att'y Gen. Op. No. H-15 (1973) where the attorney general implies that a death benefit payable to the beneficiaries of a deceased county employee would be a prohibited grant under Sec. 52. There is no discussion of public purpose.)

There remains the question of the meaning of the new "public purpose" rule as it applies to grants to municipal corporations—a term which, in effect, means any local government. In the normal sense of the term, a grant by the state to a county, a city, a school district, or any other political subdivision could hardly be for a "private purpose." Presumably, the new statement of the rule equates "public purpose" with "state purpose." In other words, the state can grant money to a local government engaged in activity of interest to the state, but not for activity of interest only to the local government. For example, a grant to a city for a sewage treatment plant might be for a state public purpose whereas a grant to the same city to buy a privately owned public utility might be considered a "private" purpose. (But see the following *Author's Comment.*)

Finally, this new equating of Section 51 with public purposes leaves the public calamity exception out in left field. Since a public calamity is a public purpose par excellence, the exception has withered away. But then the exception apparently is really only an exception to Section 6 of Article VIII, which limits appropriations to two years. In *Dallas County v. McCombs,* the supreme court disallowed a five-year state grant of state ad valorem taxes to counties during the Great Depression. The ground was the violation of Section 6 of Article VIII. Other instances of long-term grants of such taxes were distinguished because they were for real public calamities whereas in the case before the court the legislative declaration of calamities was too general to qualify under Section 51. (135 Tex. 272, 140 S.W.2d 1109 (1940).)

## Comparative Analysis

About half the states have a grants and loans prohibition. Some of the states have added exceptions, usually in terms of aiding the poor. Two of the newest constitutions, Illinois and Montana, omit the earlier restrictions, both of which were aimed directly at aid to railroads. The new Louisiana Constitution preserves the prohibition with a typical set of exceptions. Neither the *Model State Constitution* nor the United States Constitution has a comparable provision.

## Author's Comment

One wonders whether the 1894 amendment mentioned above is the first Critz theory amendment. (See *Author's Comment* on Sec. 62 of Art. XVI.) In the light of Section 2 of Article XI calling for the establishment of county poor houses and farms, there could hardly have been any doubt that the state had the power to

operate a poor house for Confederate veterans. One can only conclude that the amendment was a device to get public approval of the program. Once the unnecessary provision got into the constitution, every change would naturally follow the same route.

It was suggested earlier that a grant to a municipal corporation to buy a private public utility might be considered for a "private purpose." Actually, the problem of grants to municipal corporations should be considered a problem of general versus local laws. If the state offered grants to any and all municipalities that wished to carry out some local "proprietary" function, there would be no need to argue that a private purpose was involved. (For "proprietary functions," see *Explanation* of Sec. 1 of Art. XI.) If the grant were only to cities with populations between 192,567 and 192,569, the better approach would be to strike down the law as local rather than say that it was a grant for a private purpose. In any event, revenue sharing is now "in." A Section 51 prohibiting grants to local governments is a restriction whose time has gone.

It was also suggested that, notwithstanding the new "public purpose" broom, the "grants and loans" muddle has not been wholly swept away. The recent letter advisory discussed earlier (Tex. Att'y Gen. Letter Advisory No. 33) demonstrated that the sovereign immunity doctrine is stronger than "public purpose." If the state abandoned sovereign immunity there would be no Section 51 problem. To indemnify a public officer or employee for acts for which his employer, the government, is not liable would be spending money for a "private" purpose. But a law that indemnifies the officer or employee for acts for which the government would be liable if it were to waive its immunity is in effect an indirect waiver of immunity and an expenditure for a public purpose.

It must be conceded that an agency of the state has no authority to carry liability insurance to cover a tort which is not covered by the Tort Claims Act, for that would be thwarting the legislative policy not to waive immunity. But even here, it is not appropriate to rely on Section 51. The vice is not a grant for a private purpose but an unauthorized administrative act. On this basis the attorney general's opinion cited previously (Tex. Att'y Gen. Op. No. H-70 (1973)) is undoubtedly correct; his reliance on Sections 51 and 52 is subject to question. If the legislature specifically authorizes liability insurance for an act for which the government could be held liable absent sovereign immunity, Sections 51 and 52 are red herrings diverting attention from the real issue of indirect waiver of sovereign immunity. (See also the *Author's Comments* on Sec. 59 of this article and Sec. 1 of Art. XI.)

Assuming that today Section 51 means simply that money can be spent only for a public purpose, then the section should be dropped. A requirement that public money be spent for public purposes is reasonable. It is not reasonable to state the requirement several different ways, especially if one of the ways is literally saying something else. (For an exposition of the more traditional distinction between "public purpose" and "grants and loans," see Willatt, "Constitutional Restrictions on Use of Public Money and Public Credit," 38 *Texas Bar J.* 413 (1975).)

Sec. 51-a. ASSISTANCE GRANTS AND MEDICAL CARE FOR NEEDY AGED, DISABLED AND BLIND PERSONS, AND NEEDY CHILDREN; FEDERAL FUNDS; SUPPLEMENTAL APPROPRIATIONS. The Legislature shall have the power, by General Laws, to provide, subject to limitations herein contained, and such other limitations, restrictions and regulations as may by the Legislature be deemed expedient, for assistance grants to and/or medical care for, and for rehabilitation and any other services included in the federal laws as they now read or as they may hereafter be amended, providing matching funds to help such families and individuals attain or

prohibition in the original section. Be all this as it may, the effect of the *Collingsworth* opinion is to make the earlier flat statement true in fact. For *Collingsworth* concludes (a) that the original Section 52 did not prohibit issuing bonds for purposes for which counties and other local governments could spend money and (b) that the 1904 amendment broadened rather than restricted that preexisting power. Thus, *Collingsworth* leaves the lending prohibition with only its natural grammatical meaning.

*Subsection (a).* Although this subsection is the "local" version of Sections 50 and 51, the *Explanation* of Section 51 covers both "grants" and "loans" as such, whether the government involved is the state or a local unit. Thus, that explanation covers this subsection.

*Subsection (b).* This subsection is part of the constitutional tax structure and can be understood only after a review of the tax sections, particularly Section 9 of Article VIII. (See *History* and *Explanation* of that section.) The primary original purpose of the subsection was to provide additional means for raising capital funds for water and for roads. With the adoption of Section 59 of Article XVI in 1917, the water power of Subsection (b) became almost but not quite obsolete; there are still some Section 52 water districts around.

To avoid duplication of coverage, the constitutional problems of water districts will be discussed under Section 59 of Article XVI.

Road districts are a different matter. They still exist and will continue even though the state long ago took over many county roads for the state highway system. (There is a long story concerning the takeover of county roads but the problems involved do not arise from Section 52. The leading cases are *Robbins v. Limestone County,* 114 Tex. 345, 268 S.W. 915 (1925), and *Jefferson County v. Board of County and District Road Indebtedness,* 143 Tex. 99, 182 S.W.2d 908 (1944).) Road districts are not "special districts" in the technical sense of an independent unit of government with fiscal and administrative power to provide particular services. A road district is a "body corporate" that can sue and be sued (*Horn v. Matagorda County,* 213 S.W. 934 (Tex. Comm'n App. 1919, *jdgmt adopted*)), but it exists solely as a geographical unit for the purpose of determining who is to vote and to be taxed for a bond issue for road construction. The issuing of the bonds, the levying of the tax, and the construction of roads are handled by the county commissioners court. Subsection (b) authorizes a road district covering more than one county, but the legislature has authorized only whole counties so to combine to form a road district. (Tex. Rev. Civ. Stat. Ann. art. 778a (1964). See Tex. Att'y Gen. Op. No. O-4214 (1941).)

Since the road district exists in practice only as a money-raising unit, the judicial gloss on Subsection (b) is limited substantially to questions concerning bond issues. For example, the proceeds of a bond issue must be used for the roads that the election specified would be built. (*Fletcher v. Howard,* 120 Tex. 298, 39 S.W.2d 32 (1931).) Although the section speaks of "macadamized, graveled or paved roads," "paved" has been interpreted loosely to cover almost anything that makes a road reasonably permanent. (*Aransas County v. Coleman-Fulton Pasture Co.,* 108 Tex. 223, 191 S.W. 556 (1917); Tex. Att'y Gen. Op. No. O-3652 (1941).) Bond money of a road district that includes a city may be spent on city streets that are part of a highway system (see *City of Breckenridge v. Stephens County,* 120 Tex. 318, 40 S.W.2d 43 (1931)); but a city may issue its own bonds for city streets that are part of the highway system. Such bonds are not subject to the limitations of Subsection (b). (See *Lucchese v. Mauerman,* 195 S.W. 422 (Tex. Civ. App.—San Antonio 1946, *writ ref'd n.r.e.*), *cert. denied,* 329 U.S. 812 (1947).)

It must be kept in mind at all times that Section 9 of Article VIII and

Constitution.

At the 1875 Convention the delegates added the duty to authenticate publication of the laws and added a sentence fixing his salary at $2,000 annually. There was an effort to make the office elective and extensive debate about the amount of his salary but none on the deletion of "elect" following "Governor" in the 1869 phrase. (See *Debates,* pp. 162-63, 166, 256-57.)

In 1936 an amendment increased the salary for the office to $6,000 annually, and in 1954 an amendment removed the constitutional limitation on salary, but a companion amendment prohibited the legislature from setting the salary at less than $6,000. (See Art. III, Sec. 61.)

## Explanation

With one exception, this section is self-explanatory. The peculiar wording about the tenure of the office suggests that a governor who succeeds to the office when vacant can select his own secretary of state. That construction was more plausible under the earlier constitutions, when the tenure was the "term of service of the Governor elect," but there is no indication that the 1875 delegates intended to make a change, for if they had, it easily could have been clearer.

## Comparative Analysis

Most states have a constitutional secretary of state. A majority make it an elective office, and two provide for filling it by a joint vote of the legislature. Almost all states provide that the duties of the office are to be prescribed by law, and a substantial percentage provide some constitutional duties ranging from *ex officio* membership on boards to attending to the governor, council, and legislature. There is no secretary of state provided by the *Model State Constitution.*

## Author's Comment

Constitutional debate about the secretary of state usually involves the necessity of making it a constitutional office. The *Author's Comment* on Section 16 points out that two states have made the officer who performs the duties of the secretary of state the successor to the governor. Unless the secretary of state performs this role, however, there seems little justification for maintaining his constitutional status.

Sec. 22. ATTORNEY GENERAL. The Attorney General elected at the general election in 1974, and thereafter, shall hold office for four years and until his successor is duly qualified. He shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and perform such other duties as may be required by law. He shall reside at the seat of government during his continuance in office. He shall receive for his services an annual salary in an amount to be fixed by the Legislature.

## History

The 1845 Constitution created the constitutional office of attorney general in the judicial article. He was appointed by the governor, with advice and consent of

the senate, to a two-year term, and his duties and salary were prescribed by statute. An amendment in 1850 made the office elective, and the 1861 Constitution retained the 1845 language and the 1850 amendment.

In the 1866 Constitution the office remained in the judicial article. He was elected to a four-year term, required to reside in the capital and perform duties fixed by law, and received, in addition to perquisites, an annual salary fixed at $3,000 that could not be "increased or diminished during his term of office."

The 1869 Constitution moved the office into the executive article and provided that it be filled by appointment of the governor with senate confirmation. Again, the attorney general had to reside in the capital and served for four years. In addition to the duties required by law, he was to "represent the interests of the State in all suits or pleas in the Supreme Court in which the State may be a party; superintend, instruct, and direct the official action of the district attorneys so as to secure all fines and forfeitures, all escheated estates, and all public moneys to be collected by suit; and . . . when necessary, giving legal advice in writing to all officers of the government. . . ." (See Tex. Const. Art. IV, Sec. 23 (1869).) Only the 1869 Constitution imposed qualifications (same as the governor) on the office.

The 1876 Constitution again made the office elective and reduced its term to two years. The attorney general's compensation was an annual salary of $2,000 "besides such fees as may be prescribed by law; provided, that the fees which he may receive shall not amount to more than two thousand dollars annually." The delegates to the 1875 Convention without much debate added lengthy instructions to the attorney general about corporate charters and illegal corporate actions or charges. (See *Journal*, p. 295; *Debates*, pp. 163-64.)

In 1936 an amendment increased the attorney general's salary to $10,000 and deleted the fee provisions. In 1954 another amendment adopted the present language on compensation while a companion amendment prohibited the legislature from setting the salary at less than $10,000. (See Art. III, Sec. 61.) A 1972 amendment increased the term of the office to four years.

### Explanation

The provisions of this section regarding the attorney general's term of office, residence, and compensation are simple and straightforward. If the powers and duties of the office had been left to be prescribed by law, Section 22 would have caused few problems. Since some powers and duties were included, however, the meaning of the section has been a continuous source of litigation and speculation.

One of the first questions to arise involved the relationship between the attorney general and the county and district attorneys. Article V, Section 21, provides that the county and district attorneys "shall represent the State in all cases in the District and inferior courts," and this section requires the attorney general to "represent the State in all suits and pleas in the Supreme Court." Presumably, the draftsmen intended the local state's attorneys to handle trials and the attorney general to handle appellate work. If that was so, Section 22 was incomplete because the constitution directed no one to appear for the state in the court of appeals, which appeared in the 1876 Constitution as it was originally adopted. (The court of criminal appeals and courts of civil appeals replaced the court of appeals in 1891. See the *History* of Art. V, Sec. 1.) Apparently, the Committee on the Executive Department, whose report the convention considered and finally adopted four days before the Committee on the Judicial Department had even reported (*Journal*, pp. 375, 406), anticipated that the judiciary article would provide only one appellate court—a supreme court—as had been the case in all the prior state constitutions. (See the *History* of Art. V, Sec. 1.) In fact, the report of

the Committee on the Judicial Department provided only for the supreme court. (*Journal*, pp. 406-22.) The convention added the court of appeals during floor debate more than 20 days after final adoption of the executive article (*Journal*, p. 640), and apparently no one remembered to go back and add the court of appeals to this section.

Shortly after adoption of the constitution, Justice Stayton, who had been a delegate to the 1875 Convention, stated for the supreme court that indeed the constitution divided responsibility for representing the state with the attorney general to appear before the supreme court and county and district attorneys to appear in trial courts. (The legislature could determine who would represent the state before the court of appeals.) This constitutional division of authority was mandatory, and a statute could not authorize the attorney general to file suit in behalf of the state without express constitutional authorization. (*State v. Moore*, 57 Tex. 307 (1882).) Such a division of authority proved impracticable, however. As a supreme court opinion in a later case pointed out (see following citation for *Brady v. Brooks*), county and district attorneys are elected locally and they are elected primarily to perform their principal function—prosecution of criminal cases. Their independence of any statewide authority made it impossible to apply a uniform policy in the initiation (or defense) of suits on behalf of the state. Perhaps for those reasons the legislature ignored *Moore* and continued to direct the attorney general to sue on behalf of the state to collect delinquent taxes, recover state lands, etc. Finally, in *Brady v. Brooks* (99 Tex. 366, 89 S.W. 1052 (1905)) the supreme court ruled that the phrase in Section 22 directing the attorney general to "perform such other duties as may be required by law" empowers the legislature "to create causes of action in favor of the state, and to make it the exclusive duty [of the attorney general] to prosecute such suits" in trial as well as appellate courts. Since *Brady* the courts have emphasized repeatedly that the attorney general may be given trial duties when the legislature creates a new or additional cause of action. (See *Smith v. State*, 160 Tex. 256, 328 S.W.2d 294 (1959); *Maud v. Terrell*, 109 Tex. 97, 200 S.W. 375 (1918).)

The *Brady* rule that the attorney general may appear for the state in trial court only to enforce a *new* cause of action in favor of the state has not been explored further. No reported opinion has ruled that a cause of action the attorney general sought to enforce pursuant to a statutory authorization was an old or preexisting one that is to be enforced exclusively by county and district attorneys. One case, however, ruled that the attorney general may not be given *exclusive* authority to prosecute *criminal* offenses, but the court declined to decide whether he may be authorized to prosecute crimes in instances in which local state's attorneys refuse to prosecute. (See *Shepperd v. Alaniz*, 303 S.W.2d 846 (Tex. Civ. App.—San Antonio 1957, *no writ*).) In practice, the *Moore-Brady* rule that the trial-appellate division of powers in this section and Article V, Section 21, is exclusive has been ignored. The attorney general frequently appears for the state at the trial level, sometimes without statutory authorization, and district and county attorneys usually appear before the supreme court in appeals of cases they handled in trial court.

The attorney general's constitutional powers respecting private corporations have also required judicial clarification. Soon after adoption of this constitution the supreme court ruled that the attorney general's supervisory powers over private corporations authorize him to institute and maintain suit to prevent or redress illegal acts by private corporations even in the absence of a statute and that his power to do so is exclusive and may not be exercised by or given by law to the county and district attorneys. (*State v. Paris Ry.*, 55 Tex. 76 (1881); *State v. International & G.N.R.Co.*, 89 Tex. 562, 35 S.W. 1067 (1896). Prior to *Brady*, this

was the attorney general's only constitutional authority to appear in trial court.) The attorney general may not sue a corporation when only private rights are involved, however; injury to the public generally must have occurred or be imminent. (*State v. Farmers' Loan & Trust Co.*, 81 Tex. 530, 17 S.W. 60 (1891).) Thus if a public utility seeks to charge unreasonably high rates, the attorney general may, at least in the absence of governmental regulation of rates, institute suit to prevent imposition of the unreasonable rates. (*State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526 (Tex. 1975).)

This section and Article V, Section 22, in defining who may represent the state, are exclusive. The legislature may not authorize a private citizen to maintain suit on behalf of the state (*American Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580 (Tex. Civ. App.—Austin 1942), *aff'd*, 141 Tex. 379, 172 S.W.2d 972 (1943)). More importantly, the legislature may not authorize another state, county, or district office or agency to employ attorneys to represent its and, hence, the state's interest in court unless the agency's attorney acts as a subordinate to and with approval of the attorney general or a county or district attorney. (*Maud v. Terrell*, 109 Tex. 97, 200 S.W. 375 (1918).) Perhaps because the caseloads in some instances have become too burdensome for the state's attorneys and their staffs, the legislature occasionally authorizes other attorneys to represent the state in court (presumably as a *special* assistant state's attorney), if the attorney general or a local state's attorney approves. (See, *e.g.*, Tex. Rev. Civ. Stat. Ann. art. 7335a.)

The legislature has created an office of state's attorney, appointed by the court of criminal appeals and independent of the constitutional state's attorneys, to represent the state before the court of criminal appeals. (See Tex. Rev. Civ. Stat. Ann. art. 1811.) Presumably, the legislature concluded that it could do so because this section mentions only appearances for the state before the supreme court. An early case stated that the attorney general may act only if he has constitutional or statutory authority to do so. (*Day Land & Cattle Co. v. State*, 68 Tex. 526, 4 S.W. 865 (1887) (Stayton, J.). See also *Garcia v. Laughlin*, 155 Tex. 261, 285 S.W.2d 191 (1955); *State* ex rel. *Downs v. Harney*, 164 S.W.2d 55 (Tex. Civ. App.—San Antonio 1942, *writ ref'd w.o.m.*).) Several attorneys general have contended, however, that the office has inherent, common-law powers (*e.g.*, Shepperd, "Common Law Powers and Duties of the Attorney General," 7 *Baylor L. Rev.* 1 (1955)), and gratuitous statements in a few early decisions support the contention (*e.g.*, *Queen Ins. Co. v. State*, 22 S.W. 1048, 1052 (Tex. Civ. App.), *rev'd on other grounds*, 86 Tex. 250, 24 S.W. 397 (1893)). In fact, the attorney general has been representing the state on the assumption that he has common-law authority to do so in federal habeas corpus proceedings, for example. (See Taylor, "Modernizing the Powers of the Attorney General of Texas," 36 *Texas Bar J.* 51 (1973).) The issue has not yet been decided by the courts. It is not inconceivable that the courts ultimately may decide that the office has implied or common-law powers to represent the state in situations in which the constitution and the statutes are silent. Yet the *Brady* case and the express constitutional requirement that county and district attorneys represent the state in trial courts appear to be insuperable obstacles to any implied power to institute or defend suits in state courts.

The attorney general's constitutional duty to render advisory opinions has caused no problems. Indeed, the constitutional duty has been supplanted by broader statutory responsibilities (Tex. Rev. Civ. Stat. Ann. art. 4399).

### Comparative Analysis

The attorney general is a constitutional officer in most states and is elected in about half. In one state he is appointed by the supreme court to an eight-year term.

His term of office is usually the same as the governor's, and his duties are usually prescribed by law, although several states also prescribe some duties in the constitution. Only a few constitutions require the attorney general to be an attorney. The *Model State Constitution* does not mention a chief law officer.

## Author's Comment

It is because of the excessive detail about the duties of the attorney general (and of the county and district attorneys) that this section has caused so much litigation. If the 1875 Convention had abandoned the 1869 Constitution's specification of duties and returned to the form of the first three state constitutions, which left *all* the attorney general's duties to be prescribed by law, a century of jurisdictional clashes with local state's attorneys probably would not have occurred.

Moreover, if the 1875 Convention's Committee on the Executive Department had paid closer attention to the effect of the changes it was making it might have foreseen the unworkability of divided authority to represent the state. The 1869 Constitution directed the attorney general to represent the state before the appellate court, but it also gave him supervisory power over local state's attorneys in most civil cases. (See the *History* of this section.) Thus the 1869 division of authority made sense. At least in theory, the cases the attorney general handled on appeal had been tried by his subordinates. The committee probably was displeased with the theoretical subordination of local state's attorneys to the attorney general, but their retention of the 1869 Constitution's division of authority without any central supervision over the local trial attorneys undoubtedly created as many problems as it solved. It may have appeared convenient to delegates who had come long distances to the convention, probably on horseback over poor or nonexistent roads, to let the attorney general stay in the capital and the local state's attorneys stay in their localities, but had the delegates questioned the need for preserving that convenience in the constitution, particularly in light of the change they made in the status of the local state's attorneys, they might have elected to return to the language of earlier constitutions.

Traditionally, the primary state function of county and district attorneys has been the prosecution of criminal cases. The connotations of the label "district attorney" should be sufficient to preserve that function. If the constitution must expressly divide authority to represent the state, however, it should go no further than to specify the local state's attorneys' criminal responsibilities.

Section 22 also illustrates the importance of convention procedures in determining the content of the convention's proposal. The task of drafting a constitution probably cannot be handled successfully without dividing its parts among several committees. Usually there are committees on the executive article, the legislative article, the judiciary, local government, etc. The product of each committee, however, is part of a single document, and all its parts must mesh. Close coordination between committees is imperative, but even this is not enough. It was not the lack of committee coordination that led the 1875 Convention to overlook inclusion of the court of appeals in this section; that court was written into the judicial article during floor debate after the executive article had been finally approved. Final approval of each article should await preliminary approval of all articles, and the convention should prescribe some procedure for detecting the impact of a change made in one article on other articles and for making the necessary modifications prior to final approval.

# TAB 7

FILED
22-0224
4/7/2022 4:52 PM
tex-63382247
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 22-0224

# In the Supreme Court of Texas

————

Warren K. Paxton, in his official capacity as Attorney General of Texas; Shawn Dick, in his official capacity as Williamson County District Attorney,

*Defendants-Appellants,*

*v.*

Isabel Longoria; Cathy Morgan,

*Plaintiffs-Appellees.*

————

On Certified Questions
from the United States Court of Appeals for the Fifth Circuit

————

## BRIEF FOR APPELLANT
## THE ATTORNEY GENERAL OF TEXAS

————

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General
State Bar No. 24115221
Lanora.Pettit@oag.texas.gov

Beth Klusmann
Assistant Solicitor General

Cody C. Coll
Assistant Attorney General

Counsel for the Attorney General
   of Texas

speech, but it prevents the Court from prematurely resolving the question based on the record before it.[13]

## III. The Attorney General Cannot Seek Civil Penalties Under Texas Election Code Section 31.129.

The last question certified by the Fifth Circuit is whether the Attorney General can bring a suit for civil penalties under Texas Election Code section 31.129. *Longoria*, 2022 WL 832239, at *7. That answer will inform but not determine whether Plaintiffs' suit against the Attorney General is barred by sovereign immunity, as he must have "some connection" to enforcement in order to avoid dismissal under *Ex parte Young*.[14] Because the Legislature did not explicitly grant the Attorney General the authority to seek these particular penalties on behalf of the State, the answer to the third certified question is "no"—though that does not mean that the Attorney General entirely lacks means to enforce section 276.016.

---

[13] As a practical matter, Longoria's claims will also soon be moot. This Court has set the case for argument on May 11, two days before applications to vote by mail are due for the May 2022 primary runoff—the last election before her resignation will be effective. *Compare* KHOU 11, *supra* n.4, *with* Texas Secretary of State, *Important Election Dates 2021-2022*, https://www.sos.state.tx.us/elections/voter/important-election-dates.shtml (visited April 5, 2022).

[14] *Ex parte Young* also requires Plaintiffs to show that the Attorney General has demonstrated the willingness to exercise any enforcement authority he may possess. *City of Austin v. Paxton*, 943 F.3d 993, 1001-02 (5th Cir. 2019). They have not done so; their allegations show merely that Paxton "has chosen to intervene to defend *different* statutes under *different* circumstances," which is insufficient under federal law. *Id.* at 1002.

## A. Under the Texas Constitution, the Attorney General requires legislative authorization to represent the State in a state trial court.

The Texas Constitution generally splits the duty of representing the State between the Attorney General and the district and county attorneys based on the court in which an action will be pursued. Tex. Const. art. IV, § 22; *id.* art. V, § 21. District and county attorneys "shall represent the State in all cases in the District and inferior courts in their respective counties." *Id.* art. V, § 21. The Attorney General's constitutional duties include representing the State in this Court and in certain trial-court actions involving corporations and charters. *Id.* art. IV, § 22. He may also "perform such other duties as may be required by law." *Id.*

Under this Court's jurisprudence, the "other duties" clause permits the Legislature to assign other duties to the Attorney General that may include representing the State in trial court, notwithstanding the general assignment of that duty to the district and county attorneys. *El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996); *see also, e.g.*, *Brady v. Brooks*, 89 S.W. 1052, 1055 (Tex. 1905) (noting the district and county attorneys' constitutional duties do not deprive the Legislature of "the authority to empower the Attorney General to bring suits on behalf of the state"). Giving the example of Texas Civil Practice and Remedies Code section 101.103, the Court has explained that "[w]hile there is no general statute authorizing the Attorney General to represent the State and its agencies in district court, the

Legislature has provided for such representation in particular types of cases." *El Paso Elec. Co.*, 937 S.W.2d at 438-39.[15]

Under this precedent, when the Legislature wants the Attorney General to be able bring a cause of action on behalf of the State, it typically must explicitly authorize the Attorney General to do so. "[I]t is clear that when the Legislature creates a new or additional cause of action in favor of the State it *may* also constitutionally authorize the Attorney General to prosecute such cause of action in both the trial and appellate courts of the State." *Smith*, 328 S.W.2d at 295 (emphasis added). But this Court has generally required a clear statement that "expressly authorized the Attorney General, as well as any District or County Attorney, to institute and prosecute the statutory suit thus created." *Id.* at 294-95; *Brady*, 89 S.W. at 1053 (examining a statute stating that "[t]he Attorney General is authorized and required upon request by the Comptroller, to bring suit in the name of the state").

Because "magic words" rules are disfavored, it may be possible that the overall statutory context will permit the Attorney General to bring suit without express authorization. For example, in an unrelated context, this Court has found that while sovereign immunity can typically be waived only by extremely clear language, it can also be waived "on rare occasions" based on a larger statutory framework

---

[15] The Texas Court of Criminal Appeals recently rejected this Court's reasoning on this important constitutional question. *Stephens*, 2021 WL 5917198, at *8 (stating that this Court "erroneously" interpreted the "other duties" clause). Because that holding is limited to criminal proceedings, it does not impact the application of this Court's precedent on civil penalties such as those at issue here.

demonstrating that "the Legislature has clearly and unambiguously waived sovereign immunity." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003). But the Court made clear that the standard for showing such a waiver absent "magic words" is quite high.

The Attorney General is unaware of any cases where this Court has explained when (if ever) statutory context can authorize the Attorney General to bring suit in state trial court absent an express grant of authority. But the Austin Court of Appeals has applied not dissimilar factors to those set out in *Taylor* to find authorization for the Attorney General to pursue a cause of action for civil penalties under section 242.065 of the Texas Health and Safety Code. *State v. Evangelical Lutheran Good Samaritan Soc'y*, 981 S.W.2d 509, 511 (Tex. App.—Austin 1998, no pet.). In particular, the court found authorization from the overall role of the Attorney General in the statutory scheme as well as a provision that required the Attorney General "to cooperate in any legal proceeding requested by" the defendant department. *Id.* at 511-14 (citing Tex. Health & Safety Code § 242.073) (emphasis omitted).

Absent such clear evidence of legislative authorization, this Court has typically found that such authorization was lacking. For example, in *Day Land & Cattle Co. v. State*, neither the Attorney General nor the district attorney had authority to bring suit for the cancellation of land patents at the time the Attorney General filed such a suit. 4 S.W. 865, 867 (Tex. 1887). The Court stated that "it would be difficult to hold that either of them had the implied power resulting from the general grants of power or imposition of duties" and that "no power ought to be exercised for which warrant is not there found." *Id.* The Legislature, however, subsequently passed a law

retroactively approving such suits by the Attorney General, and the Court concluded that "the suit must stand as though the attorney general and district attorney had express authority to institute and maintain it." *Id.* at 867-68.

More recently, the San Antonio Civil Court of Appeals considered a statute that did not explicitly give the Attorney General the authority to seek removal of a county officer in a nepotism case. *State ex rel. Downs v. Harney*, 164 S.W.2d 55, 57-58 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.). It concluded that, because the statute did not mention that the Attorney General could bring such actions, he was prohibited from doing so—even though he was permitted to seek similar relief in quo warranto proceedings. *Id.* at 58. This Court later approved that decision, stating that "had such holding been incorrect we could not have failed to have granted the writ on such an important law question." *Garcia v. Laughlin*, 285 S.W.2d 191, 194 (Tex. 1955).

## B. The Legislature has not clearly authorized the Attorney General to represent the State in seeking civil penalties under section 31.129 in trial courts.

While the Attorney General is involved in various capacities in Texas's elections, the Legislature has not clearly authorized him to bring a claim in a trial court for civil penalties under section 31.129. Section 31.129 itself is silent on who may enforce its substantive requirements. More generally, the Election Code "delineates between the authority of the Secretary of State and local officials" and leaves relatively little role for the Attorney General in directly enforcing its terms. *Tex. Democratic Party*, 978 F.3d at 179. Although the Attorney General frequently represents

41

the Secretary of State in election-related litigation, and the Secretary can refer a violation to the Attorney General for enforcement, Tex. Elec. Code § 31.005(c), there is no provision in the Election Code similar to that in *Evangelical Lutheran*, which requires the Secretary "work in close cooperation" with the Attorney General "throughout any legal proceedings requested by the department." Tex. Health & Safety Code § 242.073(a); *see also Evangelical Lutheran*, 981 S.W.2d at 512 (discussing Tex. Health & Safety Code §§ 242.073, .320).

This silence is telling as the Legislature has demonstrated that it is well aware of how to assign a duty to the Attorney General. Indeed, elsewhere in S.B. 1 itself, the Legislature assigned the Attorney General the duty to collect a different civil penalty. *See* Tex. Elec. Code § 18.065(f). That language would have been unnecessary if the Attorney General had the inherent or implicit authority to bring suit on behalf of the State. Because section 31.129 does not expressly permit the Attorney General to sue for civil penalties, it is unlikely that this is an "other duty" given to the Attorney General by the Legislature. The answer to the third certified question, therefore, is "no"—at least so far as it applies to initiating a claim for civil penalties under section 31.129 in trial court.

## C. The Attorney General retains authority to enforce Texas election laws by other means and in other circumstances.

The lack of authority to bring civil penalties under section 31.129 does not, however, mean the Attorney General is without any authority to enforce provisions of the Election Code. In specifying the remedies available for violation of the anti-solicitation provision, S.B. 1 preserved pre-existing remedies not once but twice. *See* S.B.

42

1 § 7.04 (codified at Tex. Elec. Code § 276.016(f) (noting that the criminal remedy is "cumulative" and that a violation "is subject to injunctive relief or mandamus as provided by this code")); *id.* § 8.01 (codified at Tex. Elec. Code § 31.130 (specifying that an official-capacity action "including an action for a writ of mandamus" be brought against the officer in his official capacity)). This preservation of remedies was made in the context of this Court's decision in *Hollins*, which allowed the Attorney General to use an *ultra vires* action to rein in election officials who intended to violate the law. *See generally* 620 S.W.3d 400. Moreover, the Election Code has long provided for proceedings to "compel the performance of any duty imposed by law in connection with the holding of an election or a political party convention" directly in this Court under Texas Election Code section 273.061(a). By preserving that as an available remedy, the Legislature presumptively intended the Attorney General to retain some enforcement role—albeit in a highly discretionary context—because the Attorney General is the government actor empowered to represent the State in this Court. Tex. Const. art. IV, § 22.[16]

With respect to criminal violations, the Attorney General retains the authority to investigate violations of election laws, Tex. Elec. Code §§ 31.006(b), 273.001(a), and may assist a local prosecutor or be deputized by one to bring criminal charges,

---

[16] That authority would also presumptively require the Attorney General to represent the State on appeal from a suit brought by a county or district attorney for civil penalties under section 31.129. But the Attorney General does not understand that to be the thrust of the Fifth Circuit's question since it would not allow him to *initiate* enforcement actions as required under *Ex parte Young. See, e.g.*, *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022).

*Stephens*, 2021 WL 5917198, at *10. He can also seek an injunction or mandamus at the request of the Secretary of State if a person refuses to abide by an order of the Secretary and is impeding the right to vote. Tex. Elec. Code § 31.005. And there remain specific provisions of the Election Code that identify the Attorney General as having authority to bring suit. *E.g.*, *Id.* §§ 18.065(f), 34.005(a), 122.0911(c). But because that language is not present in section 31.129, it does not grant him the authority to seek the civil penalties that section provides.

## PRAYER

The Court should answer the Fifth Circuit's questions as follows:

1. No, VDRs are not "public officials" under Texas Election Code section 276.016.

2. "Solicits" requires importuning or strongly urging someone to submit an application for a mail-in ballot and does not include merely providing information.

3. No, the Attorney General is not a proper official to seek the specific penalties authorized by Texas Election Code section 31.129, but he may enforce the anti-solicitation provision through other means.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
State Bar No. 24115221
Lanora.Pettit@oag.texas.gov

BETH KLUSMANN
Assistant Solicitor General

CODY C. COLL
Assistant Attorney General

Counsel for the Attorney General
of Texas

45

# TAB 8

X.
Proviso for Estates
Tail, not recited.

(¹) PROVIDED alwaies, That this Acte or any thinge therein conteyned shall not extend to make good or avaielable in Law any Letters Parentes or Grannt of the p̃mysses or any parte thereof, whereof there was or shalbe any good and lawful Estate Taile heretofore made by your Majestie or any of your Progenitors, or hereafter to be made by your Majestie, unlesse suche Estate Taile be dulie recited.

XI.
Not to extend to
certain Lands
granted to Francis
Earl of Shrewsbury
by Letters Patent,
22 November,
33 Hen. VIII.

PROVIDED alwaies and be it enacted by the Authoritie aforesaide, That neither this Acte nor any thinge therein conteyned shall extende to make good any Letters Patentes heretofore made by your Majestie, sithence the five and twentiethe yeare of your Highnes Reigne, to any pson or psons and theire Heires, for and conc̃hinge the Mannors Granges Landes Tenement̃ Tithes and other Hereditamentes whatsoev̄, sett lyinge and beinge in the several Parishes of Bakewell and [Harrington¹] in the Countie of Derbie, and in the sev̄all Parishes of Rowcester alias Rocester and Blower in the County of Staff, mencioned or intended to have bene conveied unto Fraunces late Earle of Shrewsburie by the late Kynge of famous memorie Kynge Henrie the Eighte, by his Highnes Letters Patentes bearinge date at Westm̃ the two and twentiethe day of November in the three and thirtiethe yeare of the Reigne of the saide late Kinge; but, for and conc̃hinge all other Mannors Landes Teithes and Hereditament̃ conteyned in any such Letters Patentes made since the saide five and twentiethe yeare of your Majesties Reigne, the same shalbe within the Remedie and Provisions of this p̃sent Acte of Parliament, accordinge to the p'porte true intente and meaninge of the same.

XII.
Not to confirm any
Lease to the Queen
by Bishop of
Carlisle, not
inrolled.

PROVIDED alwaies, That neither this Acte nor any thinge therein conteined shall extende to the ratifyinge or makinge good of any Lease made by John Maye, late Bishoppe of Carliell deceased, to your Majestie, whiche was not enrolled before the firste day of [the¹] Session of Parliament.

---

## CHAPTER II.

### An Acte for the Releife of the Poore.

Churchwardens and
others shall be
yearly named
Overseers of
the Poor;

BEE it enacted by the Authoritie of this p̃sent Parliament, That the Churchwardens of everie Parish, and fower three or two substanciall Housholders there as shalbe thoughte meete, havyng respecte to the pporc̃on and greatnes of the same Parishe [or¹] Parishes, to be nõiated yearelie in Easter Weeke or within one monethe after Easter, under the Hande and Seale of two or more Justices of the Peace in the same Countie, whereof one to be of the Quos, dwellinge in or nerre the same Parishe or Division where the same Parishe doth lie, shalbe called Overseers of the Poore of the

to set poor
Children, &c.
to work;

same Parishe: And they or the greater parte of them shall take order from tyme to tyme, by and withe the consent of two or more suche Justices of Peace as is aforesaide, for settinge to worke of the Children of all suche whose Parentes shall not by the saide Churchwardens and Overseers or the greater parte of them bee thoughte able to keepe and

and to raise a Stock
for that Purpose;

maintaine theire Children; And alsoe for settinge to worke all such psons maried or unmaried havinge no meanes to maintaine them, use no ordinarie and dailie trade of lief to get their livinge by; and also to raise weeckelie or otherwise, by Taxac̃on of ev̄y Inhabitant Parson Vicar and other, and of ev̄y Occupier of Landes Houses Tithes impropriate or Propriac̃ns of Tythes, Colemynes or saleable Underwoods, in the saide Parishe in such competent sũme and sũmes of Money as they shall thincke fytt, a convenient Stocke of Flaxe Hempe Wooll Threed Iron and other necessarie Ware

and Money for
Relief of impotent
Poor; and for
apprenticing
Children;

and Stuffe to sett the Poore on worke; And alsoe competent sũmes of Money for and towardes the necessarie Releife of the lame impotente olde blinde and suche other amonge them beinge poore and not able to work, and alsoe for the puttinge out of suche Children to be Apprentices, to be gathered out of the same Parishe accordinge to the Abilitie of the same Parishe; and to doe and execute all other thing̃ aswell for the disposinge of the saide Stocke as otherwise conc̃hinge the p̃misses as to them shall seeme convenient: Whiche saide Churchwardens and Overseers soe to be

shall meet monthly;

nõiated, or suche of them as shall not be lett by sicknes or other juste excuse to be allowed by two suche Justices of Peace or more as is aforesaide, shall meete together at the leaste once everie monethe in the Churche of the saide Parishe, upon the Sunday in the Afternoone after Divine Service, there to consider of some good course to be taken

and shall account
yearly, and pay
over balance in
hand;

and of some meete order to be set downe in the p̃mysses, and shall within fower daies after the ende of their yeare and after other Ov̄seers nõiated as aforesaide, make and yeelde up to suche two Justices of Peace as is aforesaide a true and pfect Accounte of all sũmes of Money by them received, or rated and sessed and not received, and also of suche Stocke as shalbe in theire Handes or in the Handes of any of the Poore to worke, and of all other thing̃ conc̃hinge their saide Office; and suche sũme or sũmes of Money as shalbe in theire Handes shall pay and deliver

Penalty for Absence
or Neglect, &c.

over to the saide Churchwardens and Overseers newlie nõiated and appointed as aforesaide; upon payne that everie one of them absentinge themselves withoute lawfull cause as is aforesaide from such monethlie Meetinge for the p'pose aforesaide, or beinge negligent in theire Office or in the executc̃on of the Orders aforesaide, being made by and withe the assent of the saide Justices of Peace or any two of them before menc̃oned, to forfeite for everie suche defaulte of absence or negligence Twentie Shilling̃.

II.
Justices may make
Rates in aid of
Parishes not able to
relieve their own
Poor.

AND be it also enacted, That if the saide Justices of Peace doe pceive that the Inhabitant̃ of any Parishe are not able to levie amonge themselves sufficient sũmes of Money for the purposes aforesaide, That then the saide two Justices shall and may taxe rate and assesse as aforesaide any other of other Parishes, or oute of any Parishe within the Hundred where the saide Parishe is, to pay such sũme and sũmes of Money to the Churchwardens and Overseers of the saide poore Parishe for the saide p'poses, as the saide Justices shall thinke fytt, accordinge to the intent of this Law:

And if the saide Hundred shall not be thoughte to the saide Justices able and fitt to releive the saide seuall Parishes not able to pvide for themselves as aforesaide, then the Justices of Peace at theire genall Quarter Sessions, or the greater number of them, shall rate and assesse as aforesaide any other of other Parishes, or out of any Parishe within the said Countie, for the p'poses aforesaide, as in their discrecion shall seeme fitt. And that it shall be lawfull aswell for the p'sent as subsequent Churchwardens and Overseers or any of them, by Warrant from any two suche Justices of Peace as is aforesaide, to levie aswell the saide sumes of Money, and all Arrerages, of eũy one that shall refuse to contribute accordinge as they shalbe assessed, by Distresse and Sale of the Offendors Goodes, as the sumes of Money or Stocke whiche shalbe behinde upon any Accompte to be made as aforesaide, rendringe to the parties the Oũplus; and in defecte of such distresse it shalbe lawfull fõr any suche two Justices of the Peace to cõmitt hym or them to the cõmon Gaole of the Countie, there to remaine without Baile or Mainprise untill payment of the said Sume Arrerages and Stocke: And the saide Justices of Peace or any (·) of them to sende to the House of Correction or cõmon Gaole suche as shall not employ themselves to worke, beinge appoynted thereunto as aforesaide: And also any two suche Justices of Peace to cõmitt to the saide Prison eũy one of the saide Churchewardens and Overseers whiche shall refuse to accompt, there to remaine without Baile or Maineprise untill he have made a true Accompte and satisfied and paide soe much as upon the saide Accompt shalbe remayninge in his handes.

<div style="margin">Overseers may levy Rates and Arrears, &c. by Distresse, &c.

Justices may commit Persons refusing to work; and Overseers refusing to account, &c.</div>

AND be it further enacted That it shalbe lawfull for the saide Churchwardens and Overseers, or the greater parte of them, by the assent of any two Justices of the Peace aforesaide, to binde any suche Children as aforesaide to be apprentices, where they shall see convenient, till suche Man childe shall come to the age of fower and twentie yeares, and suche Woman childe to the age of one and twenty yeares, or the tyme of her mariage; the same to be as effectuall to all p'poses as if suche Childe were of full Age, and by Indenture of Covenant bounde hym or her selfe.

<div style="margin">III. Overseers may bind poor Children Apprentices.</div>

AND to the intent that necessarie places of Habitacõn may more convenientlie be pvided for suche pnore impotent people, Be it enacted by the authoritie aforesaide, That it shall and may be lawfull for the saide Churchewardens and Overseers, or the greater part of them, by the leave of the Lorde or Lordes of the Mannour whereof any Waste or Cõmon within theire Parishe is or shalbe parcell, and upon agreement before withe hym or them made in writinge under the Handes and Seales of the saide Lorde or Lordes, or otherwise according to any order to be set downe by the Justices of Peace of the saide Countie at their Generall Quarter Sessions, or the greater parte of them, by like leave and agreement of the said Lorde or Lordes in writinge under his or theire Handes and Seales, to erecte builde or sett up in fyt and convenient places of Habitacõn in suche Waste or Cõmon, at the genall Chardges of the Parishe or otherwise of the Hundred or Countie as aforesaide, to be taxed rated and gathered in manner before expssed, convenient Howses of Dwellinge for the said impotent Poore, and alsoe to place Inmates or more Families then one in one Cottage or House; One Acte made in the one and thirtieche yeare of her Majesties Riegne, intituled An Acte against the erectinge and mayntaininge of Cottages, or any thinge therein conteined, to the contrarie notwithstandinge; Whiche Cottages and Places for Inmates shall not at any tyme after be used or employed to or for any other Habitacõn, but onely for impotent and poore of the same Parishe, that shalbe there placed from tyme to tyme by the Churchwardens and Overseers of the Poore of the same Parishe, or the moste parte of them; upon the Paines and Forfeitures contained in the saide former Acte made in the saide one and thirtieche yeare of her Majesties Raigne.

<div style="margin">IV. Overseers may, with Consent of Lord of Manor, build Houses on the Waste for the impotent Poor;

and place Inmates there; *see* 31 *Eliz.* c. 7.</div>

PROVIDED alwaies, That if any pson or psons shall finde themselves grieved withe any Sesse or Taxe or other Acte done by the said Churchwardens and other psons, or by the saide Justices of Peace, that then it shall be lawfull for the Justices of Peace at theire Generall Quarter Sessions, or the greater number of them, to take suche order therein as to them shalbe thoughte convenient, and the same to conclude and bynde all the saide parties.

<div style="margin">V. Appeal against Rates, &c. to the Quarter Sessions.</div>

AND be it further enacted, That the Father and Grandfather, and the Mother and Grandmother, and the Children, of everie poore olde blinde lame and impotente pson, or other poore pson not able to worke, beinge of a sufficient abilitie, shall at their owne Chardges releive and maintaine everie suche poore pson, in that manner and accordinge to that rate, as by the Justices of the Peace of that Countie where suche sufficient psons dwell, or the greater number of them, at their genall Quarter Sessions shalbe assessed; upon paine that everie one of them shall forfeite Twentie shillinge for eũy monethe whiche they shall faile therein.

<div style="margin">VI. Poor shall be maintained by their Parents or Children; Penalty 20s. per Month.</div>

AND be it further herebie enacted, That the Maiors Bailifs or other Head Officers of everie Towne and Place Corporate and Citie within this Realme, beinge Justice or Justices of Peace, shall have the same authoritie by vertue of this Acte within the limits and pcincts of their Jurisdiccõns, as well out of Sessions as at theire Sessions, if they hould any, as is herein limited pscribed and appointed to Justices of the Peace of the Countie, or any two or more of them, or to the Justices of Peace in their Quarter Sessions, to doe and execute for all the uses and p'poses in this Acte pscribed, and noe other Justice or Justices of Peace to enter or meddle there; And that everie Alderman of the Citie of London within his Warde shall and may doe and execute in everie respecte so muche as is appointed and allowed by this Acte to be done and executed by one or two Justices of Peace of any Countie within this Realme.

<div style="margin">VII. Authority of Officers in Corporations;

and of Aldermen of London.</div>

AND be it also enacted, That if it shall happen any Parishe to extend it selfe into more Counties then one, or part to lie within the Libties of any Citie Towne or Place Corporate, and parte withoute, that then as well the Justices of the Peace of eũy Countie as also the Heade Officers of suche Citie Towne or Place Corporate, shall deale and entermeddle onelie in soe muche of the saide Parishe as lithe within their Libties, and not any further; And everie of them

<div style="margin">VIII. Parishes where Parish extends into Two Counties, Liberties, &c.</div>

respectivelie within their sevall Limytt Wardes and Jurisdiccōns to execute the Ordinances before mentioned, concerninge the nōiacion of Officers, the consent to bindinge Apprentices, the giving Warrante to levie Taxacōns unpaide, the takinge accompte of Churchwardens and Overseers, and the cōmittinge to prison suche as refuse to accompte, or deny to pay the Arrerages due upon theire Accomptes; And yet nevthelesse, the saide Churchewardens and Officers, or the moste parte of them of the saide Parishes that doe extende into suche sevall Limitts and Jurisdiccōns, shall withoute dividinge themselves, dulie execute their Office in all places within the saide Parishe in all Thinges to them belonginge, and shall dulie exhibite and make one Accompte before the saide Head Officer of the Towne or Place Corporate, and one other before the saide Justices of Peace, or any such two of them as is aforesaide.

IX.
Penalty on Justices, &c. for Neglect in nominating Overseers, &c.

AND further be it enacted by the authoritie aforesaide, That if in any place within this Realme there happen to be hereafter no suche nōiacion of Overseers yearlie as is before appoynted, that then everie Justice of Peace of the Countie, dwellinge within the Division where suche defaulte of Nōiacōn shall happen, and every Maior Alderman and Head Officer of Citie Towne or Place Corporate where such defaulte shall happen, shall lose and forfeit for evye suche defaulte Five poundes; to be imployed towardes the Releife of the Poore of the saide Parishe or Place Corporate, and to be levied as aforesaide of their Goodes by warrant from the generall Sessions of the Peace of the saide Countie, or of the same Citie Towne or Place Corporate if they keepe Sessions.

X.
Levying and Application of Penalties.

AND be it also enacted by the authoritie aforesaide, That all Penalties and Forfeitures, before mencioned in this Acte to be forfeited by any pson or psons, shall goe and be employed to the use of the Poore of the same Parishe, and towardes a Stocke and Habitacōn for them, and other necessarie uses and releife, as before in this Acte are mencōed and expssed; and shalbe levied by the saide Churchwardens and Overseers, or one of them, by warrant from any two suche Justices of Peace, or Maior Alderman or Head Officer of Citie Towne or Place Corporate respectivelie within their severall Limits, by distresse and sale thereof as aforesaide, or in defecte thereof it shalbe lawfull for any two suche Justices of Peace, and the saide Aldermen and Head Officers, within their sevall Limits, to cōmit the Offender to the saide Prison, there to remaine withoute Baile or Maineprise till the saide Forfeitures shalbe satisfied and paide.

XI.
A certain weekly Rate to be made on each Parish by Justices, leviable by Distress, &c.

AND be it further enacted by the authoritie aforesaide, That the Justices of Peace of everie Countie or Place Corporate, or the more parte of them, in their generall Sessions to be holden next after the Feaste of Easter next, and so yearelie as often as they shall thincke meete, shall rate everie Parishe to such a weekelie sōme of mony as they shall thincke convenient, soe as no Parishe be rated above the sōme of sixe pence, nor under the sōme of a Halfepennie weekelie to be paide, and so as the totall sōme of such Taxacōn of the Parishes in everie Countie amounte not above the rate of Two pence for everie Parishe within the said Countie; Whiche sōmes soe taxed shalbe yearelie assessed by the Agreement of the Parishioners within themselves, or in default thereof by the Churchwardens and Pettie Constables of the same Parishe, or the more parte of them, or in defaulte of thuire Agremente, by the order of suche Justice or Justices of Peace as shall dwell in the same Parishe, or (if none be there dwellinge) in the partes next adjoyninge; And if any pson shall refuse or neglect to pay any suche porcōn of Money soe taxed, it shalbe lawful for the saide Churchwardens and Constables, or any of them, or in theire default, for any Justice of Peace of the saide limitt to levie the same by distresse and sale of the Goods of the partie soe refusinge or neglectinge, rendringe to the partie the overplus, and in defaulte of such distresse, it shalbe lawfull to any Justice of that limitt to cōmitt suche pson to the saide Prison, there to abide withoute Baile or Maineprise till he have paide the same.

XII.
Sums applicable by Justices to Relief of Prisoners in King's Bench Prison, &c.

AND be it also enacted, That the saide Justices of the Peace, at their gehall Quarter Sessions to be holden at the tyme of such Taxacōn, shall sett downe what competent sōmes of Money shall be sent quarterlie out of everie Countie or Place Corporate, for the Releife of the poore Prisoners of the Kings Benche and Marshalsey, and also of suche Hospitals and Almeshouses as shalbe in the said Countie, and what sōmes of money shall be sent to everie of the saide Hospitals and Almeshouses, soe as there be sent out of every Countie yearelie Twentie shillinge at the leaste to eache of the saide Prisons of the Kings Benche and Marshalsey; whiche sōmes, ratable to be assessed upon everie Parishe,

payable to High Constable, and by him to a Treasurer, &c.

the Churchewardens of everie Parishe shall trulie collect and pay over to the Highe Constables in whose Division suche Parishe shalbe scituate, from tyme to tyme, quarterlie ten daies before the ende of everie Quarter; and everie suche Constable at everie suche Quarter Sessions in suche Countie, shall pay over the same to suche two Treasurers, or to one of them, as [shall] by the more parte of the Justices of Peace of the Countie be elected to be the saide Treasurers, to be chosen by the Justices of Peace of the saide Countie Citie or Towne or Place Corporate, or of others which were seised and taxed at five pounde Landes or Tenne pounde Goodes at the leaste, at the Taxe of Subsedie nexte before the tyme of the saide Election to be made; and the saide Treasurers soe elected to continue for the space of one whole yeare in theire office, and then to give up their chardge with a due accompte of their Receiptes and Disbursements, at the Quarter Sessions to be holden nexte after the Feaste of Easter in everie yeare, to suche others as shall from yeare to yeare in forme aforesaid successivelie be elected Treasurers for the saide Countie Citie Towne or Place Corporate;

and by the Treasurers to the Chief Justice.

Penalty for Neglect in Payment, &c.

whiche saide Treasurers, or one of them, shall pay over the same to the Lorde Chiefe Justice of England, and Knight Marshall for the tyme beinge, equallie to be divided to the use aforesaide, takinge their Acquittance for the same, or in defaulte of the saide Chiefe Justice, to the next ancientest Justice of the Kings Benche as aforesaide; And if any Churchwarden or Highe Constable, or his Executors or Adminystrators, shall faile to make payment in forme above sfsfied, then everie Churchwarden his Executors or Admynystrators so offendinge, shall forfeite for everie tyme, the sōme of Tenne shillings, and evy Highe Constable his Executors or Admynystrators shall forfeite for everie tyme, the sōme of Twentie shillings; the same Forfeitures, together withe the sōmes behynde, to be levied by the saide Treasurer and Treasurers by way of Distresse and Sale of the Goodes as aforesaide in forme aforesaide, and by them to be employed towardes the charitable uses comprised in this Acte.

* shalbe O.; but erroneous.

And be it further enacted, That all the Surplusage of Money whiche shalbe remaininge in the saide Stocke of any Countie, shall by discrecion of the more parte of the Justices of the Peace in their Quarter Sessions, be ordered distributed and bestowed for the Reliefe of the poore Hospitals of that Countie, and of those that shall susteine Losses by Fire Water the Sea or other casualties, and to suche other charitable p'poses for the Releife of the Poore as to the more parte of the saide Justices of Peace shall seeme convenient.

XIII.
Distribution of Surplus of Money raised.

And be it further enacted, That if any Treasurer elected shall wilfullie refuse to take upon hym the saide Office of Treasurershippe, or refuse to distribute and give Releife, or to accounte accordinge to suche forme as shalbe appointed by the more parte of the saide Justices of Peace, That then it shalbe lawfull for the Justices of Peace in their Quarter Sessions, or in their defaulte for the Justices of Assise at the Assises to be holden in the same Countie, to fyne the same Treasurer by their discrecion; the same Fyne not to be under Three Pounde, and to be levied by sale of his Goodes and to be prosecuted by any two of the saide Justices of Peace whom they shall authorise.

XIV.
Penalty on Treasurer refusing to act.

Provided alwaies, That this Acte shall not take effecte untill the Feaste of Easter nexte.

XV.
Commencement of Act.

And be it enacted, That the Statute made in the nine and thirtiethe yeare of her Majesties Reigne, intituled An Acte for the Releife of the Poore, shall continue and stand in force untill the Feaste of Easter nexte; And that all Taxacions heretofore imposed and not paide, nor that shal be payed before the saide Feaste of Easter nexte, and that all Taxes hereafter before the saide Feast to be taxed by vrtue of the saide former Acte, whiche shall not be paide before the saide Feaste of Easter, shall and may after the saide Feaste of Easter be levied by the Overseers and other p'sons in this Acte respectivelie appointed to levie Taxacions by Distresse, and by suche warrant in everie respecte as if they had bene taxed and imposed by vertue of this Acte and were not paide.

XVI.
Stat. 39 Eliz. c. 3. shall remain in force until Commencement of this Act.

Provided alwaies, That whereas the Iland of Fowlenes in the Countie of Essex, beinge invironed withe the Sea, and havinge a Chappell of Ease for the Inhabitants thereof, and yet the saide Ilande is no Parishe, but the Landes in the same are scituated within divers Parishes farre distant from the saide Ilande: Bee it therefore enacted by the authoritie aforesaide, That the saide Justices of Peace sh 'l nõiate and appointe Inhabitantes within the saide Iland, to be Overseers for the poore People dwellinge within the saide Iland; and that bothe they the saide Justices and the saide Overseers shall have the same power and authoritie, to all Intentes Consideracions and p'poses, for the execucõn of the partes and articles of this Acte, and shalbe subjecte to the same paines and forfeitures, and likewise that the Inhabitantes and Occupiers of Landes their, shalbe liable and chargeable to the same Payments Charges Expences and Orders, in suche manner and forme as if the same Ilande were a Parishe: In Consideracõn whereof, neither the saide Inhabitants or Occupiers of Lande within the saide Ilande shall not be compelled to contribute towardes the Releife of the Poore, of those Parishes wherein their Howses or Landes whiche they occupie within the saide Ilande are scituated, for or by reason of their saide Habitations or Occupyinges, other then for the Releife of the poore People within the saide Ilande, neither yet shall the other Inhabitants of the Parishes wherein suche Howses or Landes are scituated, be compelled by reason of their Resiancie or Dwellinge to contribute to the Releife of the poore Inhabitants within the saide Ilande.

XVII.
For appointing Overseers, &c. on the Island of Fowlenes, in Essex.

And be it further enacted, That if any Action of Trespas or other Suite shall happen to be attempted and broughte againste any p'son or p'sons, for takinge of any Distresse makinge of any Sale or any other thinge doinge by Authoritie of this p'sente Acte, the Defendant or Defendants in any suche Action or Suite shall and may either pleade Not Guiltie, or otherwise make Avowrie Cognisance or Justificacõn, for the takinge of the saide [Distresses'] makinge of Sale or other thinge doinge by vertue of this Acte; alleaginge in suche Avowrie Cognisance or Justificacõn that the saide Distresse Sale Trespas or other thinge whereof the Plaintife or Plaintifs complained, was done by Authoritie of this Acte, and accordinge to the tenor p'porte and effecte of this Acte, withoute any expressinge or rehearsall of any other matter or circumstance conteined in this p'sente Acte; To which Avowrie Cognisance or Justificacõn the Plaintife shalbe admitted to replie, that the Defendant did take the saide Distresse, made the said Sale, or did any other Acte or Trespas supposed in his Declaracõn, of his owne wronge, without any suche cause alleaged by the saide Defendant; wherrupon the Issue in everie such Action shal be joyned, to be tried by Verdict of Twelve men and not otherwise, as is accustomed in other p'sonall Acciõns: And upon the triall of that Issue the whole matter to be given in evidence on bothe p'ties in Evidence accordinge to the verie trueth of the same; And after suche Issue tried for the Defendant, or Nonsuit of the Plaintife after Appearance, the same Defendant to recover Treble Damages, by reason of his wrongfull vexaciõn in that behalfe, withe his Costes also in that parte susteyned, and also that to be assessed by the same Jurie or Writt to enquire of the Damages, as the same shall require.

XVIII.
General Issue may be pleaded in Actions for Distresses, &c. under this Act.

Provided alwaies, That this Acte shall endure no longer then to the ende of the same Session of Parliament.

XIX.
Continuance of this Act.

' Distresses O.

# TAB 9

# From Poor Laws to Pensions: The Evolution of Economic Support for the Aged in England and America

JILL S. QUADAGNO

*University of Kansas*

IN THE YEAR 1644, THE TOWNSHIP OF PORTSMOUTH, Rhode Island, delegated the care of "ould John Mott" to the town overseers. The overseers arranged for a caretaker who would provide for his "diett and washing" in exchange for 5s per week. These arrangements were made in spite of the fact that John Mott had a son. Rather than caring for his father personally, the son agreed to pay "A Cowe for ever and 5 bushels of Corne by the yeare so longe as the ould man shall live . . . that so he might be dischardged from any further Chardge" (Creech 1936). Old John Mott was clearly not self-reliant, and his son, while not abandoning his father entirely, relegated his care to members of the town, thus discharging himself from any further responsibility.

The case of John Mott is not unique, not some historical anomaly that can be readily explained away. Yet a common theme among contemporary writers is that old age dependency was not a problem until the late nineteenth century and that older people either worked or were cared for by family, friends, or charity.[1] These conclusions,

---

[1] Several writers coming from such diverse perspectives as modernization theory or Marxist political economy pursue this theme. For a general statement, see Rothman (1971). For specific statements on the security of the aged in the past, see Olson (1982) and Achenbaum (1983).

Milbank Memorial Fund Quarterly/*Health and Society*, Vol. 62, No. 3, 1984
© 1984 Milbank Memorial Fund and Massachusetts Institute of Technology

417

while understandable given the lack of detailed information regarding either the extent or adequacy of support for older people in the past,[2] are curious in their romanticism, and perhaps reflect more the views of twentieth-century reformers, haunted by the discovery of old age pauperism, than of actual research findings. Given the existing evidence of old-age dependency from the earliest years of the colonial period, it seems apparent that no generalizations about the adequacy of care for the dependent aged in the past should be made without some more detailed attention being directed toward the history of old-age security and the care provided older people under the poor law.

Throughout the past 400 years, old-age security has been transformed from a locally financed and administered system of care to a massive, bureaucratic, national program of income maintenance. Yet, as we shall see, some of the same conflicts over eligibility for aid that threatened the sense of community in the colonial era are still present in contemporary programs for the aged. In this paper I will trace the development of various forms of economic support for older people, beginning with those that evolved from the English Poor Law, showing how poor law precedents were maintained in welfare policy even when welfare became a national rather than just a local issue.

## The English Poor Law

The first English poor relief laws, which date back to 1535 (around the time of the decline of the monasteries), were concerned primarily with providing modes of punishment for beggars who increased as the number of landless laborers and cottagers rose. The Elizabethan Poor Law of 1601 represented a major turning point in the history of welfare in that it recognized state responsibility for the indigent. It distinguished between the able-bodied and the impotent poor and declared that it was the duty of the community to help the individuals who could not help themselves. Further, every citizen enjoying the

---

[2] Demos (1978) asserts that "many elderly New Englanders retained a substantial capacity for work, for public service, for ordinary forms of social intercourse." Yet much of his evidence could have more negative connotations. He cites numerous examples of older people performing arduous, probably part-time tasks, such as mowing salt water grass or hauling grist to the local mill, and he also finds that it was common for older men to withdraw from public office.

advantages of government was obliged to contribute to the relief of those in distress by payment of a compulsory tax levied by each parish for the care of its own poor, the first public tax ever levied for that purpose. While charging kin with responsibility for the care of their aged parents and grandparents, the law also recognized that this duty might not be fulfilled. Thus, it provided for the establishment of "convenient dwellings" for the old and infirm, whereas workhouses were to be built for the able-bodied poor.

A later addition to the poor law was the Act of Settlement of 1662, which required every person to have a settled domicile within 40 days and be enrolled in some fixed community. Each recent settlement cancelled a previous one, and paupers who could not prove settlement in a given community were often sent off to other areas where they or perhaps some relative had established settlement. Instead of simplifying administration, the settlement acts only increased the problems of administering the poor law, as administrators and poor relief recipients attempted to determine settlements (Quadagno 1982).

The hallmark of the poor law was local autonomy, and by 1832 the poor law was administered through 15,000 independent parishes. Gradually, due to a series of abuses and inequities in the assessment of the rates, pressures for reform arose. In 1834 a bill for the amendment of the poor law was brought before Parliament. After extensive debate, it was passed with overwhelming support. The key philosophical issue was how to return "able-bodied" paupers to a condition of economic and moral independence. This was accomplished by implementing the twin principles of the "workhouse test" and "less eligibility." The term "less eligibility" referred to the belief that the condition of the pauper relieved should be worse than the condition of the poorest, independent, self-supporting laborer. Outdoor relief was to be reduced, and the "able-bodied" poor were to be incarcerated in workhouses. In order to apply this policy on a uniform basis throughout the country, a permanent central authority, the Poor Law Commission, was established to direct the system. Independent parishes were to be consolidated into unions, and relief was to be administered by relieving officers under the direction of an elected board of guardians.

Although poverty was generally considered an indication of individual failure, calling for rebuke and stern treatment, the philosophy toward relief to the aged was somewhat more ameliorative. The report of 1834 concluded, "We find that even in places distinguished in general

by the most wanton parochial profusion, the allowances to the aged and infirm are moderate" (quoted in Quadagno 1982). While some argued that continued support of the aged by the parish would further erode familial ties, the commission determined that parish support for the aged was necessary because the English working classes were totally deficient in natural filial affection. Thus, it became general policy to continue to allow small amounts of out-relief to the aged without specific concern about pressuring children to contribute (Webb and Webb 1909).

In 1847 the Poor Law Commission became the Poor Law Board, and this board was subsequently absorbed into the new Local Government Board in 1871. The Local Government Board's jurisdiction encompassed the poor law under a broader spectrum of social support, usurping local authority further and placing poor law administration more clearly under the jurisdiction of the central government.

Almost immediately after its creation, the Local Government Board and its inspectorate launched a campaign against outdoor relief in an attempt to return the poor law to the principles of 1834. The 1871 "Circular on Outdoor Relief," which was one of the first policy recommendations of the Local Government Board in regard to the poor law, condemned the out-relief system and suggested that all applications for relief be more carefully scrutinized with an increased reliance on the workhouse as a test of destitution. New stress was placed on getting contributions from kin, for it was implied that if the aged were confronted with the workhouse, their relatives would come forward and maintain them (Webb and Webb 1910).

The circular was accompanied by an administrative change that emphasized implementing deliberate policy rather than allowing decisions about relief to be dependent on temporary statutes and whims of local authorities. Steady pressure was placed on boards of guardians to reduce out-relief in spite of the fact that the sick and aged made up at least half and perhaps as much as three-quarters of the adult population receiving out-relief.[3] There was increased concern with record-keeping, and tables showing the amount of relief given by

---

[3] Although Poor Law returns were not tabulated by age until 1890, there was a separate category termed "aged and infirm." According to the Poor Law Commission's annual reports, over half of the adult paupers on outdoor relief were aged and infirm from at least as early as 1840 (Rose 1972). The Webbs (1910) had estimated an even higher figure.

each union were published and circulated. Unions that gave disproportionate amounts were held accountable, regardless of the proportion of aged in the population.

This policy remained in effect (with great regional variation in administration) until the 1890s when the first return of paupers by age was made (Collins 1965). Reformers' arguments were supported by the data gathered by Charles Booth (1891, 1894) on the condition of the aged poor, showing that the average rate of pauperism among those aged 65 and above was over 29 percent and in many districts over 50 percent. In the mid-1890s, two Royal commissions were organized to investigate the condition of the aged poor. Testimony presented by witnesses at the hearings of the Royal Commission on the Aged Poor indicated that policy implementation varied tremendously from union to union, with some relying largely on out-relief while others only provided relief in the workhouse. Even where out-relief was provided systematically, the amount given was meager, and many older people lived in total destitution. Those granted out-relief often found the experience of having to apply degrading, and many others in need made no application for relief for fear of being denied outright or of being "offered the house" (Quadagno 1982). The commission's findings combined with pressure from Parliament led to a reversal of poor law policy in regard to relief of the aged. In 1896 a circular was issued from the Local Government Board that extended liberal outdoor relief to the *deserving* aged poor, those who had been "of good character, thrifty according to their opportunities, and generally independent in early life" (Circular of 11th July 1896). This policy shift coincided with a general trend in the poor law system toward greater specialization of care and differentiation of paupers into categories.

In spite of the liberalization of relief policy, the issue of filial responsibility remained a concern. The 1895 Royal Commission on the Aged Poor read into the hearings a quotation from the 1834 report regarding the neglect of kin by the working classes. The issue was also apparently a concern among individual unions. For example, in 1905 the Fulham Board of Guardians felt it necessary to formally specify that sons and unmarried daughters of sufficient means were responsible for the maintenance of aged and infirm parents:

> Legitimate children (sons, whether married or single, and daughters, if unmarried) are bound to maintain their parents when unable to work through sickness or other cause. . . . It is only relatives of

sufficient ability who are liable, and proof of ability is required by justices before an order can be made (Wall 1977).

In 1909, owing in large part to the active intervention of organized labor, most older people were effectively depauperized with the implementation of the Old Age Pension Act, although substantial numbers remained in poverty. Under the Old Age Pension Act, every person of British nationality who had resided at least twenty years in the United Kingdom was entitled to a pension at age 70. Excluded were those whose incomes exceeded £31 10s., those who "habitually failed to work . . . according to ability, opportunity and need for the maintenance of themselves and those legally dependent on them," lunatics, prisoners, and those receiving poor relief (Gilbert 1964–1965). National pensioners were removed from the jurisdiction of the poor law authority and transferred to county councils that administered pensions through the post office. In 1911 the pauper disqualification was removed, and state income maintenance was extended to even the poorest aged (Collins 1965).

Although the amount of the pension granted was meager (5s. a week), it was significant in that it spelled the demise of local control of the support of the aged. It depersonalized income maintenance and shifted that responsibility from the local community to the state bureaucracy. This shift represented a major break with tradition in that funding was moved from local rates to national taxation, and eligibility was based on universal rather than particular criteria.

## Relief under the Early Colonial Poor Law

English settlers in the American colonies brought with them the Elizabethan concept that giving public relief to those who could not support themselves, or secure support from relatives, friends, or private philanthropy, was a proper function of local government. With only one exception, every community in the Plymouth and Massachusetts Bay Colonies provided for relief in the initial stages of settlement and subsequently administered relief as a regular town function.[4] As early

---

[4] The exception was the town of Taunton in Plymouth Colony which was cited for not providing relief during the 1650s (Lee 1982). Other regions were not as quick to establish poor laws. Both North and South Carolina were slow to pass poor law legislation and, although poor laws existed in Virgina, they often were not implemented (Wisner 1970).

as 1647, at the first session of its colonial legislature, Rhode Island announced the poor law principles that stressed, most importantly, public responsibility for the poor. Public responsibility for the poor was buttressed by the other principles of English poor law—local responsibility, family responsibility, and the residency requirement of legal settlement.[5]

The proper objects of relief were the aged, infirm, or insane, who were separated from their means of support and also from a household, and various arrangements were made to care for the needy, including providing light employment, giving provisions and a pension, and boarding with a relative or neighbor at town expense or care in an almshouse, the first of which was erected in Rensselaerswick, New York, in 1657 (Axinn and Levin 1982). One common solution to old age dependency was to assign the person's property over to the community in exchange for care for life, usually through some boarding arrangement. For example, in 1660 the case of Mr. Burrowes, a resident of Providence, Rhode Island, was considered at the town meeting because of his need of relief through "age and weakness" (Creech 1936). Mr. Burrowes was moved into the home of a townsman who had been found willing to take care of him, and his property and possessions were turned over to the town. Similarly, William Baker petitioned the free inhabitants of Portsmouth, Rhode Island, to take his sheep in return for care. The town meeting granted his request and bargained with "Hinory Pearcey" to provide "diat and lodgin" for a year for £8. Sometimes the sense of communal responsibility was taken quite literally, and a rotation system for boarding was established among members of the town. In 1687 the town meeting of Hadley, Massachusetts, voted that the widow Baldwin be removed from house to house "to such as are able to receive her" and "remain a fortnight in each family" (Kelso 1922).

The decline of Joseph Patchin can be documented through the changing responses of the Fairfield, Connecticut, town meetings to his needs. In 1673 the records indicate that "Goodman Patchin is to continue his worke about the meeting house." Eight years later due to his "weaknes and age" Joseph Patchin applied to the townsmen,

---

[5] Actually, local administration of relief was not implemented immediately. Initially, in Plymouth the town meeting shared responsibility for relief with colony officials and it wasn't until 1649 that the town inhabitants delegated the task to their selectmen. The pattern was similar in the Bay Colony (Lee 1982).

"desiring his owne estate may mayntayne him as far as it will reach." Just one year later it is apparent that his health had deteriorated still further, and it is now "old Patchin" that the town refers to when it provides Thomas Bennet with £13 for a year's food and lodging (Pumphrey and Pumphrey 1961). Other older people received similar consideration in Fairfield. Thus, assistance to the aged was flexible and might shift from finding work for an ailing man to providing food and lodging when deteriorating health made employment impossible.

Although it is difficult to make any accurate assessment regarding the proportion of older people receiving relief, in Plymouth, Massachusetts where the population grew from 500 to about 700 between 1630 and 1645, 57 cases of relief were recorded, and many of the relief recipients were old. Similarly, in Watertown, Massachusetts, 21 individuals received relief between 1660 and 1675, and most was given to older people, usually widows and widowers (Lee 1982). If no generalization about the extent of support can be drawn, it is still readily apparent that some older people in every colonial town had no family members either willing or able to provide support and that relief to the aged was one of the more common functions of poor relief. It also appears that the concept of family responsibility was applied liberally as best fit the needs of individual family members and was associated, at this stage, with economic factors rather than any punitive intent.

In these early years of the colonial period, administrators of relief to the needy were neighbors in small communities, and the concept of family governance reigned, as seen by the frequency with which boarding was used as a means for relieving the aged. Yet, as early as 1617, British poor law officials began the practice of dumping their undesirables—vagrants, paupers, and convicts—upon the colonies.[6]

---

[6] There is a lively debate regarding the extensiveness of this practice. Campbell (1959) argues that most British immigrants to the colonies were from the middle ranks of British society. Galenson (1978) challenges her conclusions and cites evidence that boys released directly from parish authorities, and men released from jails where they had been confined for debt or vagrancy, comprised a good portion of the immigrants. Georgia was founded by men released from debtor's prison (Wisner 1970). Regardless of who is correct in this debate, the perceptions of the colonists that dumping undesirables was a common British practice caused them to act as if it were true.

As a means of protecting themselves against this British practice and as a way of maintaining religious and moral solidarity within the community, the colonies established laws regulating the terms under which a resident might attain inhabitancy. This was accomplished through a procedure termed "warning out," which was based on the belief that each town was a corporation that had the right to choose whom it admitted to permanent residency. The purpose of warning was to free the town of any obligation to provide relief, and once warned an individual might become an inhabitant to all intents and purposes except for the right to receive support (Benton 1911).

One of the basic reasons for denying settlement to a stranger was likelihood of early dependency, and older people were among those at risk. This was recognized in an order passed in 1680 in Portsmouth, New Hampshire, which declared "that if any children, or older person shal be sent or come from one town to another, to school, or to nurs . . . if such shal stand in need of relief, they shal be relieved at the charge of the Town, from whence they came and do belong; and not by the town, to which they are sent" (Benton 1911). Thus, even though they might need aid, older people who were not town residents were given no special consideration and, in fact, were even perceived as a threat. This was demonstrated in the case of John Harmon, "a decriped man," who had no established clear inhabitancy. In 1680 the Massachusetts towns of Taunton and Plymouth disputed which was liable for the support of John Harmon. The dispute continued for two years until the court finally ordered that "the towne of Taunton shall receive and entertaine him for the space of one whole yeer, and Plymouth then to take him for one whole yeer; and soe to be kept from yeer to yeer" (Kelso 1922). This was a practical but hardly humane solution and illustrates the difficulty of determining just who the town's poor were.

## The Impact of Social Change in the Eighteenth Century

In the late seventeenth century, a series of colonial wars uprooted hundreds who came pouring into the cities and towns needing relief. These paupers were not familiar citizens who had earned the right to be maintained by the community but neither were they disreputable strangers who could easily be warned away. In 1701 Providence,

# TAB 10

allowed, shall, upon conviction thereof, before any court of this republic, forfeit and pay a fine of one hundred dollars, and be deprived of his office.

IRA INGRAM,
Speaker of the house of representatives.
RICHARD ELLIS,
President pro tem. of the senate.

Approved, Dec. 19, 1836.

SAM. HOUSTON.

————

# AN ACT,

Organizing Justices' Courts, and defining the powers and jurisdiction of the same, and also creating and defining the office and powers of commissioners of roads and revenue.

SEC. 1. Be it enacted by the senate and house of representatives of the republic of Texas, in congress assembled, That there shall be elected, by the qualified electors of each militia captain's district, two justices of the peace for their respective districts, who shall be commisioned by the president, and shall hold their offices for a period of two years, and shall take the oath prescribed by law for all officers of this republic. It shall be lawful for the said justices so elected, after taking the oath of office, to enter immediately upon the discharge of their duties; and their acts shall be as valid in law, before they receive commissions from the president, as afterwards.

SEC. 2. In all cases where any person has been elected justice of the peace, and neglects to qualify himself within twenty days, after notice of such election, the election shall be deemed void, and the chief justice of the county court shall order a new election.

SEC. 3. Any justice of the peace who shall be guilty of any malconduct or misdemeanor in office, may be prosecuted by presentment of a grand jury, in the district court of the proper county, and on conviction thereof shall vacate his office, and be thereafter rendered incapable of holding the office of justice of the peace in this republic.

SEC. 4. The justices of the peace shall be conservators of the peace within their respective counties, and shall have power to take all manner of recognizance, with or without security, for good behaviour to keep the peace, or for appearance at the proper court, to answer charges exhibited, or crimes committed in

the view of such justices; and in case any person shall refuse to enter into recognizance as aforesaid, and to find security when required, it shall be lawful for justices of the peace to commit the person so refusing to the county jail, there to remain until he shall comply with the order of such justice; and all recognizance so taken, shall be certified to the proper court for the county, at the next term thereafter; and if any person shall forfeit his recognizance, it shall be sent and certified with the record of default or cause of forfeiture, by the justice, to the proper court without delay.

SEC. 5. Any justice of the peace shall, by warrant under his hand, cause any person charged on oath of having committed or being suspected of any crime or misdemeanor, to be apprehended and brought before him; and if, in the opinion of such justice, there is sufficient cause to commit such person to the county jail, where such offence is not bailable, or where the offender is unable or unwilling to give bail, to appear before the proper court, to answer to the crime charged.

SEC. 6. Any justice of the peace shall issue a search warrant for stolen goods, on the oath of any credible person, particularly describing the place or persons suspected and intended to be searched, and the article for which search is made.

SEC. 7. When any person charged with a crime shall be brought before any justice, he shall take the voluntary information of the accused in writing, and the information on oath of all witnesses that appear, concerning the crime alleged to have been committed; and the accused shall have the privilege of putting any questions he thinks proper, which questions and answers shall be written down. It shall be the duty of the justice to transmit a copy of all such examinations to the next succeeding term of the proper court.

SEC. 8. If any person, charged with a criminal offence, shall remove or escape from the county where such offence is alleged to have been committed, into another county, it shall be the duty of any justice of the peace for the county where such person may be, to endorse the warrant of any justice of the peace where the offence was committed, which shall be sufficient authority for arresting such offender, in any place within the jurisdiction of such justice; and such criminal shall be carried to the county where the offence was committed, for examination. Subpoenas for witnesses may issue to any county, on the part of the republic, where it is necessary for bringing an offender to justice, which shall be executed by any officer authorized to exe-

cute process in the county where such witness resides; and any justice of the peace of the county to which any offender may have removed or escaped, shall, on the oath of any credible person, arrest and have conveyed to the proper county for examination, any person charged with crime.

SEC. 9. Justices of the peace shall have jurisdiction for all suits and actions for the recovery of money on any account, bond, bill, promissory note, or other written contract, covenant, or agreement whatsoever, or for specific articles, where the sum demanded does not exceed one hundred dollars.

SEC. 10. All suits and actions before a justice of the peace, shall be commenced and executed and returned in the same manner, and under the same penalties, as provided by the ninth section of the "act establishing the jurisdiction and powers of the district court," so far as is consistent with this act.

SEC. 11. All process from a justice of the peace, in civil suits, shall be under the hand and seal of such justice, directed to the officer whose duty it shall be to execute the same, shall be returnable at a certain time and place therein named, not less than ten, nor more than thirty days from the time of issuing the same; and on return thereof, the justice shall proceed to hear and determine the case on its merits, if the parties appear; give judgment by default, if the defendant fail to appear and contest the plaintiff's demand, or enter judgment of "non suit" against the plaintiff if he fail to appear and prosecute his claim, and shall issue execution against the goods and chattels of the party against whom judgment is so entered, for the amount of judgment and cost, or costs alone, as the case may require, returnable at the time and place to be therein stated, not less than fifteen nor more than thirty days. Any justice may, for good cause shown, on oath or affirmation, adjourn the trial of any cause to a time not exceeding ten days.

SEC. 12. No person shall be sued before any justice of the peace, except within the district where he resides, or the district where the debt was contracted, if in the same county.

SEC. 13. On the trial of any cause before a justice of the peace, if other satisfactory evidence cannot be had concerning the matter in controversy, the justices shall proceed to examine the parties or either of them, on oath, and give such judgment as may appear to be just and equitable.

SEC. 14. Every justice of the peace shall make a fair record, in a book that he shall keep for that purpose, of the proceedings in all suits and examinations had before him.

SEC. 15. Any justice of the peace, before whom any case is pending, shall issue subpoenas for all witnesses required by either party residing within the county; and in case any witness required resides without the county, may, provided reasonable and sufficient notice has been given to the adverse party, of the time and place of taking the depositions of such witness, issue a commission to some justice of the county in which such witness resides, to take his or her deposition; which deposition, so taken and returned, shall be read in evidence; and the provisions respecting witnesses of the "act establishing the jurisdiction and powers of the district courts," shall apply in all cases before a justice of the peace, so far as they are not inconsistent with this act.

SEC. 16. Any justice of the peace may grant a stay of execution issued by himself, for all sums under twenty dollars, twenty days; and over twenty dollars and under fifty dollars, forty days; all sums over fifty dollars, sixty days; provided the defendant shall enter into bond, with security, to be approved by the justice, in the penalty of double the amount of the judgment, including interest and costs, conditioned for the payment of the same; and in case the money is not paid at the end of such stay, execution shall issue against the principal and security, for the judgment, with interest and all costs. All judgments rendered by any justice of the peace, shall bear legal interest until paid.

SEC. 17. Any party may appeal from the decision of any justice, to the next term of the county court for the county, where the sum in controversy shall exceed twenty dollars; and the case shall be tried de novo, on giving bond with security, to be approved by the justice, payable to the adverse party, conditioned for the prosecution of such appeal to effect; and the payment of such judgment, with the interest, and all costs and damages, in case the same shall be affirmed; and if the defendant be the party who appeals, and judgment be rendered for the plaintiff in the original suit, ten per cent. damages upon the amount shall be included in such judgment. If the judgment of the county court be for the defendant in the original suit, he shall recover full costs.

SEC. 18. Every justice of the peace, from whose decision an appeal is taken, shall, on or before the next term of the county court, file with the clerk thereof, a certified copy of all the proceedings in such case.

SEC. 19. In cases of emergency, justices of the peace may

depute any reputable person to execute any process issued by them.

SEC. 20. All fines and penalties assessed by virtue of this act, shall be paid into the county treasury of the proper county.

SEC. 21. It shall be the duty of every justice of the peace in this republic, on the first Monday of January in every year, to make a return to the county treasurer of his county, of all fines and penalties which he shall have assessed during the twelve months preceding, and to pay so much thereof as he shall have collected; and any justice who shall fail to make such return, and pay over the money by him received as aforesaid, shall be deemed guilty of a misdemeanor in office, and on conviction thereof, shall be removed in the manner prescribed in this act.

SEC. 22. When from any cause a justice of the peace shall vacate his office, all the books, records, and papers appertaining to his office, shall be transferred to the next justice of the same district, who shall complete the business of such justice, in the same manner as if originally commenced by himself.

SEC. 23. Be it further enacted, That in all cases where the defendant appears, he shall plead, in offset, all debts known to be due him by the plaintiff; and the justice shall render judgment for such sum as may appear to be due, either to the plaintiff or the defendant, as the evidence may require; and in case of a failure of any defendant or defendants so to plead his debt or demand, in offset, the said debt or demand shall not be recoverable thereafter: provided, however, that in all cases the said party may sue for and recover the same so due him, if he can show good and satisfactory cause why he did not plead such due or demand in compensation on the day of trial.

SEC. 24. No justice shall sit in judgment in any suit in which he may be interested, or where he may be related in the third degree to either plaintiff or defendant; and in all such cases the suit shall be tried by the justice of the precinct not so interested or related; and in case both of said justices shall be so interested or related, then, and in that case, the suit shall be tried and determined by the justices nearest adjoining, not so interested or related; and for the further government of the justices' court, the rules prescribed in an act establishing the jurisdiction and powers of the district courts, shall apply in all cases, when they are not inconsistent with this act.

SEC. 25. County commissioners, the justices of the peace, and the chief justice of the county court, shall constitute a board

of commissioners for their respective counties; which board shall have the entire superintendence and control of roads, highways, ferries, and bridges, and of the poor within said counties.

SEC. 26.   The said board of commissioners shall meet at the court house of their respective counties, in the months of January, April, July, and October, of each year, on such days as shall be designated by the president of the board; and when so assembled, shall have authority to establish ferries, determine the tolls of the same, to order the laying out of roads where necessary, direct where bridges shall be built, and contract for building the same, at the expense of the county; to discontinue all roads now or hereafter made, that are deemed useless; and to alter roads so as to make them more useful.

SEC. 27.   The chief justice of the county court shall be ex-officio president of the board, and shall cause a record to be made of the proceedings of the board, which record shall be made by the clerk of the county court.  In the absence of the president of the board, a president pro tempore shall be chosen.

SEC. 28.   •A majority of justices shall be necessary to constitute a board; and if any justice fail to attend the meetings of said board, he shall forfeit and pay a fine to the county treasury of not less than twenty-five nor more than fifty dollars, recoverable before any justice of the peace of the county, unless in the opinion of said board, he shall render a reasonable excuse.

SEC. 29.   It shall be the duty of said board of commissioners to provide, at the expense of the county, for the support of indigent, lame, and blind persons, who are unable to support themselves.

SEC. 30.   The said board of commissioners shall, in the month of January of each year, levy a tax, which shall be sufficient to discharge the demands on their respective counties, upon the same persons and property as are subject to a state tax, which shall be assessed and collected by the same officers, and in the same manner that taxes due to the republic are collected, and shall be paid into the hands of the county treasurer at the same time, and under the same regulations and restrictions as may be provided by law for the due collection and payment of taxes levied by the republic.

IRA INGRAM,
Speaker of the house of representatives.
RICHARD ELLIS,
President pro tem. of the senate.

Approved, Dec. 20, 1836.

SAM. HOUSTON.

# TAB 11

## CHAPTER 98.

### An Act to organize County Courts.

Section 1. Be it enacted by the Legislature of the State of Texas, That there shall be in each county of this State an inferior Court, to be styled "The County Court" which shall be composed of one Chief Justice.

Sec. 2. That the said Court shall have the power to take the Probate of Wills, to appoint guardians, to grant letters testamentary, and of administration, to settle the accounts of executors, administrators and guardians, to transact all business appertaining to the estates of deceased persons, minors, idiots, lunatics, and persons non compos mentis, and the settlement, partition and distribution of such estates; which powers shall be exercised in the manner perscribed by law.

Sec. 3. That the said Courts shall have power to lay off and divide their respective counties into convenient precincts for the election of Justices of the Peace and Constables, to establish places in such precincts where elections shall be held; to establish public ferries in their respective counties, wherever the public interest may require; to license ferrymen and regulate the tolls to be charged at all public ferries in their counties; to lay out and establish, change and discontinue public roads and highways; to build bridges; to appoint overseers and apportion hands, to work on public roads, highways and bridges, and said Courts shall have and exercise general control and superintendence over all roads, highways, bridges and ferries in their counties; said Courts shall also have power, and it shall be their duty to provide Court Houses, Jails and all necessary public buildings; to allow and settle all county accounts, and direct their payment in such manner and at such times as may meet the public interest; to try contested elections for county officers; to appoint patrols for their respective counties, whenever in their opinion the public welfare may require it; and to exercise general jurisdiction over police matters in their respective counties; and it shall be the duty of said Courts to provide for the support of indigent persons resident in the county, who can not support themselves, and for the burial of paupers.

Sec. 4. That the said County Courts shall have power to levy and collect a tax for county purposes, upon all subjects of

Sec. 29. That this act take effect and be in force on and after the first Monday in August, 1848, and on and after that day an act organizing County Courts, approved 13th May, 1846, shall be and is hereby repealed.

Approved, March 16, 1848.

---

## CHAPTER 99.

### An Act regulating Elections.

Section 1. Be it enacted by the Legislature of the State of Texas, That the County Courts of each county, shall at their first regular session, after this act takes effect and thereafter at their first regular session in each year if they deem necessary, designate such places for holding elections as may be most suitable and convenient for the people, which places so designated shall be numbered and called election precincts, and they shall also at the same time select and appoint from among the residents at, or near each election precinct, some suitable person to be the presiding officer at such precinct in all elections which shall be held thereat, during the year in which he may be appointed.

Sec. 2. Be it further enacted, That forms for notices, writs and returns of elections as furnished by the Secretary of State to the Chief Justice of each county, shall be preserved in the office of the County Clerk.

Sec. 3. Be it further enacted, That the Chief Justices of the several counties, or in case of vacancy in that office, or any inability of the Chief Justice to act, then any two of the County Commissioners, shall order all elections in their respective counties.

Sec. 4. Be it further enacted, That whenever an election may be ordered, except in cases of vacancy in the Legislature, at least ten days notice of the election shall be given by the officer ordering it, by notice posted up at each election precinct, or by publication in some newspaper if one be published in the county, specifying the time and places at which such election is to be held, and the officer or officers to be chosen, in

# TAB 12

https://www.newspapers.com/image/49664747/

Downloaded on Jan 13, 2025

The next business was the further consideration of the Legislative department; the question being on the amendment to Section fifty-one, "that the Legislature shall not grant money, public lands, or anything of value."

Mr. Stockdale spoke against the amendment, and told the Convention how the West had suffered for want of railroads, while at the same time they had always paid their full share of taxes, and assisted in the support of the government equal to any other section.

Mr. King made an able and eloquent appeal against the amendment. He said it had been the policy of the State to grant aid to works of internal improvement, and now, when the West is still lacking the conveniences that other sections possess, it is now coolly proposed to crush out the principle of granting aid to works of internal improvement. He said he would say in all earnestness and kindness, and without meaning it as a menace, that if this policy were pursued, the State would be divided. The West had suffered long enough, and his people were restless. He loved Texas with all the devotion of his heart, and would be pained beyond measure, if this great and glorious State, with all her hallowed memories of the past, were divided. He desired to sound the alarm in time, and prevent, if possible, such a sad catastrophe. He was pained to know that this amendment was introduced by a member from the west (Mr. Arnin). He had listened attentively to the address of Mr. McCormick on yesterday, to hear him advance a single argument in support of the amendment. Mr. Darnell had said that not a single railroad had been built by State aid. He (Mr. King) would venture the assertion that not a single railroad had been built in this State without such aid.

Mr. Lynch followed Mr. King. He said you can take our land, and leave us out of the advantages you possess, but you can never take from us the hallowed memories of the Goliad and the Alamo, where Travis and his 450 comrades fell in defense of their blessed Texas.

Mr. McCormick said he appreciated the honesty of the members who had preceeded him, but he was, as a member from the west, opposed to squandering the public domain on railroads, but desired it should be given to public schools. He asked members to be not at all alarmed at the "bloody shirt" held over their heads by the members who had preceded him. Western Texas was as loyal as any other portion of the State, and had no idea of severing the "Lone Star" with all her great and glorious present and the hallowed memories of the past.

Mr. Lockett said he represented an honest and generous people, who desired to extend all the benefits possible to the west. He said this had been a compact between the east and west, and could not, in good faith, be broken. Many of his colleagues from the west had traveled nearly all the entire State to get here. He had come to this State about twenty years since, and had traveled nearly all the way by rail, but it was such a rail as he did not desire to travel by again—it was a rail prizing stages out of the mud at nearly every step. The proposition of Mr. McCormick to give the public lands to schools was a subterfuge.

Mr. Flournoy spoke against the amendment. He said railroads had been a blessing to the State. They had brought immigrants and settled up places that had been but a barren waste. Were lands increased in value by the advent of railroads? Would the tax assessor and collector assess lands adjacent to railroads at the same price he would before the railroad came? No sir.

# TAB 13

This is the unrevised text of the entry as published in the Second Edition of the OED (1989). It may contain unrevised text that was originally published much earlier.

View current version of this entry

# grant, *v.*

(grɑːnt, -æ-) Pa. tense and pa. pple. **granted**. Forms: 3 **granti**, 3–7 **graunt(e**, 4 **grant(t)e**, **granty**, 5–6 **grawnt(e**, (5 **grawunt**, **grownte**), 3– **grant**. Also *pa. tense* 4 **gra(u)nt**; *pa. pple.* 4–6 **gra(u)nt**. [a. AF. *graunter*, *granter*, OF. *graanter*, *greanter*, altered form of *craanter*, *creanter*:—pop. L. type *\*crēdentāre*, f. *crēdent-em* pr. pple. of *crēdĕre* to entrust, believe.]

†**1.** *intr.* To agree, consent; to assent to the request of (a person: const. *dat.*); to agree or consent *to* or *to do* (rarely *at do*) something. *Obs.*

   *a*1300 *Cursor M.* 16851 Ioseph..Ne granted neuer wit wil ne werc, to þair gret felunni. **1340** *Ayenb.* 225 Þe ilke bernþ þet to zenne graunteþ. **1375** Barbour *Bruce* iv. 352 I grant thar-till; To ly heir mair war litill skill. *c*1385 Chaucer *L.G.W.* 2665 *Hypermnestra*, [Egiste commanded his daughter, with threats, to kill her husband;] And, for to passyn harmles of that place, She grauntyth hym. **1390** Gower *Conf.* III. 338 He.. graunteth with hem for to wende. *c*1400 Mandeville (Roxb.) xxx. 138 Þai graunted at do all þat he wald bidd þam do. *c*1400 *Sowdone Bab.* 250, I graunte to be his derlynge. *c*1440 *Jacob's Well* (E.E.T.S.) 198 Þe freendys prayed þe preest to ley þe dede body on his asse. Þerto grauntyd he hem. **1485** Caxton *Paris & V.* 15 At these words graunted Parys to goo to the sayd Ioustes. **1523** Ld. Berners *Froiss.* I. ccxliii. 363 He graunted to the warr with an yuell wyll. *a*1547 Surrey *Æneid* ii. 164 Assigning me To the altar; whereto they graunted all. **1593** Shakes. *3 Hen. VI*, i. i. 245 The Souldiers should haue toss'd me on their Pikes, Before I would haue granted to that Act.

**2.** *trans.* To agree to, promise, undertake.     †**a.** Const. *dat.* of person, and *acc.* of thing. *Obs.*

   *c*1250 *Gen. & Ex.* 1423 Ðo gan ðat moder and laban Rebecca freinen ðor for-ðan, And ȝhe it grantede mildelike. *c*1305 *St. Cristopher* 77 in *E.E.P.* (1862) 61 He grantede þis anon. **1390** Gower *Conf.* II. 243 She graunteth and behight him this. *c*1400 *Destr. Troy* 978 And he hir graunted þat gate with a good wille. *a*1400–**50** *Alexander* 516 'Þat graunt I gudly,' quod þe gome. **1559** *Mirr. Mag., Hen. VI*, xxvii, Aduise wel ere they graunt, but what they graunt, perfourme.

**b.** with *inf.* (preceded by *to*) or *clause* as obj. *Obs.* exc. in legal documents.

   *c*1420 *Chron. Vilod.* st. 141 Þe Kyng of Denmark ȝold hym anon þo And granted crystenmon ever to be. *c*1450 *Merlin* 23 They that shull come to seche me, have graunted their lorde that they shull me sle. **1484** Caxton *Fables of Æsop* ii. xi, To promytte & graunte to gyue to the that whiche thou neuer leuest to me. **1512** J. Wastell in Willis & Clark *Cambridge* (1886) I. 609 The said John Wastell graunteth to gyff…xx. markes. **1558** in *Vicary's Anat.* (1888) App. v. 186 The said T. D…couenaunteth and graunteth, to and with the said T. V…that if he [etc.]. **1647** N. Bacon *Disc. Govt. Eng.* i. (1739) 200 Do you grant to hold and keep the Laws and ⟨ri⟩ghtful Customs, which the Commonalty of your Realm shall have chosen? **1818** Cruise *Digest* (ed. 2) IV. 68 ⟨A.⟩ covenanted, granted, and agreed that B. should have the land.

**3.** To accede to, consent to fulfil (a request, prayer, wish, etc.).

*a***1225** *Ancr. R.* 34 Holdeð hine ueste, uort he habbe igranted ou al þet ȝe euer wulleð. *c***1275** Lay. 14152 Þe bet we wolleþ cweme þe ȝef þou þis wolt granti me [**1205** Ȝif þu þis ȝettest me]. *c***1290** *S. Eng. Leg.* I. 20/33 And grauntede al his bone. *a***1300** *Cursor M.* 13988 Iesus grant him his praier. **1390** Gower *Conf.* I. 182 The souldan graunteth her axinge. *c***1450** *Mirour Saluacioun* 3878 So crist..what eure sho wille aske grauntis he hire fauourably. **1526** *Pilgr. Perf.* (W. de W. 1531) Gb, Yf I sholde graunt you at all tymes your affeccyons and desyres. **1600** J. Lane *Tom Tel-troth* 110 O graunt my suit. **1697** Dryden *Virg. Georg.* i. 63 Use thyself betimes to hear and grant our Pray'rs. **1797** Mrs. Radcliffe *Italian* iii. (1826) 20 Grant me then the only request I have to make. **1867** Smiles *Huguenots Eng.* vii. (1880) 126 The authorities at once cheerfully granted all that they asked.

**4. a.** To allow or concede as an indulgence; to permit or suffer (a person) to have (something); to bestow or confer as a favour, or in answer to a request. Const. *dat.* of person, and *acc.* of thing.

**1297** R. Glouc. (Rolls) 11552 Leue him was igraunted god wot to wuch ende. *a***1300** *Cursor M.* 2506 (Cott.) Was nan þai raght þai grantid grith. *Ibid.* 25340 Grant vs þi maght til oþer sua forgiue þair sin, þat [etc.]. *c***1340** *Ibid.* 20011 + 894 (B.M. Add. MS.) Þe archibisshop..haþ graunted xl daies to pardoun to alle þat þis vie wol here. *c***1374** Chaucer *Anel. & Arc.* 188 Sheo ne graunted him in hir lyvynge No grace. *c***1380** Wyclif *Serm. Sel. Wks.* I. 132 First Crist apperide to þes holy wommen, fer to graunt a privylegie to womman's kynde. **1390** Gower *Conf.* III. 219 God to hem that ben well thewed Hath yove and graunted the victoire. *c***1400** *Rom. Rose* 2986 He me graunted ful gladly The passage of the outer hay. *a***1450** *Knt. de la Tour* Hivb, He graunted his [Absalon's] grace and pardon. **1484** *Surtees Misc.* (1888) 41 God graunte & gyff thaym joy and comforth. *c***1500** *Lancelot* 456 Grant ws dais three. *a***1586** Sidney *Arcadia* iii. (1590) 274 To onely thee thou seest we graunt this speciall grace Vs to attend. **1651** Hobbes *Leviath.* ii. xviii. 93 When he has granted all he can, if we grant back the Soveraignty, all is restored. *c***1709** Prior *Callimachus' Hymn to Jupiter* 116 Great father! grant us virtue, grant us wealth. **1711** *Fingall MSS.* in *10th Rep. Hist. MSS. Comm.* App. v. 172 By his granting better conditions to the garrison. **1841** Lane *Arab. Nts.* I. 102 Granting him a delay of three days. **1855** Macaulay *Hist. Eng.* xii. III. 208 It was an Act purporting to grant entire liberty of conscience to all Christian sects. **1860** Tyndall *Glac.* i. viii. 60 He had..the good sense..to grant me the liberty I requested. **1871** R. Ellis *Catullus* xvii. 7 This rare favour, a laugh for all time, Colonia, grant me. **1885** Mabel Collins *Prettiest Woman* x, Why might he not grant himself one more sight of her at the door of the Church.

†**b.** With a *thing* as subj. or as indirect obj.: To allow to have. *Obs.*

*c***1420** *Pallad. on Husb.* i. 105 Thikke and drie, espie & graunte hit rest. **1668** Culpepper & Cole *Barthol. Anat.* ii. vi. 98 A smal valve..grants entrance to the blood into the right Ventricle.

†**c.** To sanction, permit (an action). *Obs.*

*c***1386** Chaucer *Melib.* 22 Attempree weping is nothing defended to him that sorweful is..but it is rather graunted him to wepe..But thogh attempree weping bee y-graunted, outrageous weping certes is defended.

⸫ith *inf.* or *clause* as obj.; *rarely* with obj. and compl.

*c*1250 *Old Kent. Serm.* in *O.E. Misc.* 36 Þider lord granti us to cumene. *c*1380 Wyclif *Last Age Chirche* p. xxxvi, Þe whiche semlant he graunte us to see. *a*1400–50 *Alexander* 1826 Bot wald ȝe grant vs to gaa & gefe vs ȝour lefe. **1513** Douglas *Æneis* i. viii. 51 O hie princes, quham to Jupiter hes grant To beild ane new cietie. **1535** Coverdale *Isa.* xxvi. 13 Graunte, that we may only hope in the. **1570–6** Lambarde *Peramb. Kent* (1826) 207 They graunt him to take it with him. **1607** Shakes. *Cor.* ii. i. 156 The Gods graunt them true. **1720** Strype *Stow's Surv.* I. i. viii. 35/2 Our Lord Richard the King..hath granted..That all the Kidels that are in the Thames be taken away. **1834** Southey *Lett.* (1856) IV. 384 God grant that I may find you well enough..for a morning walk.

**e.** In *pa. pple.* as a polite rejoinder to an apology.

**1902** Kipling *Traffics & Discov.* (1904) 238 'Granted—granted as soon as asked,' he said, unbending. 'I *did* think it a shade odd at the time.' **1924** —— *Debits & Credits* (1926) 311 '..I beg your pardon...' 'Granted.' **1926** R. Macaulay *Crewe Train* ii. v. 103 When others craved their pardon for stepping on their toes, their reply was, 'Granted.' **1951** E. Coxhead *One Green Bottle* v. 115 'Pardon?' said Cathy, momentarily bewildered; whereat Mr. Derwent..replied: 'Oh-er, granted.' **1967** 'H. Calvin' *Nice Friendly Town* vi. 87 She yawned a great yawn and said, 'Sorry.' 'Granted,' I said.

**5. a.** To bestow or confer (a possession, right, etc.) by a formal act. Said of a sovereign or supreme authority, a court of justice, a representative assembly, etc. Also, in *Law*, to transfer (property) from oneself to another person, especially by deed.

*c*1305 *Pilate* 82 in *E.E.P.* (1862) 113 Þemperour..grantede pilatus al þat lond to holde bi maistrie. **1390** Gower *Conf.* III. 103 Asia..Was graunted by commune assent To Sem. **1463** *Bury Wills* (Camden) 17, I graunte hem fulle pover. **1485** Wriothesley *Chron.* (1875) I. 1 A great taske and disme grawnted to the Kinge. **1605** Camden *Rem.* 138 Graunted by Patents. **1625** Bacon *Ess., Friendship* (Arb.) 181 Where Friendship is, all Offices of Life, are as it were granted to Him, and his Deputy. **1632** Sanderson *Serm.* 436 God the Father hath graunted vs..a new Patent. **1651** Hobbes *Leviath.* iii. xlii. 302 The Power here granted belongs to all Supreme Pastors. **1766** Blackstone *Comm.* App. II. §2 They the said Abraham Barker and Cecilia his Wife..do, and each of them doth, grant, bargain, sell, release, and confirm unto the said [D. E. and F. G.;], their heirs and assigns, All that the capital messuage called Dale Hall. **1817** W. Selwyn *Law Nisi Prius* (ed. 4) II. 725 Granting letters of administration, belongs to the prerogative court of the archbishop of that province. **1849** Macaulay *Hist. Eng.* ii. I. 193 The Commons alone could legally grant him money. **1858** Buckle *Civiliz.* (1873) II. viii. 575 They granted charters to the towns and privileges to the inhabitants. **1883** *Law Reports* 11 Q. Bench Div. 545 (*headnote*) An attachment granted to enforce compliance with the order of court.

**b.** with advs., in technical phrases: *to grant* (land, a title) *away, out.* †*to grant forth* (a warrant): to issue.

**1583** Stubbes *Anat. Abus.* ii. (1882) 16 The other officers who grant foorth the warrants, the Subpœnas. **1661** A. Brome *Royalist's Answ.* ii. Songs 75 All titles of honours..being granted away With the grantees stay. **1844** Williams *Real Prop.* i. (1877) 2 The lands thus confiscated were granted out by the Conqueror to his followers. **1849** Macaulay *Hist. Eng.* x. II. 657 The estates of accused persons had been granted away before conviction. **1876** Digby *Real Prop.* i. i. §2. 14 The grantee of the land is to be entitled to grant the land away to whomsoever he pleases in his lifetime.

**†6.** To yield, give up. Also with *over. Obs.*

   **1390** Gower *Conf.* III. 122 For Libra graunteth him [i.e. Scorpion] his ende Of eighte sterres. *a***1400–50** *Alexander* 3103 Þi meche we beseke..to grant vs oure modire..out of bande. *a***1586** Sidney *Arcadia* i. (1590) 42b, Palladius not accustomed to grant ouer the possession of him self vpon so vniust titles, with sword drawne gaue them so rude an answer, that [etc.]. **1613** Purchas *Pilgrimage* (1614) 331 Certain Thracian women.. granted their haire to this purpose.

   **7.** To admit, confess, acknowledge. Now only in a more restricted use: To concede to an actual or hypothetical opponent (a proposition) to be used as a basis of argument.     **a.** with obj. either *acc.* with *inf.* or a clause introduced by *that* (often suppressed), rarely *how.* In this sense the imperative mood, the pres. pple. (used *absol.*) and the pa. pple. often introduce an adverbial (concessive) clause.

   *c***1340** *Cursor M.* 27428 (Fairf.) A man..grauntis [*Cott.* yetes]..þat he is falling in misliking. *c***1375** *Sc. Leg. Saints, Laurentius* 366 Þat ypolyt..before al had granttyt þare, þat he had bene a cristine mane. **1411** *Rolls of Parlt.* III. 650/1 The sayd Robert wold nouht graunte that he had submytted hym in that mater. *a***1450** *Le Morte Arth.* 1652 There he grauntyd a monge hem alle..How in an appelle he dede the galle. **1558** Bp. Watson *Seven Sacram.* xxi. 123 A synner maye graunt and confesse, that he hathe not considered thys great kyndenes of God. **1581** Mulcaster *Positions* xli. (1887) 237 But graunting thinges there to be well done already. **1604** E. G[rimstone] *D'Acosta's Hist. Indies* i. v. 16 They graunt there is a Heaven on this other part of the world. **1659** D. Pell *Impr. Sea* 73 Grant they never used drinking and bezling before they came to Sea..they will soon finde out the art. **1659–60** Pepys *Diary* 11 Jan., I went to see Mrs. Jem, who was in bed, and now granted to have the small-pox. **1674** tr. *Scheffer's Lapland* 4 Granting there were antiently such names..it remaines doubtfull [etc.]. **1711** Steele *Spect.* No. 4 ⁋5, I grant her Dress is very becoming, but [etc.]. **1849** Macaulay *Hist. Eng.* ii. I. 156 Grant that such a man had, by his recent services, fairly earned his pardon. Yet [etc.]. **1849** Ruskin *Sev. Lamps* iv. §1. 94 Only asserting that to be beautiful which I believe will be granted me to be so without dispute. **1853** J. H. Newman *Hist. Sk.* (1876) 161 Granting that that downfall is to come, it is reasonable [etc.]. *a***1861** T. Woolner *My Beautiful Lady* (1863) 128, I grant a few, the greatest, live content. **1884** tr. *Lotze's Metaph.* 101 Granted that two Beings, *A* and *B*, are so independent of each other.. then [etc.].

   **b.** with *n.* or *pron.* as obj. Also *absol.*

   *a***1340** Hampole *Psalter* xxi. 15 In dust of ded thou has me broght. This says he, noght grauntand it, for his body rot noght. **1375** Barbour *Bruce* xix. 48 The lord sowlis hass grantit thar The deid in-to plane parliament. **1428** *Surtees Misc.* (1888) 3 He gart yarof, als he graunted, ix^xx peces & xij. **1526** Tindale *Acts* xxiii. 8 The phariseies graunt bothe. **1596** Shakes. *1 Hen. IV*, ii. iv. 390, I grant ye, vpon instinct. **1611** Bible *Transl. Pref.* 1 This will easily be granted, by as many as know story. **1612** in *Extracts Aberd. Reg.* (1848) II. 312 Patrick Gordoune..being accusit for trubling of this burght..in drawing of ane sword, and persewing thairwith Gilbert Leslie..graunted the drawing of his sword to the said Gilbert, and persewing him thairwith. **1671** Grew *Anat. Plants* i. Ep. Ded., Like the first Principles of Mathematical Science, they are..granted by all. **1709** Berkeley *Th. Vision* §15 Though we should grant the real existence of those optic angles. **1774** Goldsm. *Nat. Hist.* (1776) I. 107 This granted, we shall take something more. **1848** Keble *Serm.* Pref. 41 If thus much be granted,..how is not our principle conceded? **1879** Geo. Eliot *Coll. Breakf. P.* 287 We settle first the measure f man's need Before we grant capacity to fill.

**c.** with obj. and complement: To admit or concede (a person or thing) to be so and so. *rare*.

**1387** Trevisa *Higden* (Rolls) IV. 367 Vienna was þo i~graunted the place of corsynge. *a***1400–50** *Alexander* 3125 And if [he] grant him noȝt de-grayd. **1602** Shakes. *Ham.* ii. ii. 100 Mad let vs grant him then. **1653** Walton *Angler* 139 [I] haue not tryed it; yet I grant it probable. **1730** Swift *Traulus* i. 83 Grant him but a drone at best. **1810** Scott *Lady of L.* ii. xiv, I grant him brave, But wild.

**d.** To admit the existence of. *Obs. rare*$^{-1}$.

*a***1619** M. Fotherby *Atheom.* i. vi. §3 (1622) 46 For, of necessitie hee granteth him [God], though of impotencie hee blaspheme him.

About OED

Historical Thesaurus

Editorial policy

Updates

Institutional account management

Accessibility

Contact us

Upcoming events

Case studies

Media enquiries

How to use the OED

Purchasing

Help with access

World Englishes

Contribute

Oxford University Press

Oxford Languages

Oxford Academic

Oxford Dictionary of National Biography

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide*

Cookie policy        Privacy policy        Legal notice

Copyright © 2025 Oxford University Press



# TAB 14

*C-174*

# DR. WEBSTER'S

# COMPLETE DICTIONARY OF THE

# ENGLISH LANGUAGE.

THOROUGHLY REVISED AND IMPROVED,

BY CHAUNCEY A. GOODRICH, D.D., LL.D.,

LATE PROFESSOR OF RHETORIC AND ORATORY, AND ALSO PROFESSOR OF THE
PASTORAL CHARGE IN YALE COLLEGE;

AND

NOAH PORTER, D.D.,

PROFESSOR OF MORAL PHILOSOPHY AND METAPHYSICS IN YALE COLLEGE.

LONDON:
PUBLISHED FOR THE PROPRIETORS BY
BELL AND DALDY, 186 FLEET STREET;
LONGMAN & Co.; SIMPKIN, MARSHALL, & Co.; WHITTAKER & Co.; HAMILTON, ADAMS, & Co.;
GROOMBRIDGE & SONS; VIRTUE BROTHERS; KENT & Co.; GRIFFIN & Co.
EDINBURGH: JOHN MENZIES. DUBLIN: M'GLASHAN & GILL.

*24 1482*

**2.** Headlong; without restraint; precipitately.

They suffer them (children) to run *ahead. L'Estrange.*

**A-height'** (a-hīt'), *adv.* [Prefix *a* and *height.*] Aloft; on high. [*Obs.*] "Look up *aheight." Shak.*

**A-high'** (-hī'), *adv.* [Prefix *a* and *high.*] On high. [*Obs.*]

**A-hold'**, *adv.* [Prefix *a* and *hold.*] Near the wind; as, to lay a ship *ahold.* [*Obs.*] *Shak.*

**A-hou'ai** (a-hōō'ā), *n.* [The indigenous Brazilian name; Fr. *ahouai.*] (*Bot.*) A species of *Cerbera*, a tree found in Brazil, having thick leaves, full of milky juice. Its fruit is a drupe, or nut, whose kernels are a deadly poison. *Loudon.*

**A-hoy',** *interj.* [Prefix *a* and *hoy*, q. v.] (*Naut.*) A term used in hailing; as, "Ship *ahoy!*"

**Ah'ri-man,** *n.* [Per. *ahriman*, Skr. *ari*, foe.] The evil genius or demon of the Persians;—opposed to Oromasdes, or Ormuzd, the good demon. *Gibbon.*

**A-hull',** *adv.* [Prefix *a* and *hull.*] (*Naut.*) With the sails furled, and the helm lashed;—applied to ships in a storm. *Totten.*

**Aï,** *n.* [Braz. *aï, haï,* from the cry the animal utters; Fr. *aï, hay.*] (*Zoöl.*) The common three-toed sloth; a species of *Bradypus. Baird.*

**Aid,** *v. t.* [*imp. & p. p.* AIDED; *p. pr. & vb. n.* AIDING.] [Fr. *aider,* Pr. *aidar,* It. *aitare,* contracted from O. Fr. *ajuder, ajuer, aiuer,* Pr. *ajudar,* Sp. *ayudar,* It. *ajutare,* from Lat. *adjutare,* to help; v. freq. fr. *adjuvare,* to help; *ad* and *juvare,* to help.] To support, either by furnishing strength or means to effect a purpose, or to prevent or remove evil; to help; to assist; as, Heaven *aids* those who *aid* themselves.

Syn.—To help; assist; support; sustain; succor; relieve.

**Aid,** *n.* [Fr. *aide,* O. Fr. *aïde, aïe,* Pr. *ayda, ahia,* It. *aita* : O. Fr. *ajude, ajue, aïue, aïe,* Pr. *ajuda,* Sp. *ayuda,* It. *ajuto,* from Lat. *adjutus,* n., p. of *adjuvare,* to help. The A-S. *aïde* is taken from the O. or Norm. Fr. See *supra.*]

1. Help; succor; support; assistance; relief. "An unconstitutional mode of obtaining *aid." Hallam.*

2. The person or thing that aids or yields support; a helper; an auxiliary. *Dryden.*

Let us make unto him [man] an *aid* like unto himself. *Tobit* viii. 6.

**3.** (*Eng. Law.*) An extraordinary grant of a subsidy or tax to the king by parliament.

**4.** (*Feudal Law.*) A pecuniary tribute (originally voluntary, afterward compulsory) paid by a vassal to his lord on certain occasions of peculiar emergency. *Blackstone.*

5. An aid-de-camp, so called by abbreviation; as, a general's *aid.*

To pray in *aid* (*Law*), to call in a person interested in a title, to assist in defending it. The petition for this purpose is called *aid-prayer. Cowell. Blackstone.*

**Aid'ance,** *n.* [O. Fr. *aidance.*] Aid. [*Rare.*]

The means and *aidances* supplied by the Supreme Reason. *Coleridge.*

**Aid'ant,** *a.* [Fr. *aidant,* p. pr. of *aider,* to help.] Helping; helpful; supplying aid. [*Rare.*] *Shak.*

**Aid'-de-camp** (ād'de-kŏng) (Synop., § 130), *n.; pl.* AIDS-DE-CAMP. [Fr. *aide de camp,* from *aide,* assistant, and *camp,* camp.] (*Mil.*) An officer selected by a general officer to assist him in his military duties.

**Aid'er,** *n.* One who helps; an assistant or auxiliary.

**Aid'less,** *a.* Helpless; without aid. *Tennyson.*

**Aid'-ma'jor,** *n.* The adjutant of a regiment. [*Obs.*]

**Ai'gre,** *n.* See EAGRE.

**Ai'gret,** *n.* An aigrette, a sort of white heron,
**Ai-grette',** with a long and slender tuft of feathers on its head; a tuft or bunch of feathers; dim. of *heron* with the aspiration cut off, Fr. Prov. *égron,* Pr. *aigron,* Sp. *airon,* O. Fr. *hairon,* It. *aghirone,* from O. H. Ger. *heigir, heigro, heigero,* Icel. *hegri,* A-S. *higere.*]

1. (*Ornith.*) The small white heron;—commonly called *egret.*

2. (*Bot.*) A feathery crown of seed. See EGRET.

3. A plume or an ornament for the head composed of feathers, or of precious stones, in the form of a heron's crest.

**Ai'gu-lette'** (ā'gil-lĕt'), *n.* [Fr. See AGLET.]

1. A point or tag at the end of a fringe or lace.

2. (*Mil.*) (*a.*) A tagged point hanging from the shoulder upon the breast, in some military uniforms in Europe. (*b.*) A braid or cord worn from one shoulder across the breast, formerly used in the uniform of certain portions of the U. S. army.

**Ai'gu-let,** *n.* [Fr. See AGLET.] A tag or point.
**Aig'let,** "Golden *aiglets." Spenser.*

**Aik'raw,** *n.* A species of lichen, or moss.

**Ail,** *v. t.* [*imp. & p. p.* AILED; *p. pr. & vb. n.* AILING.] [A-S. *eglan, eglian, elan, aglian,* to feel pain, to trouble, *me egleth,* it grieves me, *egle,* sharp, troublesome, Goth. *agls,* troublesome, irksome, *aglo, aglitha,* pain, trouble.] To affect with pain or uneasiness, either physical or mental; to trouble; to be the matter with; to affect in any way;—used to express some uneasiness or affection, whose cause is unknown; as, what *ails* the man? I know not what *ails* him.

What *aileth* thee, Hagar? *Gen.* xxi. 17.

☞ It is never used to express a specific disease. We never say, a fever *ails* him; but something *ails* him.

---

**Ail,** *v. i.* To be affected with pain or uneasiness of any sort; to be indisposed or in trouble; as, a person is *ailing.*

**Ail,** *n.* Indisposition or morbid affection. *Pope.*

**Ai-lăn'tus,** *n.* [From *ailanto,* i. e., tree of heaven, the name of the tree in the Moluccas.] (*Bot.*) A genus of beautiful trees, natives of the East. There are two kinds, one having an offensive odor, the other not. *Loudon.*

☞ Commonly, but improperly, spelt *ailanthus.*

**Ail-lette',** *n.* [Fr., dim. of *aille,* Lat. *ala,* wing.] A small square shield on the shoulders of knights, being the prototype of the modern epaulet. *Fairholt.*



Aillettes.

**Ail'ment,** *n.* Indisposition; morbid affection of the body;—not applied ordinarily to acute diseases. "Little *ailments." Lansdowne.*

**Aim,** *v. i.* [Fr. Prov. Pic. *amer,* O. Fr. *asmer, aasmer, esmer,* Pr. *esmar, aymar, ymar,* O. Sp. *asmar,* to estimate, calculate, adjust, fit, to make an offer to strike, level, aim, Lat. *æstimare,* to estimate, value, Ger. *ahmen,* M. H. Ger. *âmen, aemen,* to gauge a cask, Ger. *machahmen,* to imitate.]

1. To point with a missive weapon; as, to *aim* at an enemy.

2. To direct the intention or purpose; to attempt the accomplishment of a purpose;—followed by *at*; as, to *aim* at distinction. "*Aim'st* thou at princes?" *Pope.*

3. To guess or conjecture. [*Obs.*] *Shak.*

**Aim,** *v. t.* [*imp. & p. p.* AIMED; *p. pr. & vb. n.* AIMING.] To direct or point, as a weapon; to direct to a particular object; as, to *aim* a musket or an arrow, the fist or a blow; to *aim* a satire or a reflection at some person or vice.

**Aim,** *n.* [O. Fr. & Pr. *esme,* Catalan *esma,* estimation, appreciation. See *supra.*]

1. The pointing or direction of a missile weapon; the direction of any thing to a particular point or object, with a view to strike or affect it, as of a spear, a blow, a discourse, or remark. "Each at the head leveled his deadly *aim." Milton.*

2. The point intended to be hit, or object intended to be affected. "To be the *aim* of every dangerous shot." *Shak.*

3. Purpose; intention; scheme. "How oft ambitious *aims* are crossed!" *Pope.*

4. Conjecture. [*Obs.*] "What you would work me to, I have some *aim." Shak.*

To cry *aim,* to encourage. [*Obs.*] *Shak.*

Syn.—End; object; scope; drift; design; purpose; intention; scheme.

**Aim'er,** *n.* One who aims, directs, or points.

**Aim'less,** *a.* Without aim; as, an *aimless* life.

**Aim'less-ly,** *adv.* Without aim, or purpose.

**Air (4),** *n.* [Fr. *air,* Pr. *air, aire,* Sp. *aire,* Pg. *ar,* It. *aria,* air and tune, Lat. *aër,* Gr. *ähp,* air.]

1. The fluid which we breathe, and which surrounds the earth; the atmosphere. It is invisible, inodorous, insipid, transparent, compressible, elastic, and ponderable.

☞ By the ancient philosophers, *air* was regarded as an element; but modern science has shown that it consists essentially of two gases, oxygen and nitrogen, in the proportion of 20.81 parts of the former to 76.99 of the latter; or, by weight, of 23.01 oxygen, and 79.19 nitrogen, according to Dumas. The oxygen is the vital portion, but the nitrogen is necessary to dilute it.

2. A particular state of the atmosphere, as respects heat, cold, moisture, and the like, or as affecting the sensations; as, a smoky *air,* a damp *air,* the morning *air,* &c.

3. Any aeriform body; a gas; as, oxygen was formerly called *vital air.*

4. Air in motion; a light breeze; a gentle wind.

Let vernal *airs* through trembling osiers play. *Pope.*

5. Utterance abroad; publicity; as, a story has taken *air.* "You gave it *air* before me." *Dryden.*

6. Hence, intelligence; advice; information. [*Obs.*] *Bacon.*

7. (*Mus.*) A musical thought expressed in a pleasing and symmetrical succession of single tones; a melody; a tune; an aria.

8. The peculiar look, appearance, manner, mien or carriage of a person; as, the *air* of a youth; a heavy *air*; a lofty *air.* "His very *air." Shak.*

9. *pl.* An artificial or affected manner; show of pride; haughtiness; as, it is said of a person, he puts on *airs.*

10. (*Paint.*) The representation or reproduction of the effect of the atmospheric medium through which every object in nature is viewed. *New Am. Cyc.*

To take *air,* to be divulged; to be made public.—To take the *air,* to go abroad; to walk or ride out.

**Air,** *v. t.* [*imp. & p. p.* AIRED; *p. pr. & vb. n.* AIRING.]

1. To expose to the air for the purpose of cooling, refreshing, exhibiting, or purifying; to ventilate; as, to *air* a room. "It were good wisdom . . . that the jail were *aired." Bacon.*

Were you but riding forth to *air* yourself. *Shak.*

*Airing* a snowy hand and signet ring. *Tennyson.*

---

**2.** To expose to heat, for the purpose of expelling dampness, or of warming; as, to *air* linen, to *air* liquors.

**Air'a,** *n.* [N. Lat. *aira,* Gr. *aïpa,* darnel, It., Sp. *aira.*] (*Bot.*) A genus of grasses; hair-grass.

**Air'-bal-loon',** *n.* See BALLOON.

**Air'-bath,** *n.* An arrangement for drying substances in air of any desired temperature.

**Air'-bed,** *n.* A case of india-rubber cloth, or other material, made air-tight, and inflated through tubes closed by stop-cocks. *Simmonds.*

**Air'-blad'der,** *n.* A peculiar organ in some kinds of fishes, containing air, by which they are enabled to maintain their equilibrium in the water. *Baird.*

**Air'-built** (-bĭlt), *a.* Erected in the air; having no solid foundation; chimerical; as, an *air-built* castle.

**Air'-cas'ing,** *n.* An air-tight casing around a pipe, &c., at a little distance from it, intended to secure the interposition of air as a non-conductor of heat or cold.

**Air'-çell,** *n.* 1. A cavity containing air.

2. (*Bot.*) A cavity in the cellular tissue of plants, containing air only.

3. (*Physiol.*) A receptacle of air in various parts of the system, as a cavity in the cellular tissue of the human lungs; the air-sac of birds; the dilatation of air vessels in insects. *Carpenter.* Air-cells.

**Air'-cham'ber,** *n.* A cavity containing air to act as a spring for equalizing the flow of a liquid in hydraulic machines.

The cut is a section of a locomotive pump. The water is drawn by the action of the plunger in the barrel B, through the feed-pipe C and the valves D (resting on the seats E, and held in place by the cages F), to the air-chamber A, in the top of which the air is compressed, forcing the water out of the delivery-pipe G beyond its middle position when the piston is at the end of its stroke. *Clark.*

**Air'-cush'ion,** *n.* An air-tight cushion which can be inflated. *Francis.*

**Air'-drain,** *n.* (*Arch.*) A cavity between the external walls of a building, to prevent dampness. *Weale.*

**Air'-drawn,** *a.* Drawn or painted in air; imaginary. "This is the *air-drawn* dagger." *Shak.*

**Air'-en'gine,** *n.* An engine put in motion by hot air instead of steam; a caloric engine. *Nichol.*

**Air'er,** *n.* 1. One who exposes to the air.

2. A frame on which clothes are aired or dried.

**Air'-es-cape',** *n.* A contrivance for letting off air from water-pipes. *Francis.*

**Air'-foun'tain,** *n.* A contrivance for producing a jet of water by means of compressed air.

**Air'-gun,** *n.* An instrument resembling a musket, to discharge bullets by the elastic force of the air, compressed into a metallic globe by means of a condenser. Air-gun.

**Air'-hold'er,** *n.* 1. An instrument for holding air, for the purpose of counteracting the pressure of a decreasing column of mercury. *Dary.*

2. A gasometer.

**Air'-hole,** *n.* 1. A hole to admit or discharge air.

2. (*Founding.*) A hole or cavity in a casting, produced by bubbles of air in the liquid metal.

**Air'i-ly,** *adv.* In an airy manner.

**Air'i-ness,** *n.* 1. The state or quality of being airy; openness or exposure to the air; as, the *airiness* of a country-seat.

2. Lightness of spirits; gayety; levity; as, the *airiness* of young persons.

**Air'ing,** *n.* 1. A walk or ride in the open air; a short excursion.

2. An exposure to air, or to a fire, for warming or drying, &c.; as, the *airing* of linen, or of a room.

**Air'-jack'et,** *n.* A jacket having air-tight cells, or cavities which can be filled with air, to render persons buoyant in swimming.

**Air'less,** *a.* Not open to a free current of air; wanting fresh air, or communication with open air.

**Air'ling,** *n.* A thoughtless, gay person. [*Obs. and rare.*] "Slight *airlings." B. Jonson.*

**Air'-ma-chine'** (-ma-sheen'), *n.* An apparatus for ventilating mines.

**Air'-pipe,** *n.* A pipe used to draw foul air from a ship's hold, mines, and other close places. *Grier.*

**Air'-plant,** *n.* (*Bot.*) A plant which lives and grows for a considerable time without being rooted in earth, or in any other substance.

**Air'-poise,** *n.* [From *air* and *poise.*] An instrument to measure the weight of the air.

**Air'-pump,** *n.* 1. A pump or machine, variously constructed, for exhausting the air from a closed vessel.

2. (*Steam-engines.*) A pump used to ex- Air-pump.

splendid, magnificent, sublime; as, a *grand view*; a *grand* conception.

They are the highest models of expression, the unapproached masters of the *grand* style. *M. Arnold.*

3. Holding an elevated or advanced rank, as in years or station; — often forming compounds with the following word; as, a *grandfather*; a *grand jury*; a *grand lodge*; a *grand vizier*, and the like.

*Grand days (Eng. Law)*, certain days in the terms which are solemnly kept in the inns of court and chancery. — *Grand duke*. (a.) A sovereign duke inferior in rank to a king. (b.) (*Ornith.*) The great horned-owl (*Bubo maximus*). — *Grand juror*, one of a grand jury. — *Grand jury (Law)*, a jury of not less than twelve nor generally more than twenty-three, whose duty it is to examine into accusations against persons charged with crime, and if they see just cause, then to find bills of indictment against them, to be presented to the court; — called *grand inquest*. *Bouvier.* — *Grand piano-forte* (*Mus.*), a peculiar species of the piano-forte, in which the wires or strings are generally triplicated, increasing the power. — *Grand vizier*, the chief member or head of the Turkish council of state.

*Syn.* — Magnificent; sublime; majestic; dignified; elevated; stately; august; pompous; lofty; exalted; noble. — GRAND, MAGNIFICENT, SUBLIME. *Grand*, in reference to objects of taste, is applied to that which expands the mind by a sense of vastness and majesty; *magnificent* is applied to any thing which is imposing from its splendor; *sublime* describes that which is awful and elevating. A cataract is *grand*; a rich and varied landscape is *magnificent*; an overhanging precipice is *sublime*. "*Grandeur* admits of degrees and modifications; but *magnificence* is that which has already reached the highest degree of superiority naturally belonging to the object in question." *Crabb.*

**Grăn'dam**, *n.* [Fr. *grand*, *grande*, and *dame*. See *supra* & DAME.] An old woman; specifically, a grandmother. *Shak.*

**Grănd'chīld**, *n.* A son's or daughter's child; a child in the second degree of descent.

**Grănd'daugh'ter** (-daw'ter), *n.* The daughter of a son or daughter.

**Gran-dee'**, *n.* [Sp. *grande*. See GRAND.] A man of elevated rank or station; a nobleman. In Spain, a nobleman of the first rank, who has the king's leave to be covered in his presence.

**Gran-dee'ship**, *n.* The rank or estate of a grandee. *Swinburne.*

**Grănd'eŭr** (grănd'yur), *n.* [Fr., from *grand*. See GRAND.] The quality of being grand; vastness of size; splendor of appearance; elevation of thought or expression; nobility of action.

Nor doth this *grandeur* and majestic show Of luxury allure mine eye. *Shak.*

*Syn.* — Sublimity; majesty; stateliness; augustness; loftiness. See SUBLIMITY.

**Gran-dēv'i-ty**, *n.* [Lat. *grandaevitas*.] Great age; long life. [*Obs.*] *Glanville.*

**Gran-dē'voŭs**, *a.* [Lat. *grandaevus*, from *grandis*, grand, and *aevum*, lifetime, age.] Of great age; long-lived. [*Obs.*] *Bailey.*

**Grănd'fā'ther**, *n.* A father's or mother's father; an ancestor in the next degree above the father or mother in lineal ascent.

**Grănd'fā'ther-ly**, *a.* Having the age or manner of a grandfather; kind; benignant; complacent.

He was a *grandfatherly* sort of personage. *N. Hawthorne.*

**Gran-dif'ic**, *a.* [Lat. *grandificus*; *grandis*, grand, and *facere*, to make.] Making great. [*R.*] *Bailey.*

**Gran-dil'o-quence**, *n.* [It. *grandiloquenza*.] The use of lofty words or phrases; — usually in a bad sense; bombast.

**Gran-dil'o-quent**, *a.* [Lat. *grandis*, grand, and *loqui*, to speak.] Pompous; bombastic; grandiloquous.

**Gran-dil'o-quoŭs**, *a.* [Lat. *grandiloquus*; *grandis*, grand, and *loqui*, to speak.] Speaking in a lofty style; bombastic.

**Grănd'i-ōse** (125), *a.* [Lat. *grandis*, grand; Fr. *grandiose*.]

1. Impressing or elevating in effect; imposing; striking; — used in a good sense.

The tone of the parts was to be perpetually kept down, in order not to impair the *grandiose* effect of the whole. *M. Arnold.*

2. Characterized by self-display; swell or bombast; flaunting; turgid; bombastic; — used in a bad sense; as, a *grandiose* style.

The *grandiose* red tulips, which grow wild. *E. B. Browning.*

**Grănd'i-ōs'i-ty**, *n.* [Fr. *grandiosité*.] Swell of style or manner; also, one who is grand, pompous, or bombastic.

**Grăn'di-noŭs**, *a.* [Lat. *grandinosus*, from *grando*, *grandinis*, hail; It. *grandinoso*.] Consisting of hail; abounding in hail. [*Obs.*]

**Grănd'i-ty**, *n.* [Lat. *granditas*, O. Fr. *grandité*, Pr. *granditat*. See GRAND.] Greatness; magnificence. [*Obs.*] *Camden.*

**Grănd'ly**, *adv.* In a grand or lofty manner; splendidly; sublimely.

**Grănd'mŏth'er** (-mŭth'er), *n.* The mother of one's father or mother.

**Grănd'nĕph'ew** (-nĕf'yu), *n.* The grandson of a brother or sister.

**Grănd'ness**, *n.* Grandeur; grandness with beauty; magnificence. *Wollaston.*

**Grănd'niēçe**, *n.* The granddaughter of a brother or sister.

---

**Grănd'-paunch**, *n.* A greedy fellow; a gourmand. [*Obs.*]

Our *grand-paunches* and riotous persons have devised for themselves a delicate kind of meat out of corn and grain. *Holland.*

**Grănd'sīre**, *n.* A grandfather; more generally, any ancestor.

**Grănd'sŏn** (-sŭn), *n.* The son of a son or daughter.

**Grāne**, *v.* & *n.* The same as GROAN. [*Obs.*]

**Grānge**, *n.* [Fr. *grange*, barn, Pr., Sp., & Pg. *granja*, barn, farm, L. Lat. *grangia*, *granea*, *granica*, from Lat. *granum*, Eng. *grain*.] A house for storing grain; a granary; a barn; hence, also, a farm, with its stables and other buildings.

We have the watry fowls a certain *grange* Wherein to rest. *Spenser.*

Nor burnt the *grange*, nor bussed the milking-maid. *Tennyson.*

**Grăn'ger**, *n.* A farm-steward or bailiff. *Holland.*

**Gra-nif'er-oŭs**, *a.* [Lat. *granifer*, from *granum*, grain, and *ferre*, to bear; Fr. *granifère*.] Bearing seeds like grain. *Humble.*

**Grăn'i-fôrm**, *a.* [Lat. *granum*, grain, and *forma*, form; Fr. *graniforme*.] Formed like grains of corn. *Loudon.*

**Grăn'īte** (grăn'it), *n.* [Fr. *granit*, It. *granito*, Sp. *granido*, from Lat. *granum*, grain, It. *granito*, grainy, grained, p. p. of *granire*, to make grainy.] (*Geol.*) A crystalline, unstratified rock, consisting of quartz, feldspar, and mica, and presenting usually a whitish, grayish, or flesh-red color. It differs from gneiss in not having the mica in planes, and therefore in being destitute of a schistose structure.

☞ Granite is one of the metamorphic rocks, like gneiss and mica schist. It is also regarded as a true igneous rock. *Dana.*

*Gneissoid granite*, granite in which the mica has traces of a regular arrangement. — *Graphic granite*, granite consisting of quartz and feldspar without mica, and having the particles of quartz so arranged in the feldspar as to appear, in a transverse section, like oriental characters. — *Porphyritic granite*, granite containing feldspar in distinct crystals. — *Syenitic granite*, granito containing hornblende as well as mica.

**Grăn'i-tel**, *n.* [It. *granitello* and *granitella*, diminutives of *granito*; Fr. *granitelle*. See *supra*.] (*Geol.*) A binary, granitic compound, containing two constituent parts, as quartz and feldspar, or quartz and shorl or hornblende. [*Obs.*] *Kirwan.*

**Gra-nĭt'ic**, } *a.* [Fr. *granitique*.]
**Gra-nĭt'ic-al**, }

1. Like granite in composition, color, &c.; having the nature of granite; as, *granitic* texture.

2. Consisting of granite; as, *granitic* mountains.

**Gra-nĭt'i-fi-eā'tion**, *n.* [Eng. *granite* and Lat. *facere*, to make.] The art or process of being formed into granite. *Humble.*

**Gra-nĭt'i-fôrm**, *a.* [Eng. *granite* and Lat. *forma*, form.] (*Geol.*) Resembling granite in structure or shape. *Humble.*

**Grăn'i-tīne**, *n.* [Fr. *granitin*. See GRANITE.] (*Geol.*) A rock containing three species of minerals, some of which differ from those which compose granite, as quartz, feldspar, and shorl. *Kirwan.*

**Grăn'i-toid**, *a.* [Fr. *granitoïde*, from *granit*, and Gr. εἶδος, form.] Resembling granite in granular appearance, even though not igneous; as, *granitoid* gneiss.

**Gra-nĭv'o-roŭs**, *a.* [Lat. *granum*, grain, and *vorare*, to eat greedily; Fr. *granivore*.] Eating grain; feeding or subsisting on seeds; as, *granivorous* birds. *Browne.*

**Grăn'nam**, } *n.* [For *grandam*.] A grandmother;
**Grăn'ny**, } a grandam. [*Low.*] *B. Jonson.*

**Grănt** (6), *v. t.* [*imp.* & *p. p.* GRANTED; *p. pr.* & *vb. n.* GRANTING.] [O. Eng. *graunt*, Norm. Fr. *graunter*, *granter*, O. Fr. *graanter*, *graaunter*, *granter*, *craanter*, *creanter*, *cranter*, to promise, yield, Lat. as if *credentare*, to make believe, from *credens*, p. pr. of *credere*, to believe.]

1. To give over; to make conveyance of; to give the possession or title of; — <mark>usually in answer to petition; to convey.</mark>

*Grant* me the place of this threshing-floor. *1 Chron.* xxi. 22.

2. To bestow or confer, with or without compensation, particularly in answer to prayer or request.

Wherefore did God *grant* me my request. *Milton.*

3. To admit as true when disputed or not satisfactorily proved; to yield belief to; to allow; to yield; to concede.

*Grant* that the Fates have firmed by their decree. *Dryden.*

*Syn.* — To give; confer; bestow; convey; transfer; admit; allow; concede. See GIVE.

**Grănt**, *n.* 1. The act of granting; a bestowing or conferring; concession; admission of something as true.

2. The thing granted or bestowed; a gift; a boon.

3. (*Law.*) <mark>A transfer of property by deed or writing; especially, an appropriation or conveyance made by the government; as, a *grant* of land.</mark>

☞ <mark>Formerly, in English law, the term was specifically applied to transfers of incorporeal hereditaments, expectant estates, and letters-patent from government;</mark> and such is its present application in some of the United <mark>States.</mark> But now, in England, the usual mode of transferring realty is by *grant*; and so, in some of the States, the term *grant* is applied to conveyances of every kind of real property. *Bouvier. Burrill.*

**Grănt'a-ble**, *a.* Capable of being granted or conveyed.

**Grănt-ee'**, *n.* (*Law.*) The person to whom a grant or conveyance is made.

His grace will not survive the poor *grantee* he despises. *Burke.*

**Grănt'er**, *n.* One who grants.

**Grănt'or** (127), *n.* (*Law.*) The person by whom a grant or conveyance is made.

**Grăn'ū-lar**, } *a.* [Fr. *granulaire*. See GRAN-
**Grăn'ū-la-ry**, } ULE.] Consisting of, or resembling, grains; as, a *granular* substance; a stone of *granular* appearance.

**Grăn'ū-lar-ly**, *adv.* In a granular form.

**Grăn'ū-lāte**, *v. t.* [*imp.* & *p. p.* GRANULATED; *p. pr.* & *vb. n.* GRANULATING.] [Fr. *granuler*. See GRANULE.]

1. To form into grains or small masses; as, to *granulate* powder or sugar.

2. To raise in small asperities; to make rough on the surface. *Ray.*

**Grăn'ū-lāte**, *v. i.* To collect or be formed into grains; as, cane juice *granulates* into sugar.

**Grăn'ū-late**, } *a.* 1. Consisting of, or resem-
**Grăn'ū-lā'ted**, } bling, grains.

2. Having numerous small elevations, as shagreen. *Brande.*

**Grăn'ū-lā'tion**, *n.* [Fr. *granulation.*] The act of forming into grains; as, the *granulation* of powder and sugar. *Ure.*

*Suppurative granulation.* (*Physiol.*) (a.) The development of cells from the effusion of a raw surface which forms small grain-like protuberances and pustules. It serves to fill up the cavity and unite the sides. (b.) The act or process of such development. *Tully.*

**Grăn'ūle**, *n.* [Fr. *granule*, Sp. *granulo*, *granillo*, It. *granello*, diminutive of Lat. *granum*, grain, q. v.] A little grain; a small particle.

**Grăn'ū-lif'er-oŭs**, *a.* [Eng. *granule* and Lat. *ferre*, to bear.] Full of granulations.

**Gra-nŭl'i-fôrm**, *a.* [Eng. *granule* and Lat. *forma*, form.] (*Min.*) Having an irregular granular structure.

**Grăn'ū-līte**, *n.* [Eng. *granule* and Gr. λίθος, stone.] (*Geol.*) A whitish, granular rock, consisting of feldspar and quartz intimately mixed; — it is sometimes called *white-stone*, *leptynite*, and *eurite*.

**Grăn'ū-loŭs**, *a.* [Fr. *granuleux*, Pr. *granulos*, Sp. *granuloso*, *granilloso*, It. *granelloso*.] Full of grains; abounding with granular substances.

**Grāpe**, *n.* [Fr. *grappe*, O. & Prov. Fr. *crape*, It. *grappa*, *grappolo*, D. *grappe*, *krappe*, allied to It. *grappa*, Pr. & Sp. *grapa*, a cramp-iron, crotchet, a grapling, from O. H. Ger. *krapfo*, hook. Cf. W. *grab*, cluster, grape, *crap*, grapple.]



1. The fruit of the vine; but commonly a single berry of the vine.

2. (*Man.*) A mangy tumor on the legs of a horse.

3. (*Mil.*) Grape-shot.

Grapes, Leaves, and Tendrils.

*Grape of a cannon*, the cascabel or knob at the butt.

**Grāpe'-hy'a-çĭnth**, *n.* (*Bot.*) A plant found on sandy soils in England; the *Muscari racemosum*.

**Grāpe'less**, *a.* Wanting in grapes, or in the strength and flavor of the grape. *Jenyns.*

**Grāp'er-y**, *n.* A building or inclosure used for the cultivation of grapes.

**Grāpe'-shŏt**, *n.* (*Mil.*) A certain number of iron balls, usually nine, put together by means of cast iron circular plates at top and bottom, with two rings, and a central connecting pin and nut. Formerly the balls were placed in tiers around an iron pin, attached to a bottom plate, and inclosed in a canvas bag. *Roberts.*

**Grāpe'-stōne**, *n.* The stone or seed of the grape.

**Grāpe'-sug'ar**, *n.* See GLUCOSE.

**Grāpe'-vīne**, *n.* (*Bot.*) A vine or climbing shrub, having small green flowers and lobed leaves, and bearing a fruit called *grapes*, growing in clusters.

Grape-shot.

☞ The common grape-vine is *Vitis vinifera*, and is a native of Central Asia. Another variety is that yielding a small seedless grape commonly called *Zante currants*. The northern *Fox-grape* is the *V. Labrusca*, from which, by cultivation, has come the *Isabella* variety. The southern *Fox-grape*, or *Muscadine*, is the *V. vulpinus*. The *Frost-grape* is *V. cordifolia*, which has very fragrant flowers, and ripens after the early frosts; whence the name.

---

# TAB 15

This is the unrevised text of the entry as published in the Second Edition of the OED (1989). It may contain unrevised text that was originally published much earlier.

View current version of this entry

# aid, *n.*

(eɪd) Forms: 5 **eide**, 5–7 **aide**, **ayde**, 6–7 **ayd**, 7– **aid**. [a. OFr. *aïde*, *ayde*, earlier *aiude*, Strasb. oaths *aiudha*, *adiudha* (cf. Pr. *ajudha*, *ajuda*, Sp. *ayuda*):—late L. *adjūta*, n. f. pa. pple. fem. of *adiuvāre* (see prec.) analogous to ns. in *-ée*, *-āta*; see -ADE.]

**1. a.** Help, assistance, support, succour, relief.

> **1475** *Bk. Noblesse* 4 Be the eide of tho thre noble prynces. **1475** CAXTON *Jason* 18b, If the goddes be in myn ayde. **1559** *Myrroure for Mag., Rich II*, vi. 1 Neyther lakt I ayde in any wicked dede. **1607** SHAKES. *Cor.* i. vii. 3 If I do send, dispatch Those Centuries to our ayd. **1667** MILTON *P.L.* vi. 119 His puissance, trusting in the Almighty's aid, I mean to try. **1771** BURKE in *Corr.* (1844) I. 262 You have not called in the aid of fancy. **1807** CRABBE *Par. Reg.* ii. 130 Friend of distress! the mourner feels thy aid. **1868** GEO. ELIOT *F. Holt* 22 She had never dressed herself without aid.

**b.** *in aid of*, in support of (a cause or charity). Hence, *fig.* and *colloq.* (presumably having its origin in the freq. use of the phr. in appealing for the public support of a cause), about, concerned with; esp. in phr., often disparaging, *what's this (*or *that) in aid of?*, what is the meaning or purpose of this?, what is this all about?

> **1837** *Playbill* in M. Morley *Old Marylebone Theatre* (1960) 20 A Benefit will take place in Aid of the Funds of the New Alms Houses. **1860** S. S. HENNELL (*title*) Thoughts in aid of faith. **1881** W. S. GILBERT *Patience* i. 19 In aid—in aid of a deserving charity, I've put myself up to be raffled for! **1915** *Times* 22 Oct. 11/3 Queen Alexandra..was present at the Empire Theatre *matinée* in Aid of the British Red Cross Society. **1918** *Punch* 20 Nov. 332 (*caption*) Oh Mother,..they've given us a whole holiday to-day in aid of the war. *a***1935** T. E. LAWRENCE *Mint* (1936) 127 The hut lights were on and he had brought me a tin of tea and a hot sausage roll. 'Scram up!' he called… 'What's all this in aid of?' I asked, stupidly. **1935** MARSH & JELLETT *Nursing-Home Murder* xv. 231 'That's your disillusioned expression, Fox,' said Alleyn. 'What's it in aid of?' **1942** 'BLAKE' *We Rendezvous at Ten* ii. 41 The Group Captain called down the table to Roger: 'Find out what that's in aid of, Roger, will you?' **1949** E. BOWEN *Heat of Day* xvii. 315 What you *were* in aid of..often was a mystery to me. **1956** 'M. INNES' *Old Hall, New Hall* viii. 70 He couldn't quite make out what Olivia's questions and speculations were in aid of.

**2. a.** *Eng. Law*. Help or assistance in defending an action, legally claimed by the defendant from some one who has a joint-interest in the defence. *to pray in aid*: to claim such assistance. *aid-prayer*, the appeal therefor.

> **1625** SIR H. FINCH *Law* (1636) 367 Ayd Prayer is for Tenant for life, to request him that hath the Inheritance, to helpe him plead..and this Ayd Prayer is for the feeblenesse of his estate. **1751** CHAMBERS *Cycl.* s.v., A city or corporation, holding a fee-farm of the king, may pray in Aid of him, if anything be demanded of them relating thereto. **1809** TOMLINS *Law Dict.* s.v., There is a prayer in aid of patrons, by parsons, vicars, etc… And also ervants having done anything lawfully in right of their masters, shall have aid of them.

**b.** *to call* or *crave in aid*, properly a legal phrase, also in a loose transf. use.

> **1927** *Observer* 8 May 16/2 Imagination craves the wireless in aid. **1928** *Ibid.* 1 July 13/4 Many [bishops]..
> would call in aid, as justifying their action, the use of the *Jus Liturgicum* inherent in their office.

**3. a.** *concr.* Anything by which assistance is given in performing an operation; anything helpful, a means or
material source of help. *esp.* in *pl.* aids and appliances. *spec.* in *Horsemanship* (see quot. 1751).

> **1597** SHAKES. *2 Hen. IV*, i. iii. 24 Surmise Of Aydes incertaine should not be admitted. **1697** DRYDEN *Virg.*
> *Georg.* iv. 465 Whom, scarce my Sheep, and scarce my painful Plough, The needful Aids of Human Life allow.
> **1711** F. FULLER *Med. Gymn.* 58 Exercise may deserve to be taken as a common Aid to Physick. **1751**
> CHAMBERS *Cycl.*, *Aids*, in the manage, are helps, or assistances, by which the horseman contributes towards
> the motion or action required of the horse; by a discreet use of the bridle, caveson, spur, etc… Such a horse
> knows his *Aids*, answers his *Aids*, etc. **1824** COLERIDGE (*title*) Aids to Reflection. **1858** GLADSTONE *Homer* I.
> 23 He has furnished us with some aids towards the consideration of this question. **1953** G. BROOKE *Introd.*
> *Riding* i. 16 During the period that the novice is riding his first mount, he should learn the aids (correct and
> combined applications of his hands and legs).

**b.** Freq. with defining word, as *approach*, *artificial*, *hearing*, *homing*, *legal*, *radio-navigational*, *visual aid*: see these
words.

> **1924** *Lancet* 31 May 1140/2 A new acoustic aid for the deaf. **1955** *Oxf. Jun. Encycl.* XI. 128/2 Hearing may be
> greatly improved by the use of..electrical aids which amplify sounds.

**c.** *spec.* Material help given by one country to another, esp. economic assistance or material help given by a rich
to a poor or underdeveloped country. Also *attrib.* and *Comb.* Cf. MARSHALL.

> **1940** *Economist* 5 Oct. 421/1 The United States' aid to Britain would be rendered ineffective. **1946** *Ann. Reg.*
> *1945* 100 The difficulties of procuring American aid for Britain on acceptable terms. **1951** *Ann. Reg. 1950* 337
> The U.S. aid conventions with the Associated States [of Indo-China]. **1958** *Spectator* 17 Jan. 65/3 Congress
> would like to buy missiles with foreign-aid money. **1964** *Listener* 16 Apr. 614/1 Since the Soviet Union and..
> China have joined in the game of competitive aid-giving the Western Powers, it is argued, cannot afford to
> drop out. **1968** M. PYKE *Food & Society* xi. 165 Considerable thought has been given to the effectiveness of
> aid as a means of achieving the economic development and hence, presumably, the improved nutritional
> status, of poor countries. **1970** *Theol. Stud.* XXXI. 261 Such aid can also salve the conscience of Christians in
> the countries that control the world economy. **1974** M. B. BROWN *Econ. of Imperialism* iv. 95 The
> underdeveloped countries complain also of the overpricing of goods and shipping in their manufactured
> imports from developed lands, particularly in the case of aid-supported supplies. **1981** *Nat. Westminster Bank*
> *Q. Rev.* Aug. 36 Aid, or official development assistance (ODA).

**d.** As the second element in the names of events, etc., organized to raise money for particular charitable causes
(see quots.), as *Band Aid*, *Live Aid*, etc.
Based on *Band Aid*, the name of the rock music group formed by Bob Geldof in Oct. 1984 to raise money for famine-relief in Ethiopia.

> **1984** *Times* 12 Dec. 3/2 *Do They Know It's Christmas*, [a record] on which Boy George, Sting, George
> Michael, members of Duran Duran, Status Quo, and U2 appear under the joint name of Band Aid. **1985** *Music*
> *Week* 2 Feb. 2/3 Britain has been the source of musically-based political commentary—from the mostly British

composition of Band Aid to Frankie Goes to Hollywood. **1985** *Times* 11 July 32/1 The failure of Live Aid to penetrate the poorer countries is unlikely to affect adversely the amount of money it makes. *Ibid.* 5 Nov. 13/1 The fashion world is smouldering with gossip about Fashion Aid, which takes off like a rocket at the Albert Hall tonight. **1985** *Sunday Tel.* (Colour Suppl.) 29 Dec. 5/2 Other events such as Visual Aid, the sale of limited edition prints at auction, and School Aid, in which..school-children are to be asked to contribute pocket money for famine relief. **1986** *Daily Tel.* 24 Sept. 5/2 Top performers due to appear in 'Classic Aid' to raise money for refugee relief will include Vladimir Ashkenazy, [etc.].

**4.** *Eng. Hist.* A pecuniary grant in aid; a grant of a subsidy or tax to the king for an extraordinary purpose. *Later*, an exchequer loan.

*c***1460** Fortescue *Abs. & Lim Mon.* (1714) 52 For the expensis wherof, he schal not so sodenly have Ayde of his People. **1523** Ld. Berners *Froissart* I. ccclxxxvii. 663 The kyng and his counsayle wolde generally reyse vp throughe all Fraunce ayedes, fowages, tayles and subsydes. **1669** Marvell *Corr.* 130 Wks. 1875 II. 294 The House did..vote an aid to his Majesty not exceeding the summe of 400,000*l.* **1702** *Lond. Gaz.* mmmdcccix/8 Dropt..a Talley on the Fourth 4*s.* Aid of 1000*l.* No. 2058. **1862** Ld. Brougham *Brit. Const.* xii. 166 For the granting of an aid or supply to the crown.

**5.** *Feudal System.* A pecuniary contribution by a feudal vassal to his lord; limited by *Magna Carta* to three special occasions.

**1590** Swinburn *Testaments* 72 The lordes lost their..aids, 'Pur faire fitz chiualer & pur file marier.' **1649** Selden *Laws of Eng.* i. lxii. (1739) 125 The aids were of three kinds, one to make the Lord's eldest Son Knight, the other to marry his eldest Daughter; the third to help him to pay a relief to his Lord Paramount. **1753** Chambers *Cycl. Supp.* s.v., The bishops also received aids, *auxilia episcopi.* **1768** Blackstone *Comm.* II. 63 Aids were originally mere benevolences granted by the tenant to his lord, in times of difficulty and distress. **1868** Chambers *Encycl.* I. 92 These Aids were abolished by 12 Car. II. c. 24.

**6.** *French Hist.* (*pl.*) Customs-dues. *Court of Aids*, the Court that supervised the customs-dues.

**1714** *Fr. Bk. Rates* 29 Mr. John Rouvelin, Farmer-General of our Aids. **1753** Chambers *Cycl. Supp.*, *Aids*, in French laws, denote a duty paid on all goods sold and transported either out of, or into the kingdom. **1792** A. Young *Trav. France* 20 The house of the first president of the court of aids.

**7. a.** A person who renders help or assistance; a helper, an assistant; *pl.* auxiliaries. (Cf. Fr. *aide*, L. *auxilium*, and Eng. *help*, all applied to persons.)

**1569** *Epitaph on Bonner* in *Harl. Misc.* I. 615 His ayds took always pain To keep their god, their hope, their trust. **1587** Holinshed *Chron.* I. 37/2 He had no legionarie souldiers, but certeine bands of aids. **1611** Bible *Tobit* viii. 6 It is not good that man should bee alone, let vs make vnto him an aide like to himselfe [cf. Wyclif *Gen.* ii. 18 An help lijk to him self]. **1738** Wesley *Ps.* cxxi. 1 The Lord that built the Earth and Skies Is my perpetual Aid. **1838** Arnold *Rome* I. 397 He was at the head of a mighty army; for the Latins and the Hernicans had brought their aids.

*S.* = aide. See also aid-de-camp.

**1780** S. Holten in *Essex Inst. Coll.* (1920) LVI. 94 One of General Lincoln's aids is arrived with the accounts of the surrender of Charlestown. **1832** J. P. Kennedy *Swallow Barn* I. xix. 190 Ned and myself formed part of his retinue, like a pair of aids somewhat behind the commander-in-chief. **1907** *Chicago Tribune* 8 May 2 Gen. A. W. Greely..arrived with his..aids.

**8.** *Comb.* and *attrib.*, chiefly in sense 7, as *aid-band*, *aid-cohort*, *aid-force*, *aid-soldier*; or in sense 5, as *aid-money*: (all *obs.*). Also **aid-major** *obs.* an adjutant; **aid-post**, a post at which wounded soldiers receive first medical attention; **aid-prayer** in *Law*: see 2.

**1600** Holland *Livy* xxx. xxxiii. 763c, Then he embattailed the aid souldiers [*auxilia*] of the Ligurians. **1603** Greenwey *Tacitus Ann.* xii. viii. (1622) 166 They intercepted two ayde-bandes. **1610** Holland *Camden's Brit.* ii. 65 A small powre of Aid-forces. **1635** Bacon *Use of Com. Law* 32 Ayde money to make the Kings eldest son a knight, or to marry his eldest daughter. **1670** Cotton *Espernon* iii. xii. 632 The Office of Aide Major to the Regiment of Guards. **1691** *Lond. Gaz.* mmdcc/2 *L'Assurance* Aid-Major killed. **1916** 'Boyd Cable' *Action Front* 49 To walk..to the nearest aid-post and hospital. *a***1917** E. A. Mackintosh *War, the Liberator* (1918) 149 The Aid Post was like a shambles with blood and wounded men.

About OED

How to use the OED

Historical Thesaurus

Purchasing

Editorial policy

Help with access

Updates

World Englishes

Institutional account management

Contribute

Accessibility

Oxford University Press

Contact us

Oxford Languages

Upcoming events

Oxford Academic

Case studies

Oxford Dictionary of National Biography

Media enquiries

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide*

Cookie policy    Privacy policy    Legal notice

Copyright © 2025 Oxford University Press



# TAB 16

A

# DICTIONARY OF LAW

CONTAINING

DEFINITIONS OF THE TERMS AND PHRASES OF AMER-
ICAN AND ENGLISH JURISPRUDENCE,
ANCIENT AND MODERN

INCLUDING

THE PRINCIPAL TERMS OF INTERNATIONAL, CONSTITUTIONAL, AND COM-
MERCIAL LAW; WITH A COLLECTION OF LEGAL MAXIMS AND
NUMEROUS SELECT TITLES FROM THE CIVIL LAW
AND OTHER FOREIGN SYSTEMS

---

BY HENRY CAMPBELL BLACK, M. A.

Author of Treatises on "JUDGMENTS," "TAX-TITLES," "CONSTITUTIONAL PROHIBITIONS," etc.

---

ST. PAUL, MINN.
WEST PUBLISHING CO.
1891

RELICTION. An increase of the land by the sudden withdrawal or retrocession of the sea or a river.

RELIEF. 1. In feudal law. A sum payable by the new tenant, the duty being incident to every feudal tenure, by way of fine or composition with the lord for taking up the estate which was lapsed or fallen in by the death of the last tenant. At one time the amount was arbitrary, but afterwards the relief of a knight's fee became fixed at one hundred shillings. 2 Bl. Comm. 65.

2. "Relief" also means deliverance from oppression, wrong, or injustice. In this sense it is used as a general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court, particularly in equity. It may be thus used of such remedies as specific performance, or the reformation or rescission of a contract; but it does not seem appropriate to the awarding of money damages.

3. The assistance or support, pecuniary or otherwise, granted to indigent persons by the proper administrators of the poor-laws, is also called "relief."

RELIEVE. In feudal law, relieve is to depend; thus, the seigniory of a tenant *in capite* relieves of the crown, meaning that the tenant holds of the crown. The term is not common in English writers. Sweet.

RELIGION, OFFENSES AGAINST. In English law. They are thus enumerated by Blackstone: (1) Apostasy; (2) heresy; (3) reviling the ordinances of the church; (4) blasphemy; (5) profane swearing; (6) conjuration or witchcraft; (7) religious imposture; (8) simony; (9) profanation of the Lord's day; (10) drunkenness; (11) lewdness. 4 Bl. Comm. 43.

RELIGIOUS. When religious books or reading are spoken of, those which tend to promote the religion taught by the Christian dispensation must be considered as referred to, unless the meaning is so limited by associated words or circumstances as to show that the speaker or writer had reference to some other mode of worship. 72 Me. 500.

RELIGIOUS HOUSES. Places set apart for pious uses; such as monasteries, churches, hospitals, and all other places where charity was extended to the relief of the poor and orphans, or for the use or exercise of religion.

RELIGIOUS IMPOSTORS. In English law. Those who falsely pretend an extraordinary commission from heaven, or terrify and abuse the people with false denunciations of judgment; punishable with fine, imprisonment, and infamous corporal punishment. 4 Broom & H. Comm. 71.

RELIGIOUS MEN. Such as entered into some monastery or convent. In old English deeds, the vendee was often restrained from aliening to "Jews or religious men" lest the lands should fall into mortmain. Religious men were civilly dead. Blount.

RELIGIOUS SOCIETY. A body of persons associated together for the purpose of maintaining religious worship. A church and society are often united in maintaining worship, and in such cases the society commonly owns the property, and makes the pecuniary contract with the minister. But, in many instances, societies exist without a church, and churches without a society. 16 Gray, 330; 9 Cush. 188.

RELIGIOUS USE. See Charitable Uses.

RELINQUISHMENT. In practice. A forsaking, abandoning, renouncing, or giving over a right.

RELIQUA. The remainder or debt which a person finds himself debtor in upon the balancing or liquidation of an account. Hence *reliquary*, the debtor of a *reliqua;* as also a person who only pays piece-meal. Enc. Lond.

RELIQUES. Remains; such as the bones, etc., of saints, preserved with great veneration as sacred memorials. They have been forbidden to be used or brought into England. St. 3 Jac. I. c. 26.

RELOCATIO. In the civil law. A renewal of a lease on its determination. It may be either express or tacit; the latter is when the tenant holds over with the knowledge and without objection of the landlord. Mackeld. Rom. Law, § 412.

RELOCATION. In Scotch law. A re-letting or renewal of a lease; a *tacit relocation* is permitting a tenant to hold over without any new agreement.

REMAINDER. The remnant of an estate in land, depending upon a particular prior estate created at the same time and by the same instrument, and limited to arise immediately on the determination of that estate, and not in abridgment of it. 4 Kent, Comm. 197.

An estate limited to take effect and be enjoyed after another estate is determined. As, if a man

# TAB 17

# THE

# LAWS OF TEXAS

## 1822-1897

*Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Independence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the same by Texas; Constitution of the United States; Constitutions of the State of Texas, with all the Laws, General and Special, passed thereunder, including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress.*

COMPILED AND ARRANGED BY

## H. P. N. GAMMEL
OF AUSTIN.

WITH AN INTRODUCTION BY C. W. RAINES.

## VOLUME VIII.

40564

AUSTIN:
THE GAMMEL BOOK COMPANY.
1898

# CONTENTS.

|  | Page |
|---|---|
| Fourteenth Legislature, Regular Session, General Laws, 1874 | 1 |
| Fourteenth Legislature, Regular Session, Special Laws, 1874, | 265 |
| Fourteenth Legislature, Second Session, General Laws, 1875, | 371 |
| Fourteenth Legislature, Second Session, Special Laws, 1875, | 589 |
| Ordinances of the Constitutional Convention, 1875 | 751 |
| Constitution of the State of Texas, 1875 | 779 |
| Fifteenth Legislature, Regular Session, General Laws, 1876, | 835 |
| Fifteenth Legislature, Regular Session, Special Laws, 1876, | 1185 |
| Sixteenth Legislature, Regular Session, General Laws, 1879, | 1299 |

# GENERAL LAWS

OF

# THE STATE OF TEXAS

PASSED AT THE

SESSION OF THE FIFTEENTH LEGISLATURE

BEGUN AND HELD

AT THE CITY OF AUSTIN

APRIL 18TH, 1876

BY AUTHORITY.

GALVESTON
1876

failed to issue a patent to the parties making such payment, shall be refunded to such party or parties, upon application, as hereinafter provided.

Sec. 2. It shall be the duty of the Commissioner of the General Land Office, upon application to him, made by any party or parties claiming to have made payments under the said supplemental act of November 28, 1857, and failed to receive patents to the land for which such payment was made, to investigate such claim, and when it shall appear that such claim is just, and that the money paid into the office of Commissioner of the General Land Office has not been refunded to the party or parties making such payment, and that the State of Texas is therefore justly indebted to the party or parties making such payments, he, the Commissioner of the General Land Office, shall issue to the party making application, or his legal representatives, an official certificate, showing the amount of money so paid and date of payment.

Sec. 3. Upon presentation to the Comptroller of Public Accounts of such certificate from the Commissioner of the General Land Office, properly authenticated, it shall be his duty to draw his warrant upon the State Treasurer, in favor of the party holding such certificate, for the whole amount originally paid into the General Land Office, as shown by the certificate of the Commissioner thereof, with interest thereon at the rate of eight per cent. per annum from the date of the original payment into the Land Office to the date of the said warrant on the State Treasurer. The sum of two hundred dollars, or so much thereof as may be required, is hereby appropriated out of any money in the Treasury not otherwise appropriated, to carry out the provisions of this act.

Sec. 4. In order that immediate relief may be granted under the provisions of this act in cases of extreme destitution and want, this act shall take effect from and after its passage.

Approved July 19, 1876.

Takes effect from its passage.

---

CHAPTER LV.—An Act to organize Commissioners' Courts, and to define their jurisdiction and duties, and provide for vacancies therein.

Section 1. Be it enacted by the Legislature of the State of Texas, That there shall be organized in each county in this State an inferior court, to be styled " The Commissioners' Court," which shall be composed of the County Judge and four County Commissioners.

Sec. 2. The County Judge shall be the presiding officer of said court, and shall be elected at each general election held for State and county officers, and shall hold his office for two years, or until his successor shall be appointed or elected and qualified.

Sec. 3. In each Commissioner's precinct there shall be elected at each general election, one County Commissioner, who shall hold his office for two years, or until his successor is qualified.

Sec. 4. The said courts shall have power, and it shall be their duty: 1st. To lay off their respective counties into precincts, not less than four nor more than eight, for the election of Justices of the Peace and Constables, and shall fix the times and places of holding the various Justices' Courts in their counties, and to establish places in such precincts where elections shall be held. 2nd. To establish public ferries whenever the public interest may require. 3rd. To lay out and establish, change and discontinue public roads and highways. 4th. To

build bridges. 5th. To apportion hands and appoint road overseers. 6th. To exercise general control and superintend over all roads, ferries, highways and bridges in their counties. 7th. To provide court-houses, jails, and all necessary public buildings. 8th. To allow and settle all county accounts and direct their payment. 9th. To provide for the support of paupers, and such idiots and lunatics as cannot be admitted into the Lunatic Asylum, residents of their county, who are unable to support themselves. 10th. To provide for the burial of paupers. 11th. And said courts shall have and exercise such other powers and jurisdiction as is now or may be hereafter prescribed by the Constitution and laws of this State.

Sec. 5. The said courts shall have power to levy and collect a tax for county purposes, upon all subjects of taxation in their respective counties on which a tax may be levied by the State, but shall not levy more than one-half of the State tax in their respective counties for any one year for county purposes, except for the payment of debts already incurred, and for the erection and repair of public buildings, under such limitations and with such restrictions as may be prescribed by law and the Constitution of this State; provided, that no tax levied for the purpose of paying debts incurred prior to the eighteenth day of April, A. D. 1876, shall exceed two and a half mills on the dollar; and no tax levied for the erection of public buildings shall exceed two and a half mills on the dollar for any one year.

Sec. 6. That said courts shall examine and adjust the accounts and books of the County Treasurer, and shall, quarterly, make up and cause a detailed statement of receipts, expenditures and debts of their respective counties to be posted up in some conspicuous place in the office of the County Clerk; provided, that said court shall, at the end of each year, make out a statement for the year of the receipts, expenditures and debts of their respective counties, and cause the same to be published in some newspaper printed in the county, if there be one; and if not, then to be posted in said Clerk's office as aforesaid, and at three other public places in the county.

Sec. 7. Each Commissioners' Court of this State shall have a seal, whereon shall be engraved a star with five points, the words "Commissioners' Court, ——— county, Texas," (the blank to be filled with the name of the county), which seal shall be kept in the County Clerk's office, and shall be used in the authentication of all official acts of said court, or of the Clerk of said court, or of the presiding officer, in all cases where a seal may be necessary for the authentication of any of said acts.

Sec. 8. The several County Clerks of the respective counties of this State shall be ex-officio Clerks of the several Commissioners' Courts; and it shall be their duty to attend upon each term of the said courts; to preserve and keep in their possession all books, papers, records and effects belonging to said courts; to issue all notices, writs and process necessary for the proper execution of the powers and duties imposed upon such courts; and shall perform all such duties as may be prescribed by law; provided, that the duties herein provided for shall be performed by the District Clerks in those counties where no County Clerks have been elected, or where, by law, a single Clerk performs the duties of both District and County Clerk.

Sec. 9. Each County Commissioners' Court shall have full power and authority to issue all such notices, citations, writs and process as may

be necessary for the proper execution of the powers and duties imposed upon such courts, and to enforce its jurisdiction; and all notices, citations, writs and process issued by said courts shall be dated and signed by the Clerk, and when not otherwise directed by law, shall be executed at least five days before the return day thereof, which shall be specified in the same; provided, however, that subpoenas for witnesses, whenever necessary, may be executed and returned forthwith; and all such notices, citations and writs, other than subpoenas for witnesses, shall have the seal of such court impressed thereon, and may be directed to any lawful officer of the State, whose duty it shall be to execute and return the same.

Sec. 10. The Commissioners' Court shall have like power to punish contempts as the District and County Courts have, or may have, by law; provided, that said punishment shall be by fine or imprisonment, and in no case by fine exceeding twenty-five dollars, or by imprisonment beyond twenty-four hours; and in case of fine, the party to be held in custody until said fine be paid.

Sec. 11. The Commissioners' Court shall cause to be procured and kept in the Clerk's office suitable books, in which shall be recorded the proceedings of each term of the Court, which record shall be read over and signed by the County Judge, or the member of the Court presiding, at the end of each term, and attested by the Clerk. The Clerks shall also record all the proceedings of said Courts authorized to take place in the vacation between the terms; and such records so made in vacation shall be read over and signed on the first day of the proper court next after such proceeding took place.

Sec. 12. Any three members of the Commissioners' Court, including the County Judge, shall constitute a quorum; provided, however, that no county tax shall be levied unless at some one of the regular terms, and when a full court is present.

Sec. 13. The regular terms of the Commissioners' Courts shall commence and be held at the court-house of their respective counties of this State, on the second Monday in February, May, August and November in every year, and may continue in session one week. Special terms of said courts may be called by the County Judge, or any three of the Commissioners, and may continue in session until the business is disposed of; provided, that at the called session of said courts the said Commissioners shall not receive pay for more than four days' service; and provided, the members of said Commissioners' Courts shall not receive pay for more than one called session for any one month.

Sec. 14. The County Judges and County Commissioners shall each receive the sum of three dollars per day for every day that they may be necessarily engaged in attendance on any regular term of said court, and the same amount for any special term, except as prescribed in the preceding section, to be paid out of the county treasury, upon the order of said court.

Sec. 15. All books, records, papers and effects belonging to the State Police Courts of the different counties of this State shall be transferred to the Commissioners' Courts established by this act; and the said Commissioners' Courts shall have and exercise all the powers conferred by law on County Courts as heretofore existing, which are not herein enumerated, and which are not in conflict with the provisions of this act.

Sec. 16. Neither the County Judges nor any of the Commissioners shall enter upon the duties of their offices until they shall have first

taken the oath of office prescribed by the Constitution, and shall also take an oath that they will not be directly or indirectly interested in any contract with a claim against the county in which they reside, except such warrants as may issue to them as fees of office, before some officer authorized to administer oaths; which oaths, together with the certificate of the officer who administered the same, shall be filed and recorded in the County Clerk's office, in a book to be provided for that purpose.

Sec. 17. In all cases where by law it shall be the duty of the Commissioners' Court to approve the bond of any of the officers of their several counties, it shall be their duty, whenever they shall become satisfied that said bonds, from any cause, are insufficient, to require new bonds or additional security to be given, as the case may require; and said court shall cause the officer whose bond is complained of to be cited to appear at a term of their court, not less than five days after service of said citation; and if any citizen shall be dissatisfied with the action of the Court approving the bond of any officer, or if any citizen or officer shall be dissatisfied with the action of the Court in the matter of requiring a new bond or additional security, as herein provided, an appeal may be made from the decision of said Commissioners' Court to the District Judge of the county, whose decision shall be final; and when said appeal is taken by a citizen, written notice shall be served upon the officer interested within ten days after the order of the court on said bond.

Sec. 18. In cases of vacancy, other than County Judge, in any of said Commissioners' Courts, from any cause, it shall be the duty of the District Judge in which such county is situated, upon satisfactory information of such vacancy, to appoint some suitable person living in the precinct where such vacancy occurs, to serve as Commissioner for said precinct until the next general election.

Sec. 19. As public policy demands immediate organization of Commissioners' Courts in this State, and as these courts have now no rules of law defining their duties and powers; therefore, an imperative public necessity exists for the immediate passage of this act, and the same shall take effect and be in force from and after its passage.

Sec. 20. That whenever a vacancy occurs in any Justice's precinct for Justice of the Peace or Constable, or when it becomes necessary to create a new precinct, in either case it shall be the duty of the County Commissioners' Court to fill the same by appointment until the next general election.

Sec. 21. In case there is a regular established public hospital in the county, it shall be the duty of the County Commissioners to provide for the indigent sick in their county by sending such sick persons to a hospital; and when more than one public hospital exists in the county, indigent patients shall have the right to enter any such institution which such indigent patient may select.

Sec. 22. That all laws and parts of laws in conflict with this act be and the same are hereby repealed.

Approved July 22, 1876.

Takes effect from its passage.

# TAB 18

Newspapers.com
by ancestry

https://www.newspapers.com/image/68037324/

Brenham Weekly Banner (Brenham, Texas) · Fri, Jan 4, 1878 · Page 3
Downloaded on Jan 13, 2025

## Local Intelligence.

From Saturday's Daily.

THE rain of Thursday night and yesterday morning has made the streets a little sloppy.

IT HAS COME.—The norther that has been expected for a number of days, arrived yesterday about 5 o'clock in the afternoon.

THE BANNER acknowledges the receipt of an invitation to attend a Regalia Ball, given by Brazos Lodge No. 27. S. O. M., at Washington on Tuesday evening next.

PARTY.—There was a social gathering and conversation party at the residence of Mr. C. R. Breedlove on Thursday evening, which was finely enjoyed by all those present.

BOOMING.—The Brazos river is on another rise—being nearly even with its banks. Large quantities of drift wood is said to be passing down, rendering crossing by ferry boats extremely hazardous.

THIEVES.—Several well known thieves have been seen in town for a day or two past and officer Doran has kept a close watch on their movements, but thus far they have done no mischief. Our citizens should at all times keep a close watch for these gentry and not wait until robberies are committed before taking warning. The police have no right to arrest them unless detected in some rascality, as they generally have money and cannot be arrested under the vagrant law.

From Tuesday's Daily.

MR. T. DWYER has resumed work on his new store house, on St. Charles street.

DIED—On the evening of Dec. 19th, near Lampasas, Tex., MRS REBECCA TOM, wife of J. C. Tom, formerly of this city.

NATURAL LEAF.—Abe Meyer has just received a new supply of fine natural leaf. Lovers of the weed will stick a pin here.

TO DUTY.—Many of the cadets from the A. & M. College,

ed gentlemen have, however, stultified themselves. So far as we have been able to learn, public opinion is strongly in favor of the establishment of a poor farm. There are of course differences of opinion regarding its location. When the facts in the premises are fully developed, we think, it will be found that some other fellow or fellows have a place he or they are anxious to dispose of to the county at a good round price. The price agreed to have been paid for the Lewis farm, considering its proximity to town, was not exhorbitant. No action was taken by the court in regard to the future establishment of a county farm. Meanwhile the thirty-five or forty paupers will continue to draw their regular allowance from the county. The grand jury would do well to examine the pauper rolls and see that there and no "crooked paupers" drawing scrip.

From Wednesday's Daily.

BUT few people were in town

Jan 4 1878

Clipped By:
lhann923
Jan 13, 2025

Copyright © 2025 Newspapers.com. All Rights Reserved.

# TAB 19

Newspapers.com
by ancestry
https://www.newspapers.com/image/50858468/



# ATTENTION, PAUPERS!

The overseer of the poor farm having this day given notice that he is ready to receive and care for the county poor, therefore, in pursuance of an order of the Commissioners' Court of Dallas county, entered May 23, 1877, all allowances to the poor outside of the poor farm will cease from this date.

Witness my hand and seal of said court at my office in the city of Dallas, this 12th day of May, A. D. 1877.        A. HARWOOD,
                                County Clerk.

By R. D. RAWLINS, Deputy.        jun14d&w1t

Dallas June 15 1877

Clipped By:
lhann923
Jan 13, 2025

Copyright © 2025 Newspapers.com. All Rights Reserved.

# TAB 20

Newspapers.com by Ancestry

https://www.newspapers.com/image/358723279/

Austin American-Statesman (Austin, Texas) · Fri, Aug 16, 1878 · Page 3
Downloaded on Jan 13, 2025

# THE STATESMAN.

PUBLISHED BY
CARDWELL & MORRIS

FRIDAY.........AUGUST 16, 1878

### Texas—Facts and Fancies.

The colored voters of Victoria county will support Schleicher.

At Waelder there are two Greenback clubs composed entirely of negroes.

The congressional convention for the first district meet September 4 at Nacogdoches.

Mesquite, the place where Sam Bass and his gang figured, has adopted option by a small majority.

Let the example of Holly Springs be emulated. Make Austin pure and let it be an asylum for the diseased.

The congressional convention meets at Pittsburg on the twenty-first inst. Culberson will be nominated.

The "large" Greenback club said to have been lately organized at Hempstead does not number over twenty members.

Corpus Christi has quarantined against Indianola, simply as a measure of safety against the introduction of disease from New Orleans.

The Courier says that the Radical nominees of that county are frauds, and that they were fraudulently nominated by a fraudulent convention.

In Grimes county the canvass is being conducted strictly on color lines. The Democracy is white, and the Independent Greenbacks are colored.

The total value of property in Harris county per assessment rolls just completed is $9,867,030. The total value of town property, Houston included, is $4,883,628.

Waller county pays out $2100 a year for supporting paupers, and the Courier wants to see the county own a poor farm, where paupers may be made to support themselves.

# TAB 21

Newspapers.com
by ancestry

https://www.newspapers.com/image/68048610/

## Commissioners' Court.

At a regular term of this court begun on the 8th day of May 1882, present all the commissioners, the following proceedings were had:

Tom Phears was elected presiding officer.

The first day's session was devoted to road matters and the consideration of plans and specifications for a new courthouse.

The motion to determine the matter of building a new court house and to receive plans and specifications for same at this term of the court resulted in a tie vote. Phears and Winkleman voting no and Cain and Blunt aye.

Charles McClellan, being upwards of one hundred years old, was declared a pauper and allowed $7 per month from May 1st.

L. A. Wood, road overseer, authorized to buy 1200 feet of lumber.

Stephen Maxwell declared a pauper and ordered to poor farm.

The proposition of the commissioners of Fayette county to adjust the boundary lines between Fayette and Washington countsie was rejected, the boundary being considered as settled.

G. B. Cassells placed on pauper roll and allowed $7 per month from May 1st.

Brenham June 1 1882

Clipped By:
lhann923
Jan 13, 2025

Copyright © 2025 Newspapers.com. All Rights Reserved.

# TAB 22

Brenham Weekly Banner (Brenham, Texas) · Fri, Jul 12, 1878 · Page 2
Downloaded on Jan 13, 2025
https://www.newspapers.com/image/68038199/

THE Hempstead *Messenger* favors the establishment of a county poor farm for Waller county. It suggest that the question of a poor farm be made a plank in the platform of candidates for county commissioner Washington county needs a poor farm very much and the people should elect commissioners favorable to the establishment of such an institution. We are now paying about $3600 a year for the support of the fifty paupers on the rolls.

Benham July 12 1878

Clipped By:
lhann923
Jan 13, 2025

Copyright © 2025 Newspapers.com. All Rights Reserved.

# TAB 23



# Analyses of Proposed Constitutional Amendments and Referenda

Appearing on the November 3, 1987, Ballot



Texas Legislative Council
Information Report No. 87-2
September, 1987



# Analyses of Proposed Constitutional Amendments and Referenda

Appearing on the
November 3, 1987, Ballot

Prepared by the Staff
of the
Texas Legislative Council

— Information Report No. 87-2 • September 1987 —

# TEXAS LEGISLATIVE COUNCIL
## of the
## 70th LEGISLATURE OF TEXAS

Lieutenant Governor William P. Hobby, Chairman

Speaker Gibson D. (Gib) Lewis, Vice-Chairman

**SENATORS**

Roy Blake
Cyndi Krier
Bob Glasgow
Bob McFarland
Carl Parker

**REPRESENTATIVES**

Charles Evans
Al Granoff
James E. (Pete) Laney
Mike Millsap
Tony Polumbo
Randall Riley
Jim D. Rudd
Robert Saunders
Stan Schlueter
Ron Wilson

Robert I. Kelly, Executive Director

P.O. Box 12128, Capitol Station

Austin, Texas   78711

# AMENDMENT NO. 4

House Joint Resolution 5, proposing a constitutional amendment authorizing the legislature to provide assistance to encourage economic development in the state. (HOUSE AUTHOR: Ashley Smith; SENATE SPONSOR: Bob Glasgow)

The proposed amendment to Article III of the Texas Constitution adds Section 52-a, authorizing the legislature to provide for programs and the making of loans and grants of public money to aid economic development in the state.

The description of the proposed amendment that will appear on the ballot is as follows: "The constitutional amendment authorizing the legislature to provide assistance to encourage economic development in the state."

## BACKGROUND

The Texas Constitution has prohibited grants and loans of public money to individuals, associations of individuals, and municipal and other corporations since 1876. The prohibition was added as a response to abuses of public funds, principally by the legislature. Essentially, state money was being given away to railroads and other private businesses. The general prohibition on grants and loans of public money is contained in Article III, Section 51, of the Texas Constitution. Section 52(a) of that article, which applies only to local governments, repeats the prohibition.

Although Article III, Sections 51 and 52, appear to be outright prohibitions on any grant or loan of public money to a private entity, over the years they have come to be interpreted as prohibitions on grants or loans for other than public purposes. Bexar County v. Linden, 220 S.W. 761 (1920); Tex. Att'y Gen. Letter Advisory No. 9 (1973). However, it has also been held that a grant for the purpose of obtaining the general benefits resulting from the operation of a private industry is not for a public purpose. Op. Tex. Att'y Gen. No. H-357 (1974).

The Texas economy has recently been suffering hard times caused by, among other things, a drastic drop in the price of oil. Many businesses have failed and many people have lost their jobs. Proposals have been made to aid the state's economy and reduce unemployment by use of bond proceeds and other public funds to attract new businesses to the state and aid the development of existing businesses. Questions have arisen, however, concerning whether the proposed programs are prohibited by Article III, Sections 51 and 52. The proposed amendment would resolve those questions by making it clear that public funds could be used to make grants and loans to private businesses to aid economic development in the state, including development of agriculture.

14

## ARGUMENTS

FOR:

1. Recent problems in the state's economy have damaged many private enterprises that are beneficial to the state, causing unemployment and other hardships for the state's citizens and loss of revenue to the state. The proposed amendment would stimulate the state's economy, and the resulting development would increase tax revenue, reduce unemployment, and provide other benefits to the state far outweighing the state's cost.

2. The state's economy is too dependent on the oil industry. The proposed amendment would provide for the diversification of the state's economy and prevent the state from being too dependent on the fortunes of a single industry.

3. Many other states have developed programs of state assistance to private economic development and have benefitted from those programs. The Texas constitutional prohibition on that type of program has put Texas at a competitive disadvantage with those other states in attracting new businesses and clients for existing businesses.

AGAINST:

1. The fostering of private business is inherently a private matter. Public funds should not be used to support an enterprise having the purpose of providing a profit for private individuals. Quality businesses of the type the state needs are not the type that need handouts from the state.

2. The state is currently suffering massive shortages of public funds. What money the state has should be used to fund more essential government functions. The proposed amendment contemplates programs that are not essential government functions and that are of questionable benefit to the state, and thus are luxuries that the state cannot afford.

3. Abusive public giveaways of state funds to private businesses are the specific reason that the constitutional prohibition on gifts and grants to those businesses was originally adopted. There is no reason to assume that those abuses are less likely to occur now than they were when the prohibition was adopted in 1876. The proposed amendment does not provide adequate safeguards against those abuses.

# TAB 24

THE TEXAS CONSTITUTION

ARTICLE 1. BILL OF RIGHTS

Sec. 3.  EQUAL RIGHTS.  All freemen†, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

(Feb. 15, 1876.)
† The language of this provision is identical to the language of the official legislative measure that originally proposed the provision. A digital image of the original text of the official enrolled measure can be found here.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrea Mintzer on behalf of Jonathan Fombonne
Bar No. 24102702
andrea.mintzer@harriscountytx.gov
Envelope ID: 96225578
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellees
Status as of 1/15/2025 7:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Yetter Coleman | | efile@yettercoleman.com | 1/14/2025 6:14:55 PM | SENT |
| Christopher Garza | 24078543 | christopher.garza@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| Edward Swidriski | 24083929 | Edward.Swidriski@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| Jonathan Fombonne | 24102702 | jonathan.fombonne@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| Grant Martinez | | gmartinez@yettercoleman.com | 1/14/2025 6:14:55 PM | SENT |
| Christian Menefee | 24088049 | christian.menefee@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| Ryan Cooper | 24123649 | ryan.cooper@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| William Farrell | | biff.farrell@oag.texas.gov | 1/14/2025 6:14:55 PM | SENT |
| Andrea Mintzer | | Andrea.Mintzer@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| Eleanor Matheson | 24131490 | Eleanor.matheson@harriscountytx.gov | 1/14/2025 6:14:55 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 1/14/2025 6:14:55 PM | SENT |
| Lily Hann | | lhann@yettercoleman.com | 1/14/2025 6:14:55 PM | SENT |
| Marisa Mata | | mmata@yettercoleman.com | 1/14/2025 6:14:55 PM | SENT |